# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

KATIE WOOD,
*Plaintiff-Appellee,*

AV SCHWANDES, et al.
*Plaintiffs,*

v.

FLORIDA DEPARTMENT OF EDUCATION,
FLORIDA STATE BOARD OF EDUCATION,
COMMISSIONER OF EDUCATION,
EDUCATION PRACTICES COMMISSION,
MONESIA BROWN,
In their official capacity as member of
defendant education practices, et al.
*Defendants-Appellants,*

HILLSBOROUGH COUNTY SCHOOL BOARD, et al.
*Defendants.*

Appeal from the U.S. District Court for the
Northern District of Florida, No. 4:23-cv-526 (Walker, C.J.)

## BRIEF OF APPELLANTS

Bryan Weir
Daniel Shapiro
Daniel M. Vitagliano*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: (703) 243-9423
bryan@consovoymccarthy.com

*\* Supervised by principals of the firm
admitted to practice in VA*

*Counsel for Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Per Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Appellants certify that the following have an interest in the outcome of this appeal:

1.  Akerman LLP, *Counsel for Defendant*

2.  Altschuler Berzon LLP, *Counsel for Plaintiffs-Appellee*

3.  Ameerally, Aadil, *Defendant-Appellant*

4.  Baltzer, James, *Attorney for Plaintiffs-Appellee*

5.  Barr, Jared, *Defendant-Appellant*

6.  Boyd, Sam, *Attorney for Plaintiffs-Appellee*

7.  Brown, Monesia, *Defendant-Appellant*

8.  Butcher, Michael, *Defendant-Appellant*

9.  Byrd, Esther, *Defendant-Appellant*

10. Chriss, Simone, *Attorney for Plaintiffs-Appellee*

11. Christie, Grazie, *Defendant-Appellant*

12. Colon, Elayne, *Defendant-Appellant*

13. Commissioner of Education, *Defendant-Appellant*

14. Consovoy McCarthy PLLC, *Counsel for Defendants-Appellants*

15. Copenhaver, Ann, *Defendant-Appellant*

16.   Diaz Jr., Manny, *Florida Commissioner of Education*

17.   Doe, Jane, *Plaintiff*

18.   Education Practices Commission, *Defendant-Appellant*

19.   Finberg, James M., *Attorney for Plaintiffs-Appellee*

20.   Fleisher, Aaron S., *Attorney for Plaintiffs-Appellee*

21.   Florida Department of Education, *Defendant-Appellant*

22.   Florida Virtual School Board of Trustees, *Defendant*

23.   Fox, James D., *Attorney for Defendant*

24.   Garcia, Kelly, *Defendant-Appellant*

25.   Gibson, Benjamin, *Defendant-Appellant*

26.   Goodwin, Joseph, *Defendant-Appellant*

27.   Grosholz, Jeffrey J., *Attorney for Defendant*

28.   Henry, Benjamin, *Defendant-Appellant*

29.   Hillsborough County School Board, *Defendant*

30.   Holley, Timothy, *Defendant-Appellant*

31.   Holshouser, Eric J., *Attorney for Defendant*

32.   Innerst, Lisa, *Defendant-Appellant*

33.   Johnson, Jeffrey, *Defendant-Appellant*

34.   Jones, Colin, *Attorney for Plaintiffs-Appellee*

35. LaPee, Kenneth, *Defendant-Appellant*

36. Lee County School Board, *Defendant*

37. Lewis, Mason, *Defendant-Appellant*

38. Magar, Mary-Lynn, *Defendant-Appellant*

39. Makar, Mikala, *Attorney for Defendant*

40. Margolin, Jason L., *Attorney for Defendant*

41. Marsey, J. David, *Attorney for Defendant*

42. McCoy, Scott D., *Attorney for Plaintiffs-Appellee*

43. Monfared, Neema M., *Attorney for Defendant*

44. Murphy, Sallie, *Defendant-Appellant*

45. Petty, Ryan, *Defendant-Appellant*

46. Plaza, Christine, *Defendant-Appellant*

47. Raben, Carli, *Attorney for Plaintiffs-Appellee*

48. Roetzel & Andress PA, *Counsel for Defendant*

49. Rogers Towers PA, *Counsel for Defendant*

50. Rosenthal, Jonathan, *Attorney for Plaintiffs-Appellee*

51. Rowe, Kevin, *Defendant-Appellant*

52. Rumberger Kirk & Caldwell PA, *Counsel for Defendant*

53. Schwandes, AV, *Plaintiff*

54.   Shapiro, Daniel, *Attorney for Defendants-Appellants*

55.   Shaw, Charles, *Defendant-Appellant*

56.   Siegel, Jodi, *Attorney for Plaintiffs-Appellee*

57.   Sloan, Orenthya, *Defendant-Appellant*

58.   Snyder, Marc, *Defendant-Appellant*

59.   Soto, Diego, *Attorney for Plaintiffs-Appellee*

60.   State Board of Education, *Defendant-Appellant*

61.   Stone, Jessica, *Attorney for Plaintiffs-Appellee*

62.   Southern Poverty Law Center, *Counsel for Plaintiffs-Appellee*

63.   Thomas, Malcolm, *Defendant-Appellant*

64.   Tompkins, Jordan, *Defendant-Appellant*

65.   Vitagliano, Daniel M., *Attorney for Defendants-Appellants*

66.   Walker, Hon. Mark E., *United States District Judge (N.D. Fla.)*

67.   Weir, Bryan, *Attorney for Defendants-Appellants*

68.   Wilks, Kathy, *Defendant-Appellant*

69.   Wood, Katie, *Plaintiff-Appellee*

Appellants are government officials or entities of the State of Florida, and Appellee is an individual. No publicly traded company or corporation has an interest in the outcome of this case or appeal. Per Circuit Rule 26.1-2(c), Appellants certify that this CIP is complete.

Dated: June 3, 2024                                   /s/ *Bryan Weir*
                                                      *Counsel for*
                                                      *Defendants-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

On May 31, 2024, this Court granted Appellants' consent motion to expedite this appeal and directed "the Clerk to place this appeal on the oral argument calendar for September 16, 2024, in Birmingham, Alabama." Dkt. 22.

This case raises important questions about state and local governments' power to regulate the speech of public school employees to students under the First Amendment. This Court's decision may have broad implications for how governments ensure educational policies aren't undermined by public school employees. In addition, the district court preliminarily enjoined a Florida law's operation, which imposes irreparable harm on the State by preventing it from effectuating a statute enacted by representatives of its people. Because of the weighty issues this appeal raises, the Court will likely benefit from oral argument.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ...................................... C-1

STATEMENT REGARDING ORAL ARGUMENT.................................. i

TABLE OF CONTENTS ............................................................. ii

TABLE OF CITATIONS ........................................................... iv

INTRODUCTION ...................................................................... 1

JURISDICTIONAL STATEMENT ............................................... 3

STATEMENT OF THE ISSUES ................................................. 3

STATEMENT OF THE CASE ...................................................... 4

    I.    The State of Florida enacts comprehensive legislation
        on K-12 education.......................................................... 4

    II.   Wood challenges Subsection 3. ................................... 11

STANDARD OF REVIEW ....................................................... 13

SUMMARY OF ARGUMENT.................................................... 14

ARGUMENT.......................................................................... 18

    I.    Wood has not demonstrated a likelihood of success
        under the First Amendment..................................... 18

        A.   Wood's desired speech is as a public employee
            pursuant to official duties, not as a private citizen. ..... 19

        B.   Wood's speech is not on a matter of public concern....... 34

        C.   The State's interests outweigh Wood's.......................... 44

II. Wood's delay in seeking preliminary injunctive relief undermines any suggestion of irreparable harm. .................. 54

CONCLUSION ............................................. 60

CERTIFICATE OF COMPLIANCE ....................................... 61

CERTIFICATE OF SERVICE ............................................... 61

# TABLE OF CITATIONS

**Cases**

*Abdur-Rahman v. Walker,*
    567 F.3d 1278 (11th Cir. 2009)................................. 21, 26, 33

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
    57 F.4th 791 (11th Cir. 2022) ........................................ 2, 46

*\*Alves v. Bd. of Regents of the Univ. Sys. of Ga.,*
    804 F.3d 1149 (11th Cir. 2015)................................... 14, 16, 18-21, 23,
                                                    26-27, 34, 36-38, 40-41

*Ambach v. Norwick,*
    441 U.S. 68 (1979)......................................................... 23, 47

*Baldwin v. Express Oil Change, LLC,*
    87 F.4th 1292 (11th Cir. 2023) ........................................... 60

*Bannon v. Sch. Dist. of Palm Beach Cnty.,*
    387 F.3d 1208 (11th Cir. 2004).......................................... 29

*Bd. of Curators of the Univ. of Mo. v. Horowitz,*
    435 U.S. 78 (1978)............................................................. 23

*Benisek v. Lamone,*
    585 U.S. 155 (2018)........................................................... 54

*Bethel School Dist. No. 403 v. Fraser,*
    478 U.S. 675 (1986)....................................................... 1, 50

*Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod*
    *Bethune Nat'l Alumni Ass'n, Inc.,*
    2023 WL 3704912 (11th Cir. May 30, 2023)...................... 55

*Bishop v. Aronov,*
    926 F.2d 1066 (11th Cir. 1991)............................... 22, 27, 47

iv

*Blanchette v. Conn. Gen. Ins. Corps.*,
   419 U.S. 102 (1974) ............................................................ 58

*\*Boyce v. Andrew*,
   510 F.3d 1333 (11th Cir. 2007) .................................. 35, 37, 39-40, 50

*Busch v. Marple Newtown Sch. Dist.*,
   567 F.3d 89 (3d Cir. 2009) ................................................ 37

*Bushong v. Del. City Sch. Dist.*,
   2020 WL 419754 (S.D. Ohio Jan. 27, 2020) ......................... 25

*Citizens Concerned About Our Child. v. Sch. Bd. of Broward Cnty.*,
   193 F.3d 1285 (11th Cir. 1999) ......................................... 55

*Clay v. Greendale Sch. Dist.*,
   602 F. Supp. 3d 1110 (E.D. Wis. 2022) .............................. 25

*Connick v. Myers*,
   461 U.S. 138 (1983) ......................................................... 45

*Does 1-6 v. Mills*,
   16 F.4th 20 (1st Cir. 2021) ............................................... 56

*Edwards v. Cal. Univ. of Pa.*,
   156 F.3d 488 (3d Cir. 1998) ............................................. 22

*Evans-Marshall v. Bd. of Educ. of the Tipp City
Exempted Vill. Sch. Dist.*,
   624 F.3d 332 (6th Cir. 2010) ........................................ 22, 51

*Fernandez v. Sch. Bd. of Miami-Dade Cnty.*,
   898 F.3d 1324 (11th Cir. 2018) ..................................... 18, 20

*Ferrara v. Mills*,
   781 F.2d 1508 (11th Cir. 1986) ......................................... 41

*Florida v. United States*,
   2023 WL 3813774 (11th Cir. June 5, 2023) ......................... 55

*Garcetti v. Ceballos,
547 U.S. 410 (2006)..................................1, 13-14, 18-19, 44, 47, 49, 53

Gonzalez v. Governor of Ga.,
978 F.3d 1266 (11th Cir. 2020)......................................... 14

Green v. Finkelstein,
73 F.4th 1258 (11th Cir. 2023) ............................... 39, 42, 51

Harrell v. Fla. Bar,
608 F.3d 1241 (11th Cir. 2010)......................................... 59

Hazelwood Sch. Dist. v. Kuhlmeier,
484 U.S. 260 (1988).............................................. 1

Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,
585 U.S. 878 (2018)................................................ 54

Johnson v. Poway Unified Sch. Dist.,
658 F.3d 954 (9th Cir. 2011)............................................. 23

Kennedy v. Bremerton Sch. Dist.,
597 U.S. 507 (2022)................................................31-33

King v. Bd. of Cnty. Comm'rs,
916 F.3d 1339 (11th Cir. 2019)..................................... 36, 38

*Kluge v. Brownsburg Cmty. Sch. Corp.,
432 F. Supp. 3d 823 (S.D. Ind. 2020) ..................... 24, 38, 44

Lee v. York Cnty. Sch. Div.,
484 F.3d 687 (4th Cir. 2007)............................................. 28

M.A.L. ex rel. M.L. v. Kinsland,
543 F.3d 841 (6th Cir. 2008)............................................. 37

Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy,
594 U.S. 180 (2021) .......................................................... 47

*Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*,
    939 F.3d 1145 (11th Cir. 2019) ............................................. 14

*Maples v. Martin*,
    858 F.2d 1546 (11th Cir. 1988) ............................................. 39

*Martinez v. Bynum*,
    461 U.S. 321 (1983) ............................................................... 47

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
    474 F.3d 477 (7th Cir. 2007) ................................................. 22

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ...................................... 24, 42-43

*Mitchell v. Hillsborough County*,
    468 F.3d 1276 (11th Cir. 2006) ................................... 35, 38-39

*Morgan v. Ford*,
    6 F.3d 750 (11th Cir. 1993) ........................................ 36-38, 42

*\*Moss v. City of Pembroke Pines*,
    782 F.3d 613 (11th Cir. 2015) ...................... 15, 19-20, 26, 51

*Ng v. Bd. of Regents of the Univ. of Minn.*,
    64 F.4th 992 (8th Cir. 2023) ................................................. 56

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ............................................... 56

*Pearson v. Macon-Bibb Cnty. Hosp. Auth.*,
    952 F.2d 1274 (11th Cir. 1992) ............................................. 40

*People's Party of Fla. v. Fla. Dep't of State*,
    608 F. Supp. 3d 1195 (M.D. Fla. 2022) ............................... 56

*Phillips v. City of Dawsonville*,
    499 F.3d 1239 (11th Cir. 2007) ............................................. 19

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*,
   391 U.S. 563 (1968) ............................................................... 44

*Rankin v. McPherson*,
   483 U.S. 378 (1987) ......................................... 41, 44-45, 50

*Renfroe v. Kirkpatrick*,
   722 F.2d 714 (11th Cir. 1984) ............................................ 39

*Ross v. Clayton County*,
   173 F.3d 1305 (11th Cir. 1999) .......................................... 51

*Shahar v. Bowers*,
   114 F.3d 1097 (11th Cir. 1997) .................................... 45, 51

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) .................................... 14, 56

*Sims v. Metropolitan Dade County*,
   972 F.2d 1230 (11th Cir. 1992) .................................... 47, 53

*Smiley v. Jenner*,
   684 F. Supp. 3d 835 (S.D. Ind. 2023) .......................... 25, 34

*Utah Gospel Mission v. Salt Lake City Corp.*,
   316 F. Supp. 2d 1201 (D. Utah 2004) ................................ 56

*Vernonia Sch. Dist. 47J v. Acton*,
   515 U.S. 646 (1995) ........................................................ 1, 50

*Virgil v. Sch. Bd. of Columbia Cnty.*,
   862 F.2d 1517 (11th Cir. 1989) .......................................... 22

*Virginia v. Am. Booksellers Ass'n, Inc.*,
   484 U.S. 383 (1988) ............................................................ 59

*Vitagliano v. County of Westchester*,
   71 F.4th 130 (2d Cir. 2023) ................................................ 59

*Watkins v. Bowden,*
    105 F.3d 1344 (11th Cir. 1997)..........................................................41

\*\**Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.,*
    680 F. Supp. 3d 1250 (D. Wyo. 2023)..............................24, 34, 38, 43

*Williams v. Roberts,*
    904 F.2d 634 (11th Cir. 1990)..........................................................42

*Wilson v. Douglas Cnty. Sch. Dist.,*
    2007 WL 9757472 (D. Nev. Mar. 29, 2007)......................................25

*Wozniak v. Adesida,*
    932 F.3d 1008 (7th Cir. 2019)..........................................................25

*Wreal, LLC v. Amazon.com, Inc.,*
    840 F.3d 1244 (11th Cir. 2016)....................................................54-55

*Zen Grp., Inc. v. Agency for Health Care Admin.,*
    80 F.4th 1319 (11th Cir. 2023)..........................................................39

## Statutes

28 U.S.C. §1292(a)(1)........................................................................3

28 U.S.C. §1331 ...............................................................................3

Fla. Stat. §1000.01(3) .......................................................................4

Fla. Stat. §1000.02(1)(b)....................................................................4

Fla. Stat. §1000.02(1)(c) ...................................................................4

Fla. Stat. §1000.02(2)(b)....................................................................4

Fla. Stat. §1000.02(2)(d)....................................................................4

Fla. Stat. §1000.03(2)(a) ...................................................................4

Fla. Stat. §1000.03(5)(a) ...................................................................4

Fla. Stat. §1000.03(5)(b) ................................................................. 4

Fla. Stat. §1000.071(1) ............................... 2, 7, 9, 28, 45, 48, 52

Fla. Stat. §1000.071(2) ................................................................. 8

Fla. Stat. §1000.071(3) ................................... 2, 3, 8, 20, 27

Fla. Stat. §1000.071(4) ................................................................. 8

Fla. Stat. §1000.071(6) ................................... 2, 8, 15, 20, 27

Fla. Stat. §1000.21(7) ......................................................... 7, 46, 48

Fla. Stat. §1003.42(1)(g)1 ..................................................... 52

Fla. Stat. §1003.46(2) ......................................................... 7, 46, 48

## Other Authorities

Ch. 2023-245, Laws of Fla ............................................................. 8

Fla. H.R. Comm. on Educ. & Emp., CS/CS/HB 1069 (2023)
   Final Staff Analysis 8 (May 22, 2023),
   https://perma.cc/Q7R6-435M .......................................... 5-7

Fla. H.R. Comm. on Educ. & Emp.,
   recording of proceedings (Mar. 23, 2023, 8:00 AM),
   https://bit.ly/4bXHa5F .................................................. 9-11

Fla. H.R., recording of proceedings (Mar. 30, 2023, 11:00 AM),
   https://bit.ly/4aZmgCx ...................................................... 9

Fla. H.R., recording of proceedings (Mar. 31, 2023, 11:30 AM),
   https://bit.ly/3wKV4YJ ................................................ 10-11

*New Oxford American Dictionary* (3d ed. 2010) ...................... 28

*Random House Dictionary of the English Language* (2d ed. 1987) ....... 28

**Rules**

Fed. R. App. P. 4(a)(1)(A) ............................................................ 3

**Regulations**

Fla. Admin. Code R. 6A-10.081(2)(a)14 ............................................ 8, 59

Fla. Admin. Code R. 6A-5.065(2)(a)2.h ................................................ 59

## INTRODUCTION

The Supreme Court has long recognized that the government "has broader discretion to restrict speech when it acts in its role as employer" where "the restrictions it imposes [are] directed at speech that has some potential to affect the entity's operations." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Government employers "need a significant degree of control over their employees' words and actions" to ensure "the efficient provision of public services." *Id.* That is particularly true in education. First Amendment rights "are different in public schools than elsewhere" because of "the schools' custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995). As a result, public schools "may impose reasonable restrictions on the speech of … teachers[] and other members of the school community." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988). The ultimate "determination of what manner of speech … is inappropriate properly rests with the school board." *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986).

The Supreme Court has also "long[]" recognized the truth "that 'sex, like race and national origin, is an immutable characteristic determined

solely by the accident of birth.'" *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807 (11th Cir. 2022) (en banc) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.)). The State of Florida shares that view and has made it "the policy of every public K-12 educational institution … that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Fla. Stat. §1000.071(1). To further those policies, Florida has prohibited "[a]n employee or contractor of a public K-12 educational institution" from "provid[ing] to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex." *Id.* §1000.071(3).

The district court preliminarily enjoined that prohibition against a teacher even though it regulates only that teacher's speech *in school* and *to schoolchildren. See id.* §1000.071(6). The law doesn't prohibit teachers from advocating publicly their views on usage of preferred titles and pronouns generally. Nor does it prohibit teachers from providing their preferred titles or pronouns to other employees in school or from providing them to anyone outside school. But even if the law affected more than a teacher's personal speech at work, the State's interests in furthering its

educational policies and preventing disruption outweigh the narrow subset of speech that the law regulates. This Court should reverse the district court's decision as a result.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331 because Wood alleges violations of the Constitution and federal civil rights laws. This Court has jurisdiction under 28 U.S.C. §1292(a)(1) because the State Defendants appeal from an order granting a preliminary injunction. The district court entered that order on April 9, 2024, R.82, and the State Defendants timely appealed on April 17, 2024, R.84. *See* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

I.     Whether the district court erred in holding that Fla. Stat. §1000.071(3)'s prohibition on public school employees providing to students at school personal titles and pronouns that are inconsistent with their sex likely violates the First Amendment.

II.     Whether the district court abused its discretion in finding that Wood showed irreparable harm, notwithstanding Wood's seven-month delay in seeking relief.

# STATEMENT OF THE CASE

## I.   The State of Florida enacts comprehensive legislation on K-12 education.

**A.** The Florida Early Learning-20 Education Code "provide[s] by law for a state system of schools, courses, classes, and educational institutions and services adequate to allow, for all Florida's students, the opportunity to obtain a high quality education." Fla. Stat. §1000.01(3). The "guiding principles for Florida's Early Learning-20 education system" include a system that "is student-centered in every facet" and "supports academic excellence." *Id.* §1000.02(2)(b), (d). The education system's "priorities" are to ensure that all students demonstrate "increased learning" and "that they meet the expected academic standards consistently at all levels of their education." *Id.* §1000.03(5)(a)-(b).

Under the Code, "[t]he Legislature shall establish education policy, [and] enact education laws." *Id.* §1000.03(2)(a). In accordance with the education system's aims, "[i]t is the policy of the Legislature" to "promote enhanced academic success" and "provide consistent education policy across all educational delivery systems, focusing on students." *Id.* §1000.02(1)(b)-(c).

Pursuant to its responsibility to establish education policy, the Florida Legislature has enacted various measures over the last few years on how public schools should address subjects such as sex and sex education. In 2021, for example, the Legislature "created the Parents' Bill of Rights (PBOR) which enumerates parental rights with respect to a minor child for education, health care, and criminal justice procedures." Fla. H.R. Comm. on Educ. & Emp., CS/CS/HB 1069 (2023) Final Staff Analysis 8 (May 22, 2023), https://perma.cc/Q7R6-435M. The PBOR requires that school districts adopt procedures for parents "to object to instructional materials … based on beliefs regarding morality, sex, and religion or the belief that such materials are harmful" and "to withdraw" their children from "any instruction regarding sexuality." *Id.* at 9 (codified at Fla. Stat. §1014.05(1)(c)-(d)).

In 2022, the Legislature enacted additional legislation to "further support[] the rights of parents to direct the education of their students." *Id.* at 10. One measure "prohibit[s] classroom instruction by school personnel … about sexual orientation or gender identity in kindergarten

through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." *Id.* (codified as amended at Fla. Stat. §1001.42(8)(c)3).

**B.** Building on these laws, Florida passed HB1069 in May 2023. HB1069 "expands the existing prohibition on instruction relating to sexual orientation and gender identity … to include prekindergarten through grade 8" and to apply to "charter schools." *Id.* (codified at Fla. Stat. §1001.42(8)(c)3). It also "requires that instruction on sexual orientation and gender identity in grades 9 through 12 be age-appropriate or developmentally appropriate for students." *Id.* (codified at Fla. Stat. §1001.42(8)(c)3). And, in furthering Florida's goal to keep parents in the driver's seat of their child's education, it requires school districts to publish "policies for notifying parents of the appeals process regarding concerns with the school district's implementation of … instruction on sexual orientation or gender identity." *Id.* (codified at Fla. Stat. §1001.42(8)(c)7).

HB1069 also "defines, for purposes of the education code, 'sex' as the classification of a person as either female or male based on the organization of the body of such person for a specific reproductive role, as indi-

cated by the person's sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth." *Id.* at 8 (codified at Fla. Stat. §1000.21(7)). The bill further requires that "instruction related to human sexuality classify males and females in accordance with the statutory definition of 'sex' … and that these reproductive roles are binary, stable, and unchangeable." *Id.* (codified at Fla. Stat. §1003.46(2)(a)).

Most relevant here, HB1069 expresses Florida's policy for public education on the binary, immutable nature of sex and the relation between a person's sex and such person's personal titles and pronouns. The law provides: "It shall be the policy of every public K-12 educational institution … that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Fla. Stat. §1000.071(1).[1]

HB1069 regulates usage of personal titles and pronouns in furtherance of that policy. For teachers, the bill provides that "[a]n employee or

---

[1] This policy "does not apply to individuals born with a genetically or biochemically verifiable disorder of sex development, including, but not limited to, 46, XX disorder of sex development; 46, XY disorder of sex development; sex chromosome disorder of sex development; XX or XY sex reversal; and ovotesticular disorder." Fla. Stat. §1000.071(1).

contractor of a public K-12 educational institution may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex." *Id.* §1000.071(3) ("Subsection 3"). For students, the bill prohibits any requirement that a student "provide his or her preferred personal title or pronouns or be penalized or subjected to adverse or discriminatory treatment for not providing [them]." *Id.* §1000.071(4). And for both teachers and students, the bill prohibits any requirement that they "refer to another person using that person's preferred personal title or pronouns if such personal title or pronouns do not correspond to that person's sex." *Id.* §1000.071(2).

HB1069's provisions regulating personal titles and pronouns are expressly limited to the school setting. They "only apply to the actions of an employee or contractor acting within the scope of their employment duties with the public K-12 educational institution." *Id.* §1000.071(6); *see also* Ch. 2023-245, §7, at 6, Laws of Fla. Florida's regulations confirm that they reach only "the use of personal titles and pronouns *in* educational institutions." Fla. Admin. Code R. 6A-10.081(2)(a)14 (emphasis added).

**C.** The statute itself and HB1069's legislative history reflect the State's interests in regulating personal titles and pronouns. As the statute provides, those interests include advancing the State's educational policies "that a person's sex is an immutable biological trait" and "that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Fla. Stat. §1000.071(1). The State's interests also include preventing confusion among students over pronoun usage that can disrupt classrooms and the teaching of core subjects. Bill sponsors emphasized "the confusion that's going on" among students from the scores of pronouns being used today. Fla. H.R. Comm. on Educ. & Emp., recording of proceedings, at 1:26:34–1:28:00 (Mar. 23, 2023, 8:00 AM), https://bit.ly/4bXHa5F ("Committee Hearing"). The sponsors explained that there are "as many as 78 pronouns that are being used in the general public, also in the school system." *Id.*; *see also* Fla. H.R., recording of proceedings, at 1:01:26–1:02:04 (Mar. 30, 2023, 11:00 AM), https://bit.ly/4aZmgCx (sponsor explaining there are too "many pronouns that are being used in schools today" to address each individually). They gave as examples the novel pronouns xe, xem, ze, and hir to "highlight

some of the confusion that is occurring with children today." Committee Hearing at 1:26:34–1:28:00. They concluded:

> The purpose of this bill around pronouns is to get our teachers back to focusing on the reason that they became teachers in the first place, get them back to focusing on why we send our children to school in the first place. And that's to learn math, English, history—the core subjects.

*Id.*

Supporting legislators echoed these interests. One representative, for example, emphasized the need to improve student literacy and writing. He explained how the use of biologically incongruous pronouns is inconsistent with "science" and "grammar." *Id.* at 2:24:20–2:24:44. He emphasized "all of th[e] time and distraction" attributed to pronouns. *Id.* Another representative—a former teacher—characterized the bill as "pro-teacher" and "pro-education." Fla. H.R., recording of proceedings, at 1:09:42–1:10:49 (Mar. 31, 2023, 11:30 AM), https://bit.ly/3wKV4YJ ("Third Reading"). It allows teachers "to focus" on fulfilling their "career in teaching—to teach—not to create a front line of a social experimentation." *Id.* (adding that, among other things, "the original overall intent of our entire public system [is] … not to confuse"). Another representative

explained that, as to the provision prohibiting teachers from being required to use students' preferred pronouns that do not correspond to the student's sex, teachers already are overworked and should not need to "tak[e] the time to memorize each individual's pronouns," so they instead can "focus on the course curriculum." Committee Hearing at 2:29:46–2:30:26; *see also* Third Reading at 51:52–52:20.

## II. Wood challenges Subsection 3.

**A.** Katie Wood is a (biological) male who "socially transitioned to being a woman in 2020." R.11-1 ¶2. Wood "use[s] the title Ms. and she/her pronouns." *Id.* Wood has been a math teacher at Lennard High School in Hillsborough County since 2021. *Id.* ¶¶3, 5. During the 2021–2022 and 2022–2023 school years, Wood went by "Ms. Wood" and used "she/her pronouns." *Id.* ¶7.

At the start of the 2023–2024 school year, Lennard High's principal informed all teachers of Subsection 3 at a faculty meeting. *Id.* ¶9. When Wood asked if the school wanted Wood to use the title "Mr.," the principal "specified that this was coming from the state, not the school," and advised that Wood could use titles like "Coach" or "Teacher." *Id.* Several

weeks later, Wood emailed members of the school board, expressing concerns about Subsection 3. *Id.* ¶12. The school board members "all said there was nothing they could do because it was a state law." *Id.* The principal said the same in a meeting with Wood later that week and again in Wood's classroom the week after. *Id.* ¶¶12-13. Wood then began "using Teacher Wood in all communications with students." *Id.* ¶15.

**B.** On December 13, 2023, seven months after the law's passage, Wood sued several state entities and officials (the "State Defendants") and the Hillsborough County School Board, challenging Subsection 3 under the First Amendment, Title VII, and two other claims.[2] *See generally* R.1 ¶¶111-242. A week later, Wood moved for a preliminary injunction on the First Amendment and Title VII claims. R.11.

On April 9, 2024, the district court denied Wood's motion on the Title VII claim but granted it on the First Amendment claim. R.82. The district court held that Wood showed a likelihood of success on the First

---

[2] The State Defendants are Florida Department of Education, State Board of Education and its individual members, Commissioner of Education, and Education Practices Commission and its individual members. Wood is joined below by two other plaintiffs, who are not parties to this appeal. Plaintiffs also asserted claims under the Equal Protection Clause and Title IX, which along with the Title VII claim are not at issue in this appeal.

Amendment claim under the government-employer framework from *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Under that framework, the district court concluded that (1) Wood speaks as a private citizen and not as a government employee when providing a preferred personal title and pronouns to students while at school; (2) that speech is on a matter of public concern; and (3) Wood's interests in that speech outweigh the State's interests. R.82 at 23-45.

The district court also held that Wood would be irreparably harmed absent a preliminary injunction—notwithstanding the seven-month delay in seeking relief. *Id.* at 45-53. The court excused that delay because Wood had a "dialogue at the local level" that sought "to find a solution" for Subsection 3's application to Wood. *Id.* at 50. The court also cited ripeness and standing concerns if Wood had sued sooner. *Id.* at 50-52. The court enjoined the State Defendants and the Hillsborough County School Board from enforcing Subsection 3 against Wood. *Id.* at 59.

The State Defendants timely appealed. R.84.

## STANDARD OF REVIEW

"In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established

the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam) (cleaned up). This Court "review[s] the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, … or makes findings of fact that are clearly erroneous." *Id.*; *see also Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1153 (11th Cir. 2019) (per curiam) ("An error of law is an abuse of discretion *per se*.").

## SUMMARY OF ARGUMENT

**I.**  Wood's First Amendment claim fails under the Supreme Court's framework from *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). To survive *Garcetti*'s first step, an employee must show that he has "spoken (1) as a citizen and (2) on a matter of public concern." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1160 (11th Cir. 2015). Wood cannot satisfy either element.

On the first element, "[t]he central inquiry is whether the speech at issue 'owes its existence' to the employee's professional responsibilities." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015). The speech that Subsection 3 regulates falls squarely within a teacher's professional responsibilities. The statute's proscription is limited "to the actions of an employee or contractor acting *within the scope of their employment duties* with the public K-12 educational institution." Fla. Stat. §1000.071(6) (emphasis added). Wood's on-the-job speech to students plainly is within the scope of a public school teacher's ordinary duties and responsibilities. Those duties and responsibilities include not only curricular instruction but also ordinary interaction and conversation in and outside the classroom, as many courts have recognized. Wood remains free to use biologically incongruous pronouns outside that context in private conversation, including with colleagues, staff, and supervisors at school and with students and anyone else outside school-related activities. Subsection 3 thus regulates only speech that "owes its existence" to Wood being a teacher.

Wood's speech also fails the second element. This Court has long emphasized that "the relevant inquiry is not whether the public would be

*interested* in the topic of the speech at issue" but "whether the *purpose* of [the employee's] speech was to raise issues of public concern." *Alves*, 804 F.3d at 1167. The "purpose" of Wood's speech is not to raise any issue of public concern—such as advocating publicly on issues surrounding pronoun usage. Instead, what motivates Wood's speech is the wish to have schoolchildren use Wood's own preferred title and pronouns in the classroom and at school for Wood's personal and emotional satisfaction. Even the district court recognized that Wood's preferred pronouns and title are "uniquely" and "deeply personal" to Wood. R.82 at 27, 37-39. In short, while the broader topic of pronoun usage may be a matter of public concern, what Wood prefers to be called, which is the issue in this case, is a quintessential matter of *personal* or *private* concern. The speech therefore is not a matter public concern under *Garcetti*.

Even if Wood could satisfy step one of *Garcetti*, Wood's claim fails step two's interest balancing. Governments have broad discretion over teachers' speech that undermines its educational mission. And here, the State asserts weighty interests in advancing its educational policies—sex is immutable and pronouns match a person's biological sex—and avoiding classroom disruption. On the other hand, neither the district court

nor Wood identified any case law supporting an interest in using biologically incongruous pronouns with students. The balance of interests weighs in the State's favor.

**II.** Even if Wood showed a likely First Amendment violation, Wood's seven-month delay in seeking preliminary injunctive relief undermines any suggestion of irreparable harm. The presumption of irreparable harm that attaches to a likely First Amendment violation is overcome where, as here, a plaintiff is not reasonably diligent and delays in seeking relief. The district court clearly erred in excusing Wood's delay that resulted from Wood first asking school officials not to enforce Subsection 3 at all. But school officials never had any discretion to ignore Subsection 3, and the record makes clear that Wood knew that was the case all along. The district court also applied improper legal standards to find that concerns of ripeness and standing justified Wood not seeking relief sooner. The district court accordingly abused its discretion in excusing Wood's delay and finding irreparable harm.

# ARGUMENT

## I. Wood has not demonstrated a likelihood of success under the First Amendment.

Wood's First Amendment claim is assessed under the two-step framework from *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). At step one, this Court asks "whether the employee spoke as a public employee pursuant to his official duties or as a private citizen on matters of public concern." *Fernandez v. Sch. Bd. of Miami-Dade Cnty.*, 898 F.3d 1324, 1329 (11th Cir. 2018). Step one is comprised of two discrete requirements: "an employee must have spoken (1) as a citizen and (2) on a matter of public concern" for the speech to be constitutionally protected. *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1160 (11th Cir. 2015). Failure to satisfy either requirement forecloses relief under the First Amendment. *Id.* at 1165 & n.5. If the public employee spoke as a private citizen on a matter of public concern, then at step two "the question becomes 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" *Fernandez*, 898 F.3d at 1329.

## A. Wood's desired speech is as a public employee pursuant to official duties, not as a private citizen.

**1.** Wood's desired speech is not protected under the First Amendment because Wood seeks to speak as a public employee pursuant to official duties as a teacher. *Garcetti*, 547 U.S. at 421. In determining whether statements are pursuant to an employee's official duties, "[t]he central inquiry is whether the speech at issue 'owes its existence' to the employee's professional responsibilities." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015).

It is well established that "a public employee's duties are not limited only to those tasks that are specifically designated." *Phillips v. City of Dawsonville*, 499 F.3d 1239, 1242 (11th Cir. 2007) (per curiam). Speech pursuant to official duties includes "speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment." *Alves*, 804 F.3d at 1162. To determine whether speech is "pursuant to" one's duties, this Court conducts "a 'functional review' of an employee's speech in relation to her duties or responsibilities," asking whether the speech was "required by one's position" or undertaken "in the course of *trying* to perform" one's "employment responsibilities." *Id.*

at 1164-65. That test is most clearly met where the speech itself "falls within an ordinary duty" of the employee. *Fernandez*, 898 F.3d at 1334.

Wood's desired speech—providing to students a personal title and pronouns that contravene state educational policies—falls squarely within Wood's ordinary duties and responsibilities as a public school teacher. Subsection 3 prohibits "[a]n *employee* … of a public K-12 educational institution" from "provid[ing] to a *student*" a biologically incongruous personal title or pronouns. Fla. Stat. §1000.071(3) (emphasis added). On its face, Subsection 3's proscription "only appl[ies] to the actions of an employee … acting *within the scope of their employment duties* with the public K-12 educational institution." *Id.* §1000.071(6) (emphasis added). Indeed, Wood conceded below that the Legislature "plainly" "sought to define Plaintiffs' use of their titles and pronouns as part of their job." R.69 at 23. That should be the end of the matter because that speech is "required by [Wood's] position," is "undertaken in the course of performing [Wood's] job," and is thus "undertaken 'pursuant to [Wood's] employment responsibilities.'" *Alves*, 804 F.3d at 1164-65.

Wood's desired speech, moreover, "owes its existence" to Wood's job as a teacher. *Moss*, 782 F.3d at 618. As Wood declared: "*As a teacher*, my

title is how I am known." R.11-1 ¶19 (emphasis added). In Wood's view, "It would not be appropriate for me to refer to myself using my first name because that is *not how any teachers* in my school … *refer to themselves.*" *Id.* (emphasis added). Wood "would often tell students: 'If you need anything, just say "Hey, Ms. Wood,"' and similar phrases." *Id.* Wood thus uses the personal title and pronouns "for the purpose of fulfilling [Wood's] assigned job duties" as a teacher, meaning the speech "owe[s] [its] existence" to Wood's "official responsibilities." *Abdur-Rahman v. Walker*, 567 F.3d 1278, 1283 (11th Cir. 2009).

Whether the educational policies that regulate Wood's desired speech are categorized as core curricula or not does not change the analysis.[3] No one contests that the government can regulate the topics that teachers can teach. *See Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d

---

[3] The district court emphasized that Subsection 3 "applies to *all* employees and contractors of public K-12 educational institutions," beyond those "one may ordinarily associate with *teaching* students," and "*regardless* of whether the employee has any responsibility at all for *teaching* students." R.82 at 30. But *Garcetti* step one requires an employee-specific inquiry into the "employee's speech in relation to her duties or responsibilities." *Alves*, 804 F.3d at 1164 (considering each plaintiffs' job duties and how speech at issue "relates back" to them). So Subsection 3's application to other public school employees has no bearing on this *as-applied* challenge by Wood, a *teacher*.

1517, 1520-25 (11th Cir. 1989). When a teacher instructs students, she does "something she was hired (and paid) to do, something she could not have done but for the [school's] decision to hire her as a public school teacher." *Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340 (6th Cir. 2010); *see also Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (noting that when teachers teach, "the school system does not 'regulate' teachers' speech as much as it *hires* that speech").

But setting the curriculum is just the start of it. The government also has "authority over the conduct of teachers in and out of the classroom that significantly bears on the curriculum or that gives the appearance of endorsement by the [school]." *Bishop v. Aronov*, 926 F.2d 1066, 1074 (11th Cir. 1991). Public school teachers' First Amendment rights therefore do not "extend to choosing their own curriculum *or classroom management techniques* in contravention of *school policy* or dictates." *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) (Alito, J.) (emphasis added). Indeed, as the Supreme Court has long recognized, "[t]he educational process … centers around a continuing relationship between faculty and students, 'one in which the teacher must occupy many

roles.'" *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978). "[T]eachers are in direct, day-to-day contact with students both in the classrooms and in the other varied activities of a modern school." *Ambach v. Norwick*, 441 U.S. 68, 78 (1979). As a result, they "do not cease acting as teachers each time the bell rings or the conversation moves beyond the narrow topic of curricular instruction." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 967-68 (9th Cir. 2011). So limiting a teacher's duties to teaching curriculum "would disregard the actual activities engaged in by" teachers. *Alves*, 804 F.3d at 1164.

For these reasons, "[t]he answer is clear" on "whether [Wood]'s speech owes its existence to [Wood's] position, or whether [Wood] spoke just as any non-employee citizen could have": Wood "spoke as an employee." *Johnson*, 658 F.3d at 967. "Certainly, [Wood] did not act as a citizen when [Wood] went to school and taught class, took attendance, supervised students, or regulated their comings-and-goings; [Wood] acted as a teacher—a government employee." *Id.* The same is true when Wood provides biologically incongruous pronouns to students.

Other courts have agreed that public school teachers' speech to students is unprotected. At least two courts have held that a policy *requiring*

public school teachers to use students' preferred pronouns passed muster under *Garcetti*. In *Kluge v. Brownsburg Community School Corp.*, the court held that the teacher did not speak as a citizen because the "way in which he addresses students is part of his official duties as a teacher." 432 F. Supp. 3d 823, 839 (S.D. Ind. 2020). The court reasoned that teachers could not "perform [their] teaching duties on any subject without a method by which to address individual students" and "addressing students is necessary to communicate with them and teach them the material." *Id.* And in *Willey v. Sweetwater County School District No. 1 Board of Trustees*, the court held that the policy required the teacher only "to speak pursuant to her official duties as a teacher" because it "only implicate[d] [her] interactions with students inside her classroom, and the communications she has pursuant to those duties with parents." 680 F. Supp. 3d 1250, 1287 (D. Wyo. 2023).[4]

---

[4] The Sixth Circuit's decision in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), is not to the contrary. *Meriwether* concerned "the academic speech of *university professors*." *Id.* at 503 (emphasis added). As the court explained, "professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship," *id.* at 505, while "the First Amendment does not extend to the in-class curricular speech of teachers in *primary* and *secondary* schools," *id.* at 505 n.1 (emphasis added).

If policies that require teachers to use students' biologically incongruous pronouns pass muster under *Garcetti*, then so must Subsection 3, which merely requires using biologically aligned pronouns. Florida's law likewise covers—and only covers—communication between a teacher and students. The *Kluge* and *Willey* courts are also hardly unique. Many other courts have recognized that "[a] school teacher ordinarily must interact with and speak to students" and in fact "is expected to perform these acts," so such speech is "unprotected by the First Amendment." *Bushong v. Del. City Sch. Dist.*, 2020 WL 419754, at *6 (S.D. Ohio Jan. 27, 2020), *aff'd*, 851 F. App'x 541 (6th Cir. 2021).[5]

---

[5] *See also Smiley v. Jenner*, 684 F. Supp. 3d 835, 842 (S.D. Ind. 2023) ("informal conversation" and other "interactions, even when spontaneous and not part of official curriculum, are within the scope of [the] duties and responsibilities [of] an elementary school teacher and therefore not protected by the First Amendment"); *Clay v. Greendale Sch. Dist.*, 602 F. Supp. 3d 1110, 1122 (E.D. Wis. 2022) (holding French teacher acted pursuant to official duties in sending email about gay marriage after school from his school email address to students at their school email addresses); *see also Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019) ("how faculty members relate to students *is* part of their jobs"); *Wilson v. Douglas Cnty. Sch. Dist.*, 2007 WL 9757472, at *4 (D. Nev. Mar. 29, 2007) ("As a teacher, Defendant['s] … primary official duties require him to interact with his students … .").

**2.** The district court's decision on this *Garcetti* element ran afoul of precedent. To start, the district court determined that Wood's "self-referential speech" of "Ms." and "she/her" pronouns "owes its existence to [Wood's] personal identity, not [Wood's] official duties as a public school teacher." R.82 at 27. But that reasoning turns *Garcetti* upside down. The particular opinion or speech that an employee wishes to convey—but can't—*always* "owes its existence" to that employee because it originates with the employee. A teacher who wishes to tell students his opinion on the Civil War, for example, is not exempt from *Garcetti* because that opinion "owes its existence" to that teacher. Instead, *Garcetti* is an objective inquiry that looks at the "employee's speech in relation to her duties or responsibilities." *Alves*, 804 F.3d at 1164. That inquiry considers factors "such as the employee's job description" and "whether the speech occurred at the workplace," *Moss*, 782 F.3d at 618, not whether the speech originated with the teacher.

Under the correct framing of *Garcetti*, the district court's reasoning ignored the scope of Subsection 3 and "divorce[d] the speech … from [Wood's] employment context." *Abdur-Rahman*, 567 F.3d at 1285. Subsection 3 prohibits public school employees only from "provid[ing] to a

student" biologically incongruous titles and pronouns "within the scope of their employment duties." Fla. Stat. §1000.071(3), (6). While on duty, Wood can provide biologically incongruous titles and pronouns to administrators, colleagues, and parents. Subsection 3 prohibits Wood only from providing biologically incongruous titles and pronouns to students while on duty. *That* speech "'owes its existence' to [Wood's] professional responsibilities" and "cannot reasonably be divorced from those responsibilities." *Alves*, 804 F.3d at 1165. Wood speaks to students at school *only* because Wood is a public school teacher.

The district court also reasoned that "no one would mistake" Wood's expression of pronouns "to be conveying the government's message regarding [Wood's] identity." R.82 at 29. But this Court has long recognized that "a teacher's speech can be taken as directly and deliberately representative of the school." *Bishop*, 926 F.2d at 1073. Schools thus have an interest "in scrutinizing expressions that 'the public might reasonably perceive to bear its imprimatur.'" *Id.* (alterations omitted). Here, students might reasonably perceive Wood's providing the title "Ms." and "she/her" pronouns as government approval of the proposition that a fe-

male title and pronouns can refer to a male—a conclusion that would directly contravene the State's educational policies as well as common English usage. *See* Fla. Stat. §1000.071(1); *see also, e.g.*, Random House Dictionary of the English Language 879, 1163, 1754 (2d ed. 1987) (defining "he" as "the male person"; "male" as "a person bearing an X and Y chromosome pair"; and "sex" as "either the male or female division of a species"); *New Oxford American Dictionary* 636, 1600, 1607 (3d ed. 2010) (defining "she" as a pronoun "used to refer to a woman, girl, or female"; "female" as "denoting the sex that can bear offspring or produce eggs, distinguished biologically by the production of gametes (ova) that can be fertilized by male gametes"; and "sex" as "either of the two main categories (male and female) into which humans … are divided on the basis of their reproductive functions").

Consider Wood's display of "Ms." and "she/her" on the classroom whiteboard and on Wood's syllabi. R.11-1 ¶7. These may reasonably be perceived as bearing the school's imprimatur because they are prominently displayed on official school mediums directed at students. *See Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 698-99 (4th Cir. 2007) (holding displayed religious materials "plainly" bore "the imprimatur of the school"

because they were posted on "school-owned bulletin boards in [the] class-room" and "constantly present for review by students in a compulsory classroom setting"); *see also Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1214 (11th Cir. 2004) (per curiam) (holding student-painted mural displayed "in prominent locations in the school" bore school's imprimatur). The same is true when Wood presents to students as "Ms." or advises students who refer to Wood as "Mr." that Wood goes by "Ms." *See* R.11-1 ¶7.

The district court expressed concern that under the State Defendants' view, the government could "dictate how [teachers] describe [themselves] to students." R.82 at 26. It added that "[t]aken to its extreme, Defendants' argument permits the State to rename public school teachers." *Id.* But that is not the State's position here. Rather, consistent with the First Amendment, the State may regulate the speech of public school teachers within the scope of their employment to ensure, for example, that teachers convey truthful information to their students. The State also may regulate speech that undermines its education policies. It is only the contrary position that can yield absurd consequences. Under the district court's view, the First Amendment would entitle teachers to refer to

themselves and have students address them as whatever the teacher chooses, no matter how inappropriate or untrue.

The district court recognized that slippery slope and, in a footnote, futilely attempted to elide it: "This Court does not mean to suggest that public schools would never be justified in restricting a teacher's speech with respect to how they refer to themselves." *Id.* at 43 n.22. The court promised that it "would be a different case" if a school wanted to prevent a teacher from "insisting that his students refer to him with profanity or some inappropriate moniker, like 'Mr. Butthead.'" *Id.* But the court did not explain why it "would be a different case"; it instead relied on *ipse dixit*: "that is not this case." *Id.* The reality is there is no end to the slippery slope under the district court's reasoning. If adopted, this element of *Garcetti* would protect a teacher who wanted to be called "Mr. Butthead" or much worse.

This issue goes beyond a rule merely allowing schools to regulate "profanity." *Id.* Imagine a teacher who told his students that he rules over his class with an iron fist and, therefore, students had to call him "King" or "Emperor." Or a teacher who genuinely believed that he was the duly elected Governor of Florida and that this was "essential" to his "personal

identity." *Id.* at 27. Surely a school could legitimately prohibit this teacher from demanding his students refer to him as "King," "Emperor," or "Governor"—not because the titles are profane but because in attempting to use that appellation the teacher is communicating incorrect information to his students.

**3.** The district court also relied on *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), on this element. There, the Supreme Court held that a high school football coach spoke as a citizen when offering a quiet prayer on the 50-yard line after games. *Id.* at 529-31. *Kennedy*'s reasoning, however, confirms that Subsection 3 regulates only teachers' speech pursuant to official duties.

The Court explained in *Kennedy* that "speech [an] employee [is] expected to deliver in the course of carrying out his job" is unprotected "government speech." *Id.* at 529. But the Court held that when the coach uttered his prayers, "he was not engaged in speech 'ordinarily within the scope' of his duties as a coach." *Id.* Specifically, "[h]e was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the [d]istrict paid him to produce as a coach." *Id.* at 529-30. Here, however, when Wood provides a personal title and

pronouns to students, Wood is engaged in speech within the ordinary duties of a teacher. *Supra* pp.19-25. The government pays Wood to interact directly with students. Wood's use of personal titles and pronouns in student interactions "'owe[s] [its] existence' to [Wood's] responsibilities as a public employee." *Kennedy*, 597 U.S. at 530; *supra* pp.20-21.

Moreover, the "timing and circumstances" of the prayers in *Kennedy* confirmed the coach spoke as a citizen. 597 U.S. at 530. The prayers occurred "[d]uring the postgame period" when "coaches were free to attend briefly to personal matters." *Id.* The coach's "actual job description left time for a private moment after the game." *Id.* at 531. The school district even "acknowledged that its coaching staff was free to engage in all manner of private speech" at that time. *Id.* at 530. Other employees also "were free to engage briefly in personal speech and activity." *Id.* at 531. Students likewise "were engaged in other activities," which "further suggest[ed] that those prayers were not delivered as an address to the team." *Id.* at 530. And again, the Court specifically noted that the coach "was *not* instructing players." *Id.* at 529 (emphasis added).

Here, by contrast, a teacher actively communicating with students in a school setting is not "free to attend briefly to personal matters" or

"free to engage in all manner of private speech." *Id.* at 530. Adopting Wood's and the district court's contrary view would transform all classroom discussion and communication with students into a time where teachers can engage in whatever private speech they desire. But *Kennedy* makes clear that public school employees are not entitled to "deliver any message to anyone anytime they wish." *Id.* at 527.

The Supreme Court also rejected the argument that the coach "remained on duty after games." *Id.* at 530. That argument "commit[ted] the error of positing an 'excessively broad job descriptio[n]' by treating everything teachers and coaches say in the workplace as government speech subject to government control." *Id.* at 530-31. Yet it is not an "excessively broad job description" to deem teachers' direct interactions with students while at work to be within their official duties, *supra* pp.23-25 & n.5; *contra* R.82 at 26 & n.15, as compared to teachers' social interactions with administrators and colleagues, which Subsection 3 does not cover. Indeed, this Court has "consistently discredited narrow, rigid descriptions of official duties urged upon [it] to support an inference that public employees spoke as private citizens." *Abdur-Rahman*, 567 F.3d at 1284 (collecting cases).

*Kennedy* did not disturb the well-established view that public school teachers speak as employees and not as citizens when interacting with students at school. *See Smiley v. Jenner*, 684 F. Supp. 3d 835, 842-43 (S.D. Ind. 2023) (rejecting reliance on *Kennedy*); *see also Willey*, 680 F. Supp. 3d at 1287. This Court should not break new ground and say it did.

### B. Wood's speech is not on a matter of public concern.

Wood's desired speech is also not on a matter of public concern. The second inquiry under *Garcetti* step one asks "whether the employee spoke on a matter of public concern or on matters of only personal interest." *Alves*, 804 F.3d at 1162. This Court has "said before that 'the relevant inquiry is not whether the public would be *interested* in the topic of the speech at issue,' it is 'whether the *point* of the employee's speech was to raise issues of public concern.'" *Id.* at 1167 (alteration omitted) (quoting *Maggio v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000)). In other words, the analysis requires the Court "to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest." *Id.* (quoting *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985)).

In answering that question, this Court considers (1) "what the speaker's motivation in speaking was," (2) "whether the 'main thrust' of the speech in question is essentially public in nature or private," and (3) "whether the speech was communicated to the public at large or privately to an individual." *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1283 (11th Cir. 2006). This inquiry also turns on the "content, form, and context of a given statement, as revealed by the whole record." *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007) (per curiam).

**1.** Each relevant consideration shows that Wood's desired speech is not of public concern. *First*, Wood's "motivation" for sharing a biologically incongruous title and pronouns with students is entirely personal. For example, Wood states that "using my Ms. title and she/her pronouns … is what I need to be true to myself, to be the best version of myself, to love myself, and to experience the joy of living as myself." R.11-1 ¶2. Wood's declaration repeats the personal nature of the regulated speech over and over. *See id.* ¶14 ("It was extremely difficult for me to erase 'Ms. Wood' and 'she/her' from my whiteboard. I just could not remove them because it felt like a betrayal of who I am … ."); *id.* ¶17 ("[Teacher Wood] will always be unnatural because it is not who I am."); *id.* ¶19 ("As a teacher,

my title is how I am known."); *id.* ¶20 (seeking to use preferred pronouns to avoid "feelings of disgust," "betrayal," "turmoil," and "uncertainty"). In other words, "the *point* of the speech" is not to raise the issue of pronoun usage to the public generally. *Alves*, 804 F.3d at 1167. The speech is instead meant "to further [Wood's] own private interest[s]." *Id.* at 1162.

*Second*, the "main thrust" of Wood's desired speech is essentially private. While pronoun usage generally may be a topic of public interest, "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (per curiam). Even speech that "contains a public concern aspect" is unprotected if the "main thrust of [the] speech" furthers only personal interests. *Id.* at 755. That an employee may have "mentioned, or alluded to, topics" of public concern does not "convert her employee speech into a First Amendment-protected complaint" when such "topics were not the main thrust of her speech." *King v. Bd. of Cnty. Comm'rs*, 916 F.3d 1339, 1347 (11th Cir. 2019).

That is the case here. Nowhere has it been claimed that Wood's preferred title and pronouns are aimed at the public debate over pronoun usage. Nor could it be claimed. Subsection 3, after all, does not regulate

discussion or debate about proper pronoun usage. Wood's desired speech "may touch up against" broader issues of pronoun usage, but "it is not directed to" such issues and therefore unprotected. *Alves*, 804 F.3d at 1167 (holding speech "ostensibly intertwined with" but "only incident to" and "not intended to address a matter of public concern" was unprotected); *Boyce*, 510 F.3d at 1344-45 (holding speech "ostensibly intermingled with" but "not intended to address matters of public concern" was unprotected).

*Third*, Subsection 3 touches only private speech communicated to students at work, not to the public. *See Morgan*, 6 F.3d at 755. Wood seeks to provide a personal title and pronouns to students individually or as a class, whether verbally, written on the whiteboard or class materials, or displayed on Wood's lanyard. R.11-1 ¶¶7, 13-15. The regulated speech is limited to school confines—a private forum. *See, e.g.*, *M.A.L. ex rel. M.L. v. Kinsland*, 543 F.3d 841, 846-47 (6th Cir. 2008) (holding "school areas such as hallways constitute nonpublic forums"); *Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 95 (3d Cir. 2009) ("[I]n classrooms, during school hours, when curricular activities are supervised by teachers, the nonpublic nature of the school is preserved."). And Wood's desired speech

"occur[s] entirely at work." *King*, 916 F.3d at 1349. It would not be "communicated to the public at large," *Mitchell*, 468 F.3d at 1283, or "with outside persons," *Alves*, 804 F.3d at 1168.

Had Wood "been disciplined (or even faced with the threat of discipline) for speaking out against [Subsection 3] or its justifications in a *public setting*—such as speaking at a school board meeting or a rally as a concerned citizen—it would present an entirely different set of circumstances." *Willey*, 680 F. Supp. 3d at 1287. But "that is not the case here" because Wood seeks "to speak only in [the] capacity as a teacher in the private sphere." *Id.*; *see also Kluge*, 432 F. Supp. 3d at 839 (addressing a student "constituted a private interaction with that individual student and a private statement"). Wood's speech does not "attempt to involve the public in any manner" and "in no way dr[aws] the public at large or its concerns into the picture." *Morgan*, 6 F.3d at 755.

**2.** For similar reasons, the "content, form, and context" of Wood's desired speech confirms the speech is not of public concern. "Content is undoubtedly the most important factor in assessing whether particular speech touches on a matter of public concern." *Mitchell*, 468 F.3d at 1284. (cleaned up). Here, the content of Wood's speech—a "self-referential,"

"personal message[]" about Wood's "personal identit[y]," R.82 at 28-29—
is not a subject of general interest to the public. *See, e.g.*, *Renfroe v. Kirk-patrick*, 722 F.2d 714, 715 (11th Cir. 1984) (per curiam) (holding speech
"personal in nature" was not of public concern). At most, how Wood would
like to be addressed "concerns internal administration of the educational
system," which is not of public concern. *Maples v. Martin*, 858 F.2d 1546,
1552 (11th Cir. 1988); *see also Zen Grp., Inc. v. Agency for Health Care
Admin.*, 80 F.4th 1319, 1330 (11th Cir. 2023) (noting speech about "teach-ing methods" and "syllabi" is not of public concern).

Form and context are often considered together. *See, e.g.*, *Boyce*, 510
F.3d at 1343-44; *Mitchell*, 468 F.3d at 1285. As to form, "the most heavily
emphasized factor" is "whether, and how, the speech was disseminated
to the public." *Green v. Finkelstein*, 73 F.4th 1258, 1265 (11th Cir. 2023).
As to context, courts consider "the constitutional protections afforded to
the specific category of speech at issue." *Id.* at 1266. Here again, Wood's
desired speech would occur during student interactions within school
confines. The speech is not shared publicly at all. And context shows
Wood's speech is within a teacher's ordinary duties and responsibilities.
*Supra* pp.19-25. Wood's speech concerns "only matters connected with

[Wood's] job[]" and a "subject ... personal to [Wood's] working conditions." *Boyce*, 510 F.3d at 1343-44; *see Pearson v. Macon-Bibb Cnty. Hosp. Auth.*, 952 F.2d 1274, 1279 (11th Cir. 1992) (speech not of public concern because context revealed it only "concerned the circumstances of [plaintiff's] own employment"). Wood's desired speech accordingly is not on a matter of public concern.

**3.** The district court held differently because, in its view, personal titles and pronouns are "a subject of general interest ... to the public" that has "produced a passionate political and social debate." R.82 at 34-35, 39. But again, "'the relevant inquiry is not whether the public would be *interested* in the topic of the speech at issue,' it is 'whether the *purpose* of [the employee's] speech was to raise issues of public concern.'" *Alves*, 804 F.3d at 1167. On that point, the district court repeatedly acknowledged the personal nature of Wood's desired speech. It explained how "Wood's preferred pronouns and title are uniquely personal to [Wood]," R.82 at 27, and how those pronouns express a "personal message[] about [Wood's] own personal identit[y]," *id.* at 29; *see also id.* at 31 (noting "personal, self-identifying speech"); *id.* at 32 (describing "personal, self-referential nature of the speech"). In other words, the "purpose of sharing [Wood's]

preferred title and pronouns" was personal to Wood. *Id.* at 37-38. Yet, citing no authority, the district court determined that the "deeply personal" nature of the pronouns and titles "does not eliminate the public concern attendant to … Wood's self-referential speech." *Id.* The "deeply personal" nature of Wood's speech, however, demonstrates that it is on "matters of only personal interest." *Alves*, 804 F.3d at 1162. As this Court has long recognized, "a public employee may not transform a personal [issue] into a matter of public concern by invoking a supposed popular interest." *Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir. 1986). And however "passionate" the public debate over personal titles and pronouns has been, R.82 at 35, 39, the "controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern," *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

The district court viewed the "form" of Wood's speech as "publicly sharing" because it expresses Wood's identity beyond "trusted friends, family, or coworkers." R.82 at 35. But conveying speech beyond personal circles to others in the workplace does not transform a matter of personal interest into a matter of public concern. *See Watkins v. Bowden*, 105 F.3d 1344, 1348, 1353 (11th Cir. 1997) (per curiam) (discussions with office

assistant, former assistant, and employee's minister "did not draw the public at large or its concerns into the picture"). Wood's desired speech is unlike cases where the speech was disseminated "to the public" outside the workplace. *See Morgan*, 6 F.3d at 755 n.6 (collecting cases); *see also, e.g., Green*, 73 F.4th at 1265 ("statements made during an interview on a publicly disseminated podcast"); *Williams v. Roberts*, 904 F.2d 634, 638 (11th Cir. 1990) (editorials published in newsletter "distributed to all county employees and made available to the general public"). Again, the only regulated speech is *at school* in interactions *with students*—Subsection 3 does not regulate Wood's use of biologically incongruous pronouns with other teachers, staff, or supervisors or to the public at large.

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), is not to the contrary, and the district court's reliance on it was misplaced. *See* R.82 at 34-35. In *Meriwether*, the Sixth Circuit held that a university professor's refusal to address a transgender student with the student's preferred pronouns involved a matter of public concern. 992 F.3d at 508-09. Context was critical to that holding: "gender identity [was] a hotly contested matter of public concern that 'often' c[ame] up during class discussion in [the professor's] political philosophy courses." *Id.* at 506. The court

explained that "the '*point* of his speech' (or his refusal to speak in a particular manner) was to convey a message," specifically, "that one's sex cannot be changed." *Id.* at 508. In "refusing to use gender-identity-based pronouns," the professor "advance[d] an idea transcending personal interest." *Id.* He "took a side" in the public debate on gender identity and "advanced a viewpoint on gender identity." *Id.* at 509. "The 'focus,' 'point,' 'intent,' and 'communicative purpose' of the speech" was to convey "his belief that 'sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires.'" *Id.*

Here, unlike in *Meriwether*, the point of Wood's desired speech is not to advance a view on the public debate over gender identity. Wood's declaration shows that Wood's desired pronoun usage is motivated entirely by personal interests. *See* R.11-1 ¶¶2, 14, 17, 20; *supra* pp.35-36, 40-41. Nowhere in the record has Wood alleged an intent to convey a specific message about pronoun usage to students or to make any broader statements on the issue. Wood does *not* seek to "speak[] generally regarding transgender individuals" or "convey any large-scale messages to … students regarding transgender rights." *Willey*, 680 F. Supp. 3d at 1287.

All Wood seeks to do is say the words "Ms." and "she/her" to students. R.11-1 ¶¶7, 14-15. That alone does not "contribute to the broader public debate on transgender issues." *Kluge*, 432 F. Supp. 3d at 839 ("merely stating … names and pronouns without explaining … the reason for doing so[] adds little to the public discourse on gender identity issues"). Because Wood's speech is not a matter of public concern, it is not protected by the First Amendment.

### C. The State's interests outweigh Wood's.

Even if Wood seeks to speak as a private citizen on a matter of public concern, the balance of interests at step two of *Garcetti* favors the State. At that step, courts engage in "a delicate balancing of the competing interests surrounding the speech and its consequences." *Garcetti*, 547 U.S. at 423. Courts weigh "the interests of the teacher, as a citizen, in commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). Relevant considerations include "the manner, time, and place of the employee's expression" and "the context in which the [speech] arose." *Rankin*, 483 U.S. at 388.

"[T]he state interest element of the test focuses on the effective functioning of the public employer's enterprise." *Id.* Among other pertinent factors is whether the speech "interferes with the regular operation of the enterprise." *Id.*; *see Shahar v. Bowers*, 114 F.3d 1097, 1109 (11th Cir. 1997) (en banc) (noting that "both public perception and the anticipated effect" on internal operations of an employee's speech are valid considerations). Government employers "must have wide discretion and control over the management of its personnel and internal affairs," including "the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." *Connick v. Myers*, 461 U.S. 138, 151 (1983).

**1.** The interests weigh in favor of the State. Florida's first interest is to advance the State's educational policies set forth in the statute's text. The Florida Legislature decided that "[i]t shall be the policy of every public K-12 educational institution … that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Fla. Stat. §1000.071(1). These policies embrace the truth as the Supreme Court has "long[]" articulated

it: "that 'sex, like race and national origin, is an immutable characteristic.'" *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807 (11th Cir. 2022) (en banc) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.)).

The policies also dovetail with Florida's curriculum elsewhere. The Early Learning-20 Education Code defines "Sex" to "mean[] the classification of a person as either female or male based on the organization of the body of such person for a specific reproductive role, as indicated by the person's sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth." Fla. Stat. §1000.21(7). The Code also requires that in "health education, when such instruction and course material contain instruction in human sexuality, a school shall … [c]lassify males and females as provided in s. 1000.21(7)." *Id.* §1003.46(2). Just as important, the policies adhere to longstanding English usage. *Supra* p.28.

Florida's second interest is to prevent confusion among students over the meaning and usage of pronouns that can disrupt classrooms and the teaching of core subjects. *Supra* pp.9-11. Florida's interests undoubt-

edly are weighty because "[t]he provision of primary and secondary education … is one of the most important functions of local government." *Martinez v. Bynum*, 461 U.S. 321, 329 (1983); *see also Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 188 (2021) (recognizing schools' "special interest in regulating speech that 'materially disrupts classwork'"). And Subsection 3 serves these interests.

On the first interest, teachers providing to students biologically incongruous pronouns would "express views that contravene governmental policies" and frustrate "consistency and clarity" in Florida's messaging. *Garcetti*, 547 U.S. at 419, 422. As this Court has long recognized, public schools have "authority over the conduct of teachers in and out of the classroom that significantly bears on the curriculum." *Bishop*, 926 F.2d at 1074. Public schools can "ensure" that teachers' "communications are accurate … and promote the employer's mission." *Garcetti*, 547 U.S. at 422-23. And teachers "shap[e] the students' experience to achieve educational goals." *Ambach*, 441 U.S. at 78. Because teachers serve in such a "sensitive capacity," their "private speech may pose a substantial danger to the [school's] successful functioning." *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1237 (11th Cir. 1992).

As a result, a teacher using biologically incongruous pronouns can undermine the meaning of "sex" that Florida has recognized in statute, as well as portions of Florida's curriculum that address sex-based issues. *See* Fla. Stat. §§1000.21(7), 1003.46(2). It can also suggest to students that such usage is accurate English when Florida and longstanding practice holds that it is not. *Id.* §1000.071(1) (finding it is "false" to use "a pronoun that does not correspond to [a] person's sex"). And it can suggest to students that sex is mutable when Florida maintains that it is not. *Id.* ("a person's sex is an immutable biological trait").

On the second interest, there shouldn't be any doubt that the use of biologically incongruous pronouns can confuse schoolchildren and disrupt instruction on core subjects. Before the district court, Wood's *own counsel* had difficulty keeping straight one of Wood's co-plaintiff's preferred pronouns. R.80 at 34:18-21 ("With respect to Mx. Schwandes, also, I think the case for delay there is much weaker. *She* filed – excuse me. *They* filed their preliminary injunction two weeks after learning of the investigation … ." (emphasis added)). And Wood's own declaration indicates that Wood's pronoun usage caused similar problems. Before Sub-

section 3, Wood used "Ms." and "she/her" pronouns "in any communica-tions … with students"—in introducing Wood's self, on the whiteboard, and on syllabi. R.11-1 ¶7. If students addressed Wood as "Mr.," Wood "could tell them that I go by Ms. Wood and she/her pronouns." *Id.* That is the type of disruption the Legislature sought to end. *See supra* pp.9-11.

Wood, on the other hand, asserts a general interest in providing to students a personal title and pronouns that are inconsistent with Wood's sex. Wood cited no authority supporting this interest below. Instead, Wood claimed only that "it is deeply distressing for … Wood to be forced to conceal who [Wood] is." R.11 at 28. But Wood has no more of a First Amendment interest in being referenced by female pronouns in the school setting than Wood would have in being called "Governor." *See supra* pp.30-31. Upon accepting a job as a public school teacher, Wood "by necessity … accept[ed] certain limitations on [Wood's] freedom." *Garcetti*, 547 U.S. at 418. Those limitations surely include the freedom to use titles and pronouns inconsistently with Florida policy and longstanding Eng-lish usage. While Wood retains some First Amendment rights, Wood can-not "constitutionalize the employee grievance." *Id.* at 420. And it simply

cannot be that the State cannot proscribe teachers from using words incorrectly or conveying incorrect information in the course of their official duties—which is the thrust of the district court's decision.

**2.** In concluding that Wood's interests outweighed the State's, the district court appeared to assign no weight to "the fact that public school teachers generally have diminished rights in the public school context as compared with private citizens." R.82 at 40. That was legal error. It ignores the context, manner, time, and place of Wood's speech—at school to students. *See Rankin*, 483 U.S. at 388. First Amendment rights "are different in public schools than elsewhere" because of "the schools' custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995). Thus, the ultimate "determination of what manner of speech is inappropriate properly rests with the school board." *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986); *see also Boyce*, 510 F.3d at 1343 ("[I]n the First Amendment context, courts review restrictions on employees' speech with greater deference in order to balance the government employer's legitimate interests in its mission."). Educational policy "choices of the schools should be presumptively their own—the fact that such choices arouse deep feelings argues

strongly for democratic means of reaching them," *Evans-Marshall*, 624 F.3d at 341, not ad-hoc litigation under the First Amendment.

The district court also dismissed the fact that "Wood's speech conflicts with the State's viewpoint on pronouns," finding "no evidence" that "Wood's speech has impeded [Wood's] duties as a teacher, or the normal operations of Lennard High School, or the state's interests generally as an employer." R.82 at 41-42. But that view misstates the evidentiary burden here. "[A]n employer's concerns can weigh into the [interest] balancing even though there is no actual showing that those concerns would manifest themselves in the employee's individual situation." *Ross v. Clayton County*, 173 F.3d 1305, 1311 (11th Cir. 1999); *see also Shahar*, 114 F.3d at 1107-08. "The government's legitimate interest in avoiding disruption does not require proof of actual disruption." *Moss*, 782 F.3d at 622. "Reasonable possibility of adverse harm is all that is required." *Id.*; *see also Green*, 73 F.4th at 1268 ("Both we and the Supreme Court 'have given substantial weight to government employers' *reasonable predictions* of disruption, even when the speech involved is on a matter of public concern.'"). In any event, there is evidence that preferred pronoun usage is confusing and disruptive. *Supra* pp.9-11, 48-49.

It is also self-evident that Wood's desired speech impedes "the state's interests generally as an employer." R.82 at 42. It is the Florida Legislature's role to set education policy. And it decided that "[i]t shall be the policy of every public K-12 educational institution … that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Fla. Stat. §1000.071(1). Given their role in the enterprise, teachers using biologically incongruous pronouns and titles obviously would undermine these policies.[6] *Supra* pp.47-48.

The district court said this argument "simply repackage[s] [the State's] failed government speech argument" at *Garcetti* step one and refused to credit "the State's interest in furthering its own viewpoint" over a "teacher's interests in speaking." R.82 at 41-42. But that is precisely what *Garcetti* requires in the public-school context so that governments

---

[6] It is not at all unusual for the Florida Legislature to set educational policy objectives. For instance, the Legislature requires public schools to teach "[t]he history of the Holocaust (1933-1945), the systematic, planned annihilation of European Jews and other groups by Nazi Germany, a watershed event in the history of humanity." Fla. Stat. §1003.42(1)(g)1. If a Florida public school teacher happened to be a Holocaust denier, surely the State would not be committing improper viewpoint discrimination if it seeks to prevent that teacher from attempting to communicate such views to his students.

can effectuate their educational policies. *See* 547 U.S. at 422-23 (emphasizing "need for substantive consistency" in official communications so "employees' official communications … promote the employer's mission").

Relatedly, the district court emphasized that Subsection 3 "incorporates a viewpoint discriminatory prohibition on … Wood's speech." R.82 at 44. Yet it cited no support for the notion that a school's viewpoint-based restriction on a teacher's speech favors the teacher's interests. Quite the contrary. Government employers often regulate speech that is viewpoint based; that is the point of *Garcetti*. *See* 547 U.S. at 422-23. Yet courts have been clear that interest balancing generally favors *the employer* when the employee's speech undermines the employer's mission. *See Sims*, 972 F.2d at 1237-38.

Finally, the district court claimed that, under *Janus*, the State Defendants had to "shoulder a correspondingly 'heavier' burden" and receive "considerably less deference" given the "widespread impact" of Subsection 3. R.82 at 44 (quoting *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 907 (2018)). But no "'heavier' burden" applies here. The quoted language from *Janus* explained why the Supreme Court declined to apply the *Garcetti* framework to the compulsory

assessment of union agency fees—because the "framework was developed for … cases that involve 'one employee's speech and its impact on that employee's public responsibilities.'" 585 U.S. at 906-07. Only one employee's speech is at issue here—Wood's—and all agree that the *Garcetti* framework applies.

*     *     *

The district court erred at each step of the *Garcetti* framework. Wood does not speak as a private citizen on a matter of public concern when providing to students a personal title and pronouns that do not correspond to Wood's sex. But even if Wood did, the State's interests outweigh Wood's. Accordingly, there is no likelihood of success on the merits of Wood's First Amendment claim.

## II.   Wood's delay in seeking preliminary injunctive relief undermines any suggestion of irreparable harm.

**A.** A plaintiff seeking a preliminary injunction "must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (per curiam). "[A] party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Thus, "[a] delay in seeking a preliminary injunction of even

only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Id.*; *see also Citizens Concerned About Our Child. v. Sch. Bd. of Broward Cnty.*, 193 F.3d 1285, 1290 (11th Cir. 1999) (per curiam) ("[A] failure to seek immediate relief militates against a conclusion that delaying appeal to final judgment inflicts irreparable harm.").

Here, Wood's delay in seeking preliminary injunctive relief undermines any suggestion of irreparable harm. Subsection 3 was passed on May 17, 2023, and Wood did not move for a preliminary injunction until December 21, 2023—a delay of seven months. Wood's delay is equivalent to or longer than delays that alone have precluded injunctive relief. *See Wreal*, 840 F.3d at 1248 (five months); *Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, 2023 WL 3704912, at *3 (11th Cir. May 30, 2023) (per curiam) (six months); *see also Florida v. United States*, 2023 WL 3813774, at *2 (11th Cir. June 5, 2023) (delay of five months "greatly undermine[d]" irreparable harm).

**B.** The district court suggested that a delay in seeking preliminary injunctive relief cannot overcome irreparable harm from a likely First Amendment violation. R.82 at 47-48, 53. True, this Court has recognized

that "direct penalization … of First Amendment rights" is "*presumed* to cause irreparable injury." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc) (per curiam) (emphasis added); *see also, e.g., Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). But this presumption, like any other, is rebuttable. *See, e.g., Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). Courts have held that in constitutional cases, an unreasonable delay in seeking relief warrants denying a preliminary injunction. *See Ng v. Bd. of Regents of the Univ. of Minn.*, 64 F.4th 992, 999 (8th Cir. 2023) (holding "delay of at least six months in filing the motion" on equal protection and Title IX claims warranted denial); *see also People's Party of Fla. v. Fla. Dep't of State*, 608 F. Supp. 3d 1195, 1199 (M.D. Fla. 2022) (applying *Wreal* to First Amendment and other constitutional claims and denying preliminary injunction due to delay); *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1220-21 (D. Utah 2004) (finding plaintiffs' five-month delay "belies any irreparable injury" to First Amendment rights).

Wood claimed the delay was attributable to "the real-world difficulties for individual teachers without legal training of learning about what the law requires and seeking and obtaining counsel." R.69 at 39. But

Wood later conceded that no cases exist to support the proposition that a party's "lack of sophistication" justifies delay. R.80 at 31:19-23.

The district court, in any event, found that Wood "acted with 'reasonable diligence'" by trying "to ameliorate" Subsection 3's effect "by engaging in good faith with the authorities enforcing that statute." R.82 at 50. The district court cited no authority to support its view that a plaintiff can delay filing suit while he tries to get a state actor to ignore a law. Asking local school officials not to enforce Subsection 3 was a waste of time from the outset. The district court's reliance on that justification as an excuse was legal error.

Even if local school officials had discretion whether to enforce Subsection 3, that still wouldn't excuse Wood's delay. Months after Subsection 3 took effect, at "the beginning of the 2023–2024 school year," Wood was advised that state law prohibited Wood from using the title "Ms." with students. R.11-1 ¶9. When Wood inquired if Wood had to go by "Mr.," the "principal specified that this was coming from the state, not the school," and that Wood could use "Teacher." *Id.* For "[s]everal weeks" Wood refused to comply with Subsection 3 because compliance would be "too painful." *Id.* ¶¶11-12. Wood's first inquiry was to members of the

school board, who "all said there was nothing they could do because it was a state law." *Id.* ¶12. Wood's noncompliance continued until the principal directly confronted Wood. *Id.* ¶¶13-15. Wood then "begrudgingly" complied and decided to file this lawsuit. *Id.* ¶16. Wood's declaration is vague as to actual dates, but in all events Wood still waited *several months* before suing after deciding that was the only option (despite Subsection 3 making clear that was the only option all along). To the extent the district court made a factual finding otherwise based on Wood's declaration, that finding was clear error.

The district court also excused Wood's delay given the pre-enforcement nature of the suit, citing "ripeness issues" if Wood moved before the law or implementing regulations took effect and standing "risks" from no "credible threat of enforcement." R.82 at 50-52; *see* R.69 at 32 (Wood arguing same). Both reasons apply an incorrect legal standard.

As to ripeness, it is well established that "[w]here the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974). That is so

here, as Subsection 3 had a specific effective date of July 1, 2023. And while the district court noted that implementing regulations were not issued until August 2023, R.82 at 51, Subsection 3 is self-executing, and the regulations merely require general compliance with §1000.071, *see* Fla. Admin. Code R. 6A-10.081(2)(a)14 (providing that Florida educators "[s]hall not violate s. 1000.071"); Fla. Admin. Code R. 6A-5.065(2)(a)2.h (providing that educators "ensur[e] that the learning environment is consistent with s. 1000.071").

As to the "credible threat of enforcement," courts presume "recently enacted" statutes will be enforced. *See Harrell v. Fla. Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). That presumption holds true "without a past enforcement action or an overt threat of prosecution directed at the plaintiff." *Vitagliano v. County of Westchester*, 71 F.4th 130, 140 & n.5 (2d Cir. 2023) (per curiam) (collecting cases). The district court thus applied incorrect legal standards in concluding that the pre-enforcement posture justified Wood's delay in seeking preliminary injunctive relief.

*     *     *

The district court excused Wood's delay based on a clearly errone-ous factual finding and multiple instances of applying the incorrect legal standard. That is an abuse of discretion that warrants reversal. *See, e.g.*, *Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1306 (11th Cir. 2023).

## CONCLUSION

The district court's order should be reversed and the preliminary injunction vacated.

Dated: June 3, 2024                    Respectfully submitted,

*/s/ Bryan Weir*
Bryan Weir
Daniel Shapiro
Daniel M. Vitagliano*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
bryan@consovoymccarthy.com
daniel@consovoymccarthy.com
dvitagliano@consovoymccarthy
.com

*\* Supervised by principals of the firm admitted to practice in VA*

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 12,191 words, excluding the parts that can be excluded. It also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word in 14-point Century Schoolbook font.

Dated: June 3, 2024

*/s/ Bryan Weir*
*Counsel for*
*Defendants-Appellants*


## CERTIFICATE OF SERVICE

I filed this brief with the Court via ECF, which will email everyone requiring notice.

Dated: June 3, 2024

*/s/ Bryan Weir*
*Counsel for*
*Defendants-Appellants*