# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

KATIE WOOD,
*Plaintiff-Appellee,*

AV SCHWANDES, et al.
*Plaintiffs,*

v.

FLORIDA DEPARTMENT OF EDUCATION,
FLORIDA STATE BOARD OF EDUCATION,
COMMISSIONER OF EDUCATION,
EDUCATION PRACTICES COMMISSION,
MONESIA BROWN,
In their official capacity as member of
defendant education practices, et al.
*Defendants-Appellants,*

HILLSBOROUGH COUNTY SCHOOL BOARD, et al.
*Defendants.*

Appeal from the U.S. District Court for the
Northern District of Florida, No. 4:23-cv-526 (Walker, C.J.)

## APPENDIX VOLUME 2

Bryan Weir
Daniel Shapiro
Daniel M. Vitagliano*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: (703) 243-9423
bryan@consovoymccarthy.com

*\* Supervised by principals of the firm
admitted to practice in VA*

*Counsel for Defendants-Appellants*

# CASE NO. 24-11239-D

## APPENDIX INDEX

| Description of Item | Dist. Ct. Doc. / Tab No. |
|---|---|

### VOLUME 1

U.S. District Court
Northern District of Florida (Tallahassee)
Civil Docket for Case No. 4:23-cv-526-MW/MAF……………. DKT

Complaint
(12/13/2023)……………………………………………….. 1

Plaintiff Katie Wood's Motion for Preliminary Injunction
(12/21/2023)……………………………………………….. 11

Declaration of Plaintiff Katie Wood
(12/21/2023)……………………………………………….. 11-1

First Amended Complaint
(02/06/2024)……………………………………………….. 56

Plaintiffs Katie Wood and AV Schwandes's Reply
in Support of Their Motions for Preliminary Injunction
(03/04/2024)……………………………………………….. 69

### VOLUME 2

Transcript of Preliminary Injunction Proceedings
(03/29/2024)……………………………………………….. 80

| **Description of Item** | **Dist. Ct. Doc. / Tab No.** |
|---|---|
| Order on Motions for Preliminary Injunction (04/09/2024)…………………………………………….. | 82 |
| Notice of Appeal (04/17/2024)…………………………………………….. | 84 |
| Certificate of Service | |

# TAB 80

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

KATIE WOOD, et al.,         )
                                )
            Plaintiffs,    )  Case No: 4:23cv526
                                )
          v.           )  Tallahassee, Florida
                                )  March 29, 2024
FLORIDA DEPARTMENT OF       )
EDUCATION, et al.,          )
                                )  8:32 AM
            Defendants.    )
_____ )

**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 42)**

Court Reporter:            MEGAN A. HAGUE, RPR, FCRR, CSR
                            111 North Adams Street
                            Tallahassee, Florida 32301
                            megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

<u>APPEARANCES</u>:

For the Plaintiffs:          Southern Poverty Law Center
                             By:  SAMUEL TURNER SILK BOYD
                                  Attorney at Law
                                  sam.boyd@splcenter.org
                             2 Biscayne Boulevard
                             Suite 3750
                             Miami, Florida 33101

                             Southern Poverty Law Center
                             By:  DIEGO ARMANDO SOTO
                                  Attorney at Law
                                  diego.soto@splcenter.org
                             150 East Ponce De Leon Avenue
                             Suite 340
                             Decatur, Georgia 30030

                             Altshuler Berzon LLP
                             By:  JAMES MICHAEL FINBERG
                                  Attorney at Law
                                  jfinberg@altber.com
                             177 Post Street
                             Suite 300
                             San Fransico, California 94108

                             Southern Legal Counsel Inc.
                             By:  JODI LYNN SIEGEL
                                  SIMONE MICHELLE CHRISS
                                  Attorneys at Law
                                  jodi.siegel@southernlegal.org
                                  simone.chriss@southernlegal.org
                             1229 NW 12th Avenue
                             Gainesville, Florida 32601


For Florida Department of Education:

                             Consovoy McCarthy PLLC
                             By:  BRYAN K. WEIR
                                  DANIEL JOSEPH SHAPIRO
                                  DANIEL M. VITAGLIANO
                                  Attorneys at Law
                                  bryan@consovoymccarthy.com
                                  daniel@consovoymccarthy.com
                                  dvitagliano@consovoymccarthy.com
                             1600 Wilson Boulevard
                             Suite 700
                             Arlington, Virginia 22209

APPEARANCES (cont'd.):

For Hillsborough County School Board:

                           Akerman LLP
                           By:  JASON LEE MARGOLIN
                                Attorney at Law
                                jason.margolin@akerman.com
                           401 East Jackson Street
                           Suite 1700
                           Tampa, Florida 33602

For Lee County School Board:

                           Roetzel & Andress PA
                           By:  MIKALA ANN MAKAR
                                  Attorney at Law
                                mmakar@ralaw.com
                           999 Vanderbilt Beach Road
                           Suite 401
                           Naples, Florida 34108

1              **P R O C E E D I N G S**

2         (Call to Order of the Court at 8:32 AM on Friday, March 29,

3    2024.)

4              THE COURT:  Please take your seats.

5              We are here in Case No. 4:23cv526.  We are here on an

6    evidentiary hearing on a motion for preliminary injunction.  We

7    also have pending motions to dismiss.  I have counsel present.

8              I'm not sure if we switched because I don't know

9    everybody.  Is this -- are plaintiffs on this side?

10             THE COURTROOM DEPUTY:  Yes.

11             THE COURT:  Okay.  Sometimes we switch around.

12             So I've got -- is it Mr. Boyd?

13             MR. BOYD:  That's me.

14             THE COURT:  All right.

15             And if somebody else is going to speak -- and I have

16   got Mr. Weir?

17             MR. WEIR:  Yes, Your Honor.

18             THE COURT:  And for Hillsborough County?

19             MR. MARGOLIN:  Good morning, Your Honor.  Margolin for

20   Hillsborough County.

21             THE COURT:  All right.  And Makar?

22             MS. MAKAR:  Your Honor, Mikala Makar for Lee County

23   school.

24             THE COURT:  And I have got Mr. Marsey for the virtual

25   school.

1    If somebody else is going to speak, because I know we

2 have other lawyers that have joined -- for example, I have got

3 lawyers sitting with Mr. Weir -- just let me know.

4    MR. BOYD:  Your Honor, Mr. Soto will address, with

5 your permission, the Equal Protection Clause and Title IX

6 claims, to the extent that those are relevant.

7    THE COURT:  Oh, Equal -- I was getting ready to say --

8 I was thinking preliminary injunction.  I was thinking, oh, I

9 didn't think that there was an equal protection claim in the PI,

10 but I get it, for the motion to dismiss.

11    And I know this is on the docket, but just for any

12 reviewing court, so the history is clear -- and they, of course,

13 could reference the appellate docket -- once the motions were

14 filed, as y'all know, I set this for a scheduling conference.

15 The parties submitted joint proposed schedules for briefing,

16 which were ECF Nos. 30 and 48.

17    I adopted the parties' proposed schedule and joint

18 amended schedule without limitations, ECF Nos. 34 and 39.  I

19 specifically waived the word limits on the parties' responses

20 and replies, ECF No. 51, which is the minutes from the

21 scheduling conference held on February 1st, 2024.

22    Neither side asked to engage in any specific discovery

23 to prepare for the preliminary injunction hearing.  Neither side

24 indicated they intended to call live witnesses at the hearing.

25 Instead, the parties indicated they were going to rely on the

1    declarations. Both sides agreed this Court would decide the

2    pending motions, again, on the written record and evidence

3    submitted in the form of declarations and affidavits.

4         That's all to say that I want the record to be clear I

5    didn't jam everybody up. In fact, this is a schedule that's

6    much longer than the schedule I would normally set. Also, I

7    didn't keep anybody from calling witnesses; I didn't keep

8    anybody from seeking discovery that was needed to respond to the

9    motions. I also did not receive any motions to supplement the

10   record or add declarations. I also didn't artificially limit

11   the documents that were filed by the parties, motions and so

12   forth. In fact, again, I waived the word limit.

13        So both sides have had a -- when I say both sides,

14   there's multiple parties. But both sides have had a full and

15   fair opportunity to file what they wanted to file with this

16   Court and make their record.

17        I'll also note that folks reached out from the parties

18   to my courtroom deputy, and she sent them -- the parties an

19   email wherein she communicated with the parties that the way we

20   were going to conduct this hearing, since nobody intended to

21   call any witnesses and the evidence was already locked in and it

22   was closed in terms of what evidence would be considered by the

23   Court -- that the parties had had a full and fair opportunity to

24   brief the issue, so we'd start with the motions to dismiss.

25        And since the defense -- defendants, rather, were the

last side to be heard with their reply, we'd start with the

surreply, if any, and a true surreply, that is, not repeating

what's in the papers.  But if there is something that plaintiffs

needed to add in response to the surreply -- I'm sorry -- to the

reply of the defendants, we'd do the same thing in reverse for

the preliminary -- the motions for preliminary injunction.  I

say that because I want to make plain nobody should be surprised

that's how we were going to conduct this hearing.

Let me also note -- and I'm not suggesting that it's

determinative of anything; I'm not suggesting that it's going to

necessarily move the needle in one direction or the other, but I

am aware of the Eleventh Circuit decision that was released

yesterday, *Copeland,* which talks about, of course, Title VII.

Let me find out, starting with -- I believe it's going

to be Mr. Soto.  And before I do that, let me pause to say I'm

not suggesting I'm not reserving the right to ask any questions.

I just wanted to have everybody follow up, and to the extent

they want to say anything in reply to the last document filed,

we do that first.

Let me start with -- I believe it's Mr. Soto is going

to do the motions to dismiss, or no?

MR. BOYD:  Your Honor, with your permission, I would

like to address some points about Title VII and the State

interest question on the motions to dismiss.  They are relevant

to both motions, and I think Mr. Soto has a point about the

1    Equal Protection Clause with respect to the motions to dismiss.

2           THE COURT:  Okay.

3           MR. BOYD:  So first, on the government interest prong,

4    which the defendants have expanded upon in their reply brief, I

5    just wanted to make a point that holding the subsection (3)

6    advances the state interest requires accepting four propositions

7    which we think are all absurd or unsupported.

8           So, first, that a law that allows everyone in

9    Ms. Wood's school to call her Ms. Wood, except for her herself,

10   somehow advances the state interest in preventing confusion;

11   that a law that requires a teacher who identifies as and

12   presents as a woman to use male pronouns and titles, again,

13   prevents confusion; that Florida has a state interest in

14   prohibiting plaintiffs from using their titles and pronouns to

15   advance a pedagogical interest; that it is false to say that

16   their gender identity is different from their sex assigned at

17   birth when Florida law prohibits instruction on gender identity

18   in all circumstances, with one exception.  And that's my fourth

19   point.

20          So the defendants raised in their reply brief for the

21   first time a statute that's an exception to the so-called "don't

22   say gay" law that provides that health education can be taught,

23   but that statute is quite narrow.  It says that health classes

24   must, quote, *Classify males and females as provided in Section*

25   *1000.219, and teach that biological males impregnate biological*

*females by fertilizing female egg with male sperm.  The female*

*then gestates the offspring, and that these reproductive roles*

*are binary, stable, and unchangeable.*

So defense's position is that this creates a

pedagogical interest in restricting all teachers' pronoun use in

all circumstances, even though their pronoun use doesn't say

anything about their biological capacity to bear children, and

when -- defendants stated in their opposition brief -- this is

ECF 60 at page 20 -- that pronouns -- that, quote:  *Pronouns are*

*wholly divorced from biological sex.*

And second point as to Title VII, defendants placed a

great deal of emphasis in their briefing on the mutability point

with respect to protected characteristics and *Bostock* and how it

allegedly --

THE COURT:  Hold on a second.

M-u-t-a-b-l-y -- no.  I'm sorry -- l-i-t-y.

MR. BOYD:  Thank you, Your Honor.

And so the point I want to make here -- and I think

we've addressed their interpretation of *Bostock* already, but the

point I wanted to make here is even if you accept defendants'

framing of the issues, plaintiff should still prevail.

So, first of all, immutability doesn't mean, as

defendants suggest, that all members of the protected class

share that characteristic.  So, for example, in *Catastrophe*

*Management,* the Court said that hair -- that hair texture could

be an immutable characteristic because it's associated with African ancestry. But not all people who identify as Black or who we would consider Black have that hair texture.

And similarly, you know, our clients use particular pronouns. Ms. Wood uses she/her pronouns. Mx. Schwandes uses they/them pronouns. The fact that some other transgender people may not use just one pronoun doesn't mean that for our clients their pronoun use is immutable. So for them -- for Ms. Wood, for example, her use of she/her is an immutable characteristic of her gender identity as a woman.

And so I don't think the Eleventh Circuit has ever said that immutability is limited to -- the immutable characteristics -- excuse me -- are limited to those which all members of the class share. Other circuits, you know, have clarified that point and said -- for example, the Ninth Circuit says that an immutable characteristic is one which is so fundamental to one's identity that a person should not be required to abandon them. That's *Latta v. Otter,* 771 F.3d 456 at Note 4.

I just say that to note that, you know, I think the -- even if you accept the immutability analysis and the sort of status conduit distinction, for our clients their pronouns are probably the most central aspect of their transgender identity. They are -- Ms. Wood is a woman. To be a woman in our society is to be referred to using female titles and pronouns.

1           Thank you, Your Honor.

2           THE COURT:  Mr. Soto, and if you'll approach the

3    podium, please.

4           MR. SOTO:  Good morning, Your Honor.

5           I have three points in surreply on the equal

6    protection claims.  First, I'd like to clarify what plaintiffs'

7    equal protection theories are because I think there remains a

8    little bit of confusion in the State's reply brief about those

9    theories.

10          Second, I'd like to respond to Florida's position that

11   pronouns express sex rather than gender identity and that

12   pronouns are assigned based off of biological differences.

13          And then, finally, I'd like to clarify that plaintiffs

14   do, in fact, dispute that Florida has asserted a sufficient

15   interest, contrary to Florida's assertion in their reply brief.

16          So on the first point, just to clarify our --

17   plaintiffs' equal protection theories, our primary argument is

18   that subsection (3) is subject to intermediate scrutiny for two

19   reasons, the first being that it classifies on the basis of sex

20   assigned at birth, or what Florida calls biological sex, and

21   because it perpetuates stereotypes about men and women.

22          On that second point, I read Florida's brief to kind

23   of suggest that stereotypes might not be a means to invoke or

24   trigger intermediate scrutiny.  And to the extent that I read

25   that correctly, that's just contrary to the Supreme Court's

decision in *J.E.B. against Alabama* and the Eleventh Circuit's

decision in *Glenn against Brumby*.  The Eleventh Circuit also

confirmed that that theory is still viable and triggers

intermediate scrutiny in *Adams* at page 813 and *Eknes-Tucker* at

1229.

Then, in the alternative, if the Court were to

disagree with plaintiffs that intermediate scrutiny even

applies, that's when plaintiffs argue that subsection (3)

nonetheless is unconstitutional under *Arlington Heights* and

*Romer* because of its effect and purposes to discriminate against

transgender and nonbinary people.

Contrary to Florida's assertions in its reply brief,

plaintiffs never disclaimed that theory.  They never disclaimed

or abandoned their allegations in the complaint, such as at

paragraphs 29 to 33, that at least part of subsection (3)'s

purpose and effect are to discriminate against transgender and

nonbinary people.

And to the assertion in -- excuse me -- Florida's

reply brief that plaintiffs did not raise a disparate impact or

purpose claim in their client complaint, that's just not

required under case law.  Plaintiffs don't need to specify in

detail every theory as long as they allege a plausible claim.

The second point I would like to raise in the surreply

is in response to the -- to Florida's argument that like the

medication treatments in *Eknes-Tucker* for gender dysphoria,

1  pronouns are somehow different for males and for females because

2  of biological differences between males and females, but that

3  argument fails for four reasons.

4       First, that argument is the precise stereotype that

5  plaintiffs argue is what makes subsection (3) unlawful, this

6  idea that one sex assigned at birth is what determines what

7  titles and pronouns should -- a person should and shouldn't use.

8       Second, pronouns are just not like those medication

9  treatments for gender dysphoria in *Eknes-Tucker*. Whereas

10 medication treatments have different effects depending on one's

11 biological traits, pronouns do not depend on or affect one's

12 biology. And *Eknes-Tucker* was adamant at page 1229 that it was

13 dealing with medical treatments and not employment

14 discrimination. And, of course, this case is about the latter.

15      Third, Florida provides no evidence or authority for

16 the idea that pronouns exclusively describe biology rather than

17 gender identity.

18      And, finally, this argument fails because it

19 contradicts not only plaintiffs' allegations in the complaint,

20 but also Florida's own motion at page 16 about how transgender

21 and nonbinary people use titles and pronouns to express gender

22 identity, not sex. And it also contradicts Florida's assertion

23 at page 35 of its motion that subsection (3) enforces, quote,

24 "long-standing social norms and practices regarding pronouns,"

25 end quote, which are stereotypes, not biology.

1    And then the final point I'd like to make on the equal

2  protection claims is that contrary to Florida's assertion at

3  page 28 of its reply, plaintiffs do dispute that Florida has met

4  its burden on important governmental interests.

5    Florida's first interest is in teaching students its

6  stereotyped view about title and pronouns usage.  But that

7  doesn't work under cases like *United States against Virginia* and

8  *J.E.B.* in which the Supreme Court said that states cannot invoke

9  interest that themselves rely on sex stereotypes.

10    Florida's first interest is also circular and thus

11  invalid under *United States against Virginia*.  Florida says it

12  can prohibit the use of pronouns that do not correspond with

13  one's sex because, in a circular fashion, Florida has an

14  interest in teaching that it is false to use pronouns that do

15  not correspond with one's sex.

16    Florida cannot try to fix these problems by recasting

17  that first interest at a higher level in, quote, "advancing the

18  state's pedagogical goals generally" because that would, under

19  the fifth prong, the second prong of intermediate scrutiny,

20  allow Florida and other states to smuggle in any discriminatory

21  curriculum based on sex, race, and national origin, because all

22  of that curriculum would advance this general goal of

23  pedagogical -- of advancing the State's pedagogical goals.

24    And then, finally, the State's dual interests are just

25  not genuine because they are at war with each other as we

explained in our response brief.  Florida can't simultaneously

want to teach students a particular stereotyped view of sex and

pronouns while also saying that it wants to avoid these

controversial and contemptuous social issues in the classroom.

Unless Your Honor has any questions, that's all I have

in the surreply.

THE COURT:  Thank you.

MR. BOYD:  Thank you.

THE COURT:  Let me go in reverse.  I don't believe

they do, but let me find out.

Mr. Marsey, anything?

MR. MARSEY:  No, Your Honor.

THE COURT:  MS. Makar?

MS. MAKAR:  No, Your Honor.

THE COURT:  Anything from Hillsborough County?

MR. MARGOLIN:  No, Your Honor.

THE COURT:  All right.

Mr. Weir.

MR. WEIR:  Thank you, Your Honor.  I will just focus

on a few points.  I don't want to reopen anything that's been

briefed, obviously.

The first is a point on immutability, and I believe my

friends --

THE COURT:  And, by the way, I should have asked,

Mr. Weir -- and we'll do this as we are moving forward, so let

1    me pause here.  I customarily, when we go through that, because

2    you don't necessarily know what's going to be said, Are you

3    prepared or did you need a break?  And I'm going to do the same

4    thing in reverse when we do the PI.

5           Do you -- because you have colleagues for a reason;

6    and if you want to talk to somebody before you respond or look

7    for something, that's fine too.  So I want to make sure I'm not

8    cutting anybody off.

9           MR. WEIR:  I think I just have a few affirmative

10   points to make and that's it.

11          THE COURT:  That's fine.

12          MR. WEIR:  On the point about immutability versus

13   mutability, the Eleventh Circuit precedent is that that does not

14   turn on what the individual believes about the trait.  That's in

15   *Adams*, Your Honor.  I can read it.  It's from page 807.  The

16   Court said:  *The district court did not make a finding equating*

17   *gender identity as akin to biological sex, nor could the*

18   *district court have made such a finding that would have legal*

19   *significance.  To do so would refute the Supreme Court's*

20   *long-standing recognition that sex, like race and national*

21   *origin, is an immutable characteristic determined solely by the*

22   *accident of birth.*

23          And so immutability -- and that's not just *Adams*.

24   That's also in *Willingham* and *Blockbuster* and in *Catastrophe*

25   *Management*, that the same theme is running through all of those

1  cases.  So that's our response on that point.

2       On the question of -- on the equal protection clause

3  claim, whether rational -- as I understand Mr. Soto to be

4  arguing whether rational basis review or intermediate scrutiny

5  applies, we rely on *Eknes-Tucker* for the proposition that

6  rational basis applies.  We think the reasoning in that case

7  just last year applies here.

8       And the Court said in two reasons -- even though in

9  that case biological girls were not allowed to be given drugs to

10  transition to boys and vice versa, it did discriminate on the

11  basis of sex on its face.  The Court said that that did not

12  trigger intermediate scrutiny for two reasons.  And this is

13  again under the Equal Protection Clause:  *The statute does not*

14  *establish an unequal regime for males and females.  It affects*

15  *both.*  That's a quote at page 1228.  And then the statute refers

16  to sex only because the medical procedures that it regulates are

17  themselves sex-based.  That's at 1228.  We think those two --

18  those two holdings as to why intermediate scrutiny does not

19  apply and play equally here.

20       And then on whether they have pled an intentional

21  discrimination claim under the Equal Protection Clause, pleading

22  disparate impact alone under the Equal Protection Clause is not

23  enough.  The Court has been -- the Eleventh Circuit has been

24  clear on that.  So you have to have some intentional acts

25  because the Equal Protection Clause bars only intentional

1   discrimination, not disparate impact, like Title VII, for

2   example.

3          And the allegations in their complaint between 29 and,

4   I believe, 33 paragraphs, which Mr. Soto just repeated, those

5   don't -- none of those on their own constitute evidence of

6   intentional discrimination.  I think we made that point in our

7   briefs, but I wanted to make it here.

8          That's all I had in response, Your Honor.

9          THE COURT:  Thank you.

10         All right.  Now we're going to do things in reverse

11  with the motions for preliminary injunction, which are ECF

12  No. 11 and 45.  Here the last to be heard were the plaintiffs,

13  so we'll start with the defense.  But before, Mr. Weir, I turn

14  to you, because I know you've got some things to say, let me

15  find out.

16         Mr. Marsey, anything from Virtual School?

17         MR. MARSEY:  No, Your Honor.

18         THE COURT:  And I know not everybody is the subject of

19  a PI, but I'm still going to ask everybody.

20         Anything from Lee County?

21         MS. MAKAR:  No, Your Honor.

22         THE COURT:  Anything from Hillsborough County?

23         MR. MARGOLIN:  Yes, Your Honor, very briefly.

24         THE COURT:  Sure.  And so let me -- my cryptic remark,

25  I think the parties know what I'm talking about.  Not everybody

1   is -- has been heard on or is subject to and not every claim is

2   part of the preliminary injunction motions.  But go ahead.

3           MR. MARGOLIN:  Thank you.  And, again, for the record,

4   this is Jason Margolin on behalf of the defendant the

5   Hillsborough County School Board.

6           We do adopt the State's arguments in opposition to the

7   injunction motion, but I did want to just emphasize that

8   separately Plaintiff Wood has not directed any allegations

9   against the school board of conduct that could be enjoined.  And

10  I'd like to point the Court simply to Plaintiff Wood's

11  declaration.  This is at Doc 11-1 at paragraph 9.

12          Plaintiff Wood states that all the school board did

13  was inform all teachers of the law.  Wood says, quote:  *The*

14  *directive was that the, quote, 'law states,'* end quote.  Merely

15  informing all teachers of a new law is not conduct that triggers

16  any of the causes of action pled or that should be enjoined.

17  You see this again, Plaintiff Wood continues later in that same

18  paragraph and says, quote:  *When I asked if the school wanted me*

19  *to use 'Mister,' my principal specified that this was coming*

20  *from the state, not the school,* end quote.  And plaintiffs' own

21  declaration shows the absence of conduct by my client, the

22  Hillsborough County School Board.

23          In paragraph 10, Plaintiff Wood says that she was --

24          THE COURT:  Counsel, I do have to ask, though -- help

25  me to understand.  I understand that through that declaration

1    and through that statement they are saying, We didn't come up

2    with a policy, but if your boss tells you, It's not me, but you

3    can't do it, to -- because we are required to enforce state law,

4    which seems to me to be implicit, help me to understand why

5    that's not so.

6              MR. MARGOLIN:  The allegations are only that we told

7    Plaintiff Wood and all teachers about a new statute.

8              THE COURT:  Well, let me try it a different way.  If I

9    look to one of my law clerks who work directly for me and I say,

10   the AO doesn't permit you taking leave in excess of X, so I'll

11   see you tomorrow, I didn't draft the laws on leave, but I've

12   just told my employee that they can't take leave.

13             Help me to understand -- I mean, I'm just a simple

14   country judge, but help me to understand why that's not a

15   directive from me even though I didn't promulgate the leave

16   requirements, I'm just applying them to my employee.

17             MR. MARGOLIN:  I think the "I'll see you tomorrow"

18   emphasizes they would be required to come back.  Based on,

19   again, plaintiffs' very narrow allegations against my client,

20   they weren't commanding her that she had to do it, they were

21   merely informing her of what the law said and what the

22   consequences could be from the State, not from my client.

23             THE COURT:  So you're free to continue to work here

24   and go by Missus; the only -- we'll never do anything to you,

25   but the State might go after your license.  We are going to let

1    you continue to work here and use whatever pronoun you want as

2    long as you want so long as the State doesn't intervene.  And if

3    they don't do anything, you're fine to work here.  That's what's

4    implied in this record.

5            MR. MARGOLIN:  Your Honor, correct.  I think that's

6    what Plaintiff Wood's declaration has said.

7            THE COURT:  Okay.

8            MR. MARGOLIN:  And so, again, I think otherwise we

9    stand by the State's arguments, but I just wanted to emphasize

10   the minimal allegations against my client.

11           THE COURT:  Okay.

12           MR. MARGOLIN:  Thank you.

13           THE COURT:  And why don't we do one -- so we're not

14   jumping back around to that, before -- does the plaintiff have

15   any response?

16           MR. BOYD:  Yes, Your Honor, very briefly.

17           I would just add, for Ms. Wood's declaration, in

18   addition to paragraph 9, which my colleague cited, I would also

19   point to paragraph 12 where she declares that, I had a meeting

20   with my principal during which she restated the same policy.  So

21   I think that shows that she understood it to be district policy

22   that she had to follow state law, which is not unusual.

23           I would also note the State has -- the district has an

24   obligation to report violations of state law to the defendant

25   State Board of Education.  And so by telling her, You have to

1   comply with state law, she knows that district policy requires

2   them to report violations of state law.  So I think, as your

3   question suggested, the implication was fairly clear.

4           THE COURT:  When we say "she knows," is that something

5   I'm supposed to infer, or is that something that's in the

6   record?

7           MR. BOYD:  It's alleged in the complaint, which is

8   based on statute.

9           THE COURT:  Well, her knowledge is alleged in the

10  complaint, but -- I'm not suggesting it's determinative of

11  anything, but is -- does she echo that in her declaration or is

12  the complaint sworn?

13          MR. BOYD:  No, she doesn't echo that specific point in

14  her declaration, but that the statute -- it's -- it's -- the

15  statute is public record.  That's a requirement.

16          THE COURT:  I understand.

17          Thank you.

18          MR. BOYD:  Thank you, Your Honor.

19          THE COURT:  Mr. Weir?

20          MR. WEIR:  Thank you, Your Honor.  The only thing I

21  think that was not -- that we need a surreply to is just the

22  equities, because that wasn't raised in our reply in the motion

23  to dismiss, so I'll focus on those.  They don't usually get a

24  lot of air time, but I think it's important here.

25          First off, irreparable harm.  There's two arguments we

1  make why there's no irreparable harm here.  The first is the

2  plaintiffs' delay in filing their motions for preliminary

3  injunction.  They make, I think, three or four arguments that we

4  don't think have merit.

5          The first is they suggest that unsophisticated parties

6  get a pass on filing a motion for preliminary injunction, a

7  longer time to file it than the rule that it needs to be filed

8  within two or three months.  We've not seen any law on that

9  holding them to a different standard.

10         The second, which is related, is that the time runs

11 from --

12         THE COURT:  Counsel, Let me ask you this -- and I'm

13 not saying it's here, but you'd agree with me, wouldn't you,

14 that there's case law that says that timeline's not fixed,

15 because sometimes it depends on -- for example, if you're trying

16 to negotiate a resolution of the claim -- there can be other

17 reasons that courts have considered -- that have said it may be

18 shorter, it may be longer, depending on the specific facts;

19 correct?

20         MR. WEIR:  That's correct.  I do agree with that.

21         THE COURT:  And I'm not saying that exists here.  I'm

22 just suggesting that it's not like there's this magic bright

23 line.  It can go one way or the other, depending on the facts of

24 the case; correct?

25         MR. WEIR:  I think that's right.  And plaintiffs'

pointed to -- I believe it's your decision from *Dream Defenders*,
Your Honor, where you said three months was okay to get up to
speed, but that was three months from the law's enactment, not
seven months, at least for Plaintiff Wood here, that took to
file that motion.

And it's not clear to me that, really, the lawyers who
needed that much time in Southern Poverty Law Center, which
represents these plaintiffs, laid out their legal theory at
proceedings on, I believe, March 23rd last year before the
Legislature.  The same theories are pressing here, and so I
don't think they needed the three months, even if it was
three months.

And then for plaintiff -- for Schwandes, I think
there's -- there's a suggestion in the briefing that it was --
it's absurd to say that that motion was filed too late, but --
because the investigation into the violation just happened, just
started.  But investigations, which I think my friend just said,
are automatic under the code.  And so that's been a part of the
law since the beginning, since the law was enacted.

And I think the fact -- I think that position also
undermines the idea that other plaintiffs' harm in that case is
irreparable, because there could have been a motion for
preliminary injunction long ago and there wasn't one filed on
behalf of Plaintiff Schwandes.

But I think more importantly under irreparable harm is

1    the question of damages under Title VII as we've -- as we've --

2            THE COURT:  And that was going to be my question to

3    you, because I know you say there's no presumption.  But

4    assuming I disagree with you and we have -- because I believe

5    the commentary suggests even the treatises of the

6    Eleventh Circuit is a bit of an outlier.  And then the question

7    becomes what does it mean and is there limits that, for example,

8    Judge Corrigan applied to that.

9            But assuming there's a presumption of the irreparable

10   harm in a Title VII case -- and I know you disagree -- if there

11   is, as I understood, implicit in your argument, Judge,

12   there's -- if you look at the case, damages are available, this

13   is the same type of damages that would be awarded in Title VII

14   cases in federal courts all across the country every day, and

15   there's nothing unique here.  So even if there is a presumption,

16   we've overcome it based on the fact that damages could be

17   awarded.  Is that --

18           MR. WEIR:  You just made my argument for me.

19           THE COURT:  Okay.  Well, and like I said, I thought it

20   was implied in y'all's papers, but -- you focused on there being

21   no presumption, but I just wanted to make sure that I understood

22   your alternative argument.

23           MR. WEIR:  I want to just clarify.  We agree that the

24   Eleventh Circuit has said there is a presumption in the *Baker*

25   case, but it's limited to the facts of that case which were if

1  there's ongoing retaliatory conduct, that itself is adverse

2  employment.

3        THE COURT:  And I didn't mean to speak in shorthand.

4  But surely we can agree, Counsel, that there can be a legitimate

5  argument about -- and I adore Judge Corrigan -- but whether or

6  not that is a real or not a real distinction, correct?

7        MR. WEIR:  We can have a debate about it, of course.

8        THE COURT:  Right.  I mean, there's -- there's -- I

9  mean, it's not -- I want to make plain, it's not Judge Walker.

10  If you just go pull almost any employment treatise, they flag --

11  the Eleventh Circuit has this weird twist that most circuits

12  haven't adopted, and my only point is I think reasonable minds

13  could differ about whether or not you can cabin that decision

14  the way Judge Corrigan did.  I'm not saying I disagree with him.

15  I'm just saying it seems to me it's not as obvious that that's

16  the case.

17        MR. WEIR:  Just like with a lot of other cases that

18  we've cited when it comes to Title VII, you know, the

19  *Catastrophe Management* line of cases --

20       (Reporter requested clarification.)

21        MR. WEIR:  *Catastrophe Management* line of cases --

22  that's Eleventh Circuit precedence -- obviously binds this

23  Court.

24        We do think it has -- it is a rebuttable presumption.

25  The cases that we cite in our brief say it can't be rebutted by

1   showing damages are available.  And we can put it in the record,

2   but the plaintiffs have served Rule 26 disclosures and they are

3   asking for compensatory damages in those disclosures.  And we

4   think that those damages are available.

5            THE COURT:  And I'm going to ask plaintiff this, but

6   it seems to me that you don't necessarily have to call a witness

7   or introduce a declaration to rebut the presumption, that the

8   case itself and the claims that are made can -- the Court can

9   look to that to determine whether or not the presumption has

10  been rebutted.  Do you agree?  I'm going to ask the plaintiff.

11           MR. WEIR:  I agree.  It's in the complaint itself.

12           The three cases the plaintiffs cite, I just want to

13  address those briefly.  *Siegel versus Lepore*, that's a case

14  about recounting ballots in 2000.  That's the one they cite for

15  the strength of this presumption.  That cite to footnote that

16  they put in their brief is actually to the dissent in that brief

17  case, so I'm not sure that should carry any weight.

18           The *Storves versus Island Waters* case --

19      (Reporter requested clarification.)

20           MR. WEIR:  I'm sorry.  S-t-o-r-v-e-s *versus Island*

21  *Waters*.  The Court there actually found that harm could be

22  irreparable by damages.

23           And the last case from *Owner-Operator versus Landstar*

24  was not a Title VII case, and there was reparable damages there.

25  So that's damages.

1    Scope of injunction is something I want to bring up.

2  The plaintiffs have asked for an injunction.  If Your Honor were

3  to grant an injunction, that would be statewide against all

4  employers on behalf of all plaintiffs.  The Eleventh Circuit has

5  been clear that an injunction should run to the parties, no

6  broader than necessary.  To counter that proposition, the

7  plaintiffs cite a couple of First Amendment cases.  There's two

8  of them.  Both cases are ones where the regulation was -- the

9  claim was -- the First Amendment claim -- excuse me -- was that

10  the law was overbroad, and the only way to grant relief would be

11  to grant a -- a statewide --

12    THE COURT:  I didn't know I was going to have to ask

13  this, but I'll be asking the plaintiff.  They'll need to

14  address -- I -- based on the way the complaints were drafted and

15  the arguments that have been made, this seemed to me to be an

16  as-applied challenge for the two plaintiffs, but if they want to

17  try to convince me otherwise, they can.

18    MR. WEIR:  Right.  I agree with that.  I just also

19  wanted to point out that the Eleventh Circuit case that they

20  cite, *City of Miami Beach*, points out that an overbroad striking

21  down a challenge is, quote, "strong medicine," doing a statewide

22  injunction.

23    And then on the Title VII cases they point out

24  supporting a statewide injunction, those are both out of

25  circuit, of course.  They're from the 1970s, but they weren't

1  preliminary injunctions, they were cases where at summary

2  judgment, once judgment had been entered against the State and

3  after a trial, the courts in those cases entered a judgment that

4  the State could not enforce that law.  And it's obviously not

5  the posture we're in right now.

6           And the last point I wanted to bring up is in our

7  reply brief in our motion to dismiss, this *Catastrophe*

8  *Management* line of cases, we talk about *Catastrophe Management*

9  PI case -- excuse me -- briefing, which synthesized what we sort

10 of call, the three of us, the *Troika* cases, which is *Willingham*

11 and *Blockbuster*.  And the *Blockbuster* case itself rejects that

12 the but-for test applies to conduct.

13          I just wanted to highlight that.  It's in our reply

14 brief but it's not in our --

15      (Reporter requested clarification.)

16          MR. WEIR:  It's in our reply brief in the motion to

17 dismiss, but it's not in our PI opposition, just the *Catastrophe*

18 *Management* cases.

19          Thank you.

20          THE COURT:  Thank you.

21          And, Mr. Boyd, you may not need more time, but we've

22 all been talking at a pretty fast clip.  So as not to torture

23 the court reporter, we're going to go ahead and take a break

24 now, so you can confer with your colleagues and prepare whatever

25 response you have to Mr. Weir's arguments and then we'll come

1  back.

2          How long would you like?

3          MR. BOYD:  I think five minutes should be sufficient,

4  Your Honor.

5          THE COURT:  All right.  Well, I'm going to give the

6  court reporter at least ten.  So we'll come back in ten minutes

7  at 9:20.

8          Thank you.

9          MR. BOYD:  Thank you, Your Honor.

10      (Recess taken at 9:09 AM.)

11      (Resumed at 9:29 AM.)

12          THE COURT:  Please take your seats.

13          Counsel -- and, Counsel, let me go ahead and get you

14  to address from the get-go, which I'm sure you are going to talk

15  about anyway -- talk about the case law on the delay as it

16  relates to filing the complaint and seeking a preliminary

17  injunction relative to the passage of the law.  The law at

18  issue, did it take effect in July of -- 1st of 2023?

19          MR. BOYD:  I believe that's right, Your Honor.

20          THE COURT:  As I understand it, the complaint was

21  filed on 12-13, and Ms. Wood's preliminary injunction was filed

22  on 12-21-2023, and the second PI motion was filed on 1-30-2024.

23  Is that correct?

24          MR. BOYD:  I believe that's right, Your Honor.

25          THE COURT:  And so the eight-day delay between the

1  complaint and Ms. Wood's PI is not particularly consequential,

2  but I do want you to help me to understand, under the law what's

3  the explanation that you are relying on that a law is passed and

4  then you effectively serve as a teacher for almost an entire

5  semester before you seek relief?

6        MR. BOYD:  Your Honor, I don't know that there's any

7  law clearly addressing the question.  Certainly, she was not

8  aware -- Ms. Wood was not aware of the law until --

9        THE COURT:  Doesn't the law -- doesn't the case law

10 make clear it's -- you're presumed to be aware of the law, and

11 it doesn't matter when you, in fact, become aware of the law for

12 purposes of claiming irreparable damage for a PI?

13       MR. BOYD:  I think that's, perhaps, generally correct.

14 I would say I'm not sure that that's been applied in the context

15 of an individual civil rights claim like this one.  I mean,

16 certainly the cases cited by the defendants are all

17 sophisticated parties.  A lot of them are trademark cases where

18 there are particular concerns about delay.

19       THE COURT:  Has any court -- and, look, I'm right or

20 wrong or known for doing things sometimes for the first time.

21 But has any court -- any decision you can point me to the court

22 said the lack of sophistication is a basis for the delay?

23       MR. BOYD:  I'm not aware of that, Your Honor.

24       THE COURT:  Does it matter when I was going through

25 Ms. Wood's -- I'm sorry -- is it Mrs. or Ms.?

1       MR. BOYD:  Ms.

2       THE COURT:  Ms. Wood, is there -- going through her

3   affidavit, there's this progression where I'm -- we have a

4   meeting.  We're told -- we get a memo.  We then have a meeting.

5   Then they come into my room and talk to me about, you know,

6   Erase it.  You shouldn't have that on your blackboard.

7       So I know there is some facts before me that talk

8   about sort of there's this series of actions that take place,

9   and then, of course, there's -- I don't think I invented it from

10  whole cloth -- the idea that you don't have to file your

11  complaint instantaneously for -- to claim irreparable harm.

12      What else are you -- so lack of sophistication, the

13  facts where you've explained that you truly realize what's

14  happening and how the law is going to be applied, and you need

15  time to gear up for a complicated case.  What else are you

16  relying on?

17      MR. BOYD:  One other point is that the implementing

18  regulations for the statute weren't issued until August of 2023,

19  and those implementing regulations provide the enforcement

20  mechanism.  So I think had we filed a PI prior to those

21  regulations going into effect, there would be questions about,

22  you know, how is the law going to be enforced.

23      THE COURT:  I get it.  I spend a lot of time with the

24  State of Florida doing "Who's on first?" routines with respect

25  to when laws are -- when claims are ripe, and it's like

*Goldilocks and the Three Bears*:  When is the porridge just right to file your complaint?  So I understand there is a bit of a delay.

But does that explain a four-month or five-month delay between the law passing, the regulations being implemented?  So even if you use that as the trigger, it's -- it would be four months; correct?

MR. BOYD:  It would be from sometime in August.  We would have September, October, November, and then the filing in December.  So I'm not quite sure if it's four months, but -- I don't have the exact date of the regulations in front of me, so I can't quite --

THE COURT:  Surely, with one of the --

MR. BOYD:  More than three months.

THE COURT:  -- 12 lawyers here, somebody can tell me quickly.  When did the regulations -- I put -- I had August of 2023.  I didn't have a date.

MR. SOTO:  August 22nd, Your Honor.

THE COURT:  All right.  So it's one day that -- the PI was one day shy of four months.  My math is still pretty good.

But go ahead.

MR. BOYD:  Yes, I'll take four months, Your Honor.

I'd also just say, you know, it's not just the time.  As you've said, complaints don't get drafted instantly.  It's also the time for Ms. Wood to locate counsel.  You know, it's

1 one thing for us as advocates to have a concern about a law.  We

2 don't -- you know, people don't necessarily know about us.  They

3 don't know who is challenging a law.  It takes some time for

4 those concerns -- you know, for us to go out in the community

5 and say, Is this something that's affecting people?  And then --

6   THE COURT:  You can get -- if a Coca-Cola truck runs a

7 red light and kills your wife and three children, you probably

8 can get -- and probably, sadly, be approached at the hospital,

9 but you are not going to have a problem getting a lawyer.

10 Bringing a civil rights case is a harder climb.

11   MR. BOYD:  Exactly, Your Honor, especially a civil

12 rights case where we're a nonprofit organization, at least

13 Southern Poverty Law Center is and some of the legal counsel is.

14   THE COURT:  Has any case recognized that as a basis

15 for a longer delay?

16   MR. BOYD:  Not that I'm aware of, Your Honor.

17   THE COURT:  Okay.

18   MR. BOYD:  With respect to Mx. Schwandes, also, I

19 think the case for delay there is much weaker.  She filed --

20 excuse me.  They filed their preliminary injunction two weeks

21 after learning of the investigation, and certainly, you know, we

22 didn't file a preliminary injunction prior to that because we

23 felt that at that point the irreparable harm argument would be

24 weak because they had been fired and were not currently being

25 employed.

1          However, once the investigation began, we do think we

2     have -- we've cited case law for suspension of licensing to be

3     an irreparable harm, because that's a public record.  Maybe the

4     Court could order that license restored.  I'm not sure about

5     that.  There might be a separation of powers type of concern

6     about that.  But, in any event, the public stigma of that

7     process, you know, can't be erased by money damages.

8          With respect to -- and I'm shifting from the timing,

9     unless you have any other questions.

10          THE COURT:  You answered my question.  Unless you have

11     something else to add, I just wanted to --

12          MR. BOYD:  Yeah, Your Honor, we will -- yeah.  If we

13     find anything else, we'll submit it by memorandum.

14          So as to the irreparable harm question --

15          THE COURT:  Well, wait, wait.  I just want to make --

16     if you need to add something, you can add it today, but the --

17          MR. BOYD:  Understood.

18          THE COURT:  I'm taking this case under advisement.

19     Everything is closed.  That's why I started with y'all agreed,

20     both sides, on whether you were going to have discovery.  You

21     had every opportunity to file declarations, and you had no word

22     limits on anything.

23          And so the -- if something new had come up -- so,

24     like, if, you know, there was some change in the law or

25     something, then certainly we would allow additional briefing,

1 but absent something along those lines, I'm taking this under

2 advisement at the conclusion of this hearing.

3      MR. BOYD: Understood, Your Honor. I spoke too

4 quickly.

5      THE COURT: So the record will reflect I didn't yell

6 at you. I'm just saying that's the state of the record.

7      MR. BOYD: Understood, certainly.

8      And, frankly, there isn't a lot of law on this

9 question that we were able to find, at least in the

10 Eleventh Circuit.

11      So on the irreparable harm question, I think the only

12 other point I wanted to add is that there's just an ongoing

13 dignitary harm to Ms. Wood of every day having to go into class

14 and refer to herself using "Teacher," to be misgendered by her

15 students, out of ignorance in some cases, and sort of to go

16 through that process on a day-to-day basis.

17      And I would just say the *Copeland* case, which

18 Your Honor referenced at the start, that's an Eleventh Circuit

19 case about a transgender prison guard. I mean, that is a --

20 that's a damages case. It's not a preliminary injunction. But

21 I think there's a lot of language in there making very clear the

22 dignitary harms of being misgendered.

23      With respect to the First Amendment claim, I did want

24 to clarify that, you know, we are arguing that this law violates

25 the Constitution on its face because it lacks a plain,

1    legitimate scope.  There is really no one we can see this law

2    being applied to enforce -- with maybe one small exception, on

3    whom it could be applied constitutionally.  So the law is not

4    going to be enforced against a cisgender teacher because they

5    are going to want to use the pronouns that match their sex

6    assigned at birth by default, so the law is not going to come

7    into effect.  For transgender teachers, we've argued the law is

8    unconstitutional as applied to them.

9           The only possible category we can think of this law

10   could constitutionally be applied to is someone who is

11   genuinely -- you know, a gender queer person or a nonbinary

12   person who is genuinely ambivalent between the pronoun that

13   matches their sex assigned at birth and a gender-neutral pronoun

14   or the other pronoun.  So I think that certainly meets the

15   threshold for which courts have said a law can be enjoined

16   statewide under the First Amendment, and I think this is very

17   similar to the *Hamburger Mary's* case.

18          THE COURT:  You would agree that the analysis would be

19   different, though, for purpose of Title VII; correct?

20          MR. BOYD:  Yes, Your Honor, it's certainly a much

21   harder case for us to make.  I think -- you know, when a law is

22   directly conflicting with state law, I think there might be a

23   case for enjoining it as to all parties, but -- excuse me --

24   when a state law conflicts with federal law.  But certainly I

25   don't have a -- you know, a clear case as to that, particularly

1   on the preliminary injunction posture, and we are primarily, on

2   the statewide injunction portion, relying on the First Amendment

3   claim.

4           So as I was saying, on the *Hamburger Mary's* issue, I

5   think that's a very similar case to that.  That's a plaintiff

6   who was planning to engage in conduct that was clearly

7   prohibited by the statute.  Now, they framed their claim more as

8   an overbreadth claim, but I think the issues are very similar.

9   The Eleventh Circuit affirmed and the Supreme Court declined to

10  stay a statewide injunction on that issue.

11          And I think that -- you know, we certainly have

12  arguments about the statute being overbroad.  We have focused on

13  the core application, which is to our clients' use of their

14  pronouns in the classroom, but there are certainly questions

15  about the scope of this application the defendants have never

16  addressed or clarified.  For example, you know, does it apply to

17  incidental speech in the hallway?  Does it apply if two teachers

18  are talking and a student overhears them?  Does it prohibit

19  Ms. Wood from saying to her students, I am a woman?  That's

20  unclear.  She currently, you know, is afraid to say that, but,

21  you know, she -- when she says, I'm a woman, in one sense that's

22  not providing her pronouns, but in another sense, it's clearly

23  signaling what they are, right?  And I think she would rightly

24  fear discipline if she did that.

25          So to the extent that, you know, the Court were to

conclude that the core aspect of the statute is not problematic,

I think there would definitely still be questions about that

overbreadth.

And, yes, that is -- that's all the points I had on

the First Amendment.

Thank you.

THE COURT:  Thank you.

MR. WEIR:  Thank you, Your Honor.

I just want to address something that was new, nothing

additional, when it comes to the timing.

The statute itself, subsection (3), is self-executing.

It prohibits the day it was passed.  Subsection (5) of the same

statute, 1000.071, says that the State Board of Education may

adopt rules.  The rule that the State adopted only goes to

suspension of the -- of a teacher's license.  It doesn't go to

the actual prohibition itself.  I just wanted to highlight that.

THE COURT:  Anything in response to -- I'm not saying

you should or --

MR. BOYD:  I had one other small point I just wanted

to address.

THE COURT:  Certainly.

I want to make plain I'm going to let y'all -- and we

can keep going around.  If there is another lawyer that wants to

add something, you certainly can.  I'm not going to artificially

cut folks off.  I just was trying to create a framework so folks

1  could respond to each other.

2          But go ahead.

3          MR. BOYD:  This is not in response, I will confess.

4          THE COURT:  That's fair.

5          MR. BOYD:  I haven't had a chance yet to mention the

6  State's settlement of the *Equality Florida* case, which I'm sure

7  Your Honor is aware of.  I have a copy of that if you'd like me

8  to supplement the record with it.  It does include a number of,

9  you know, I think statements from the -- from the record in the

10 "don't say gay" cases that we think are relevant.  Some of them

11 are similar to ones we've put in our briefing, but to the extent

12 that they would be relevant to the State's interest, we're happy

13 to submit it now if that would be helpful.

14         THE COURT:  Mr. Weir?  He just -- he wants to

15 supplement the record with the settlement.

16         MR. WEIR:  I have no opposition -- I have no

17 opposition to that.

18         THE COURT:  I understand.

19         MR. WEIR:  The settlement just tracks the briefing,

20 the language in the briefing itself.

21         THE COURT:  Fair enough.  If you'll file a notice of

22 filing by the close of business today -- can you do that today,

23 or do you need --

24         MR. BOYD:  Yes, Your Honor.

25         THE COURT:  All right.

1          Anything additional from the plaintiffs?

2          MR. BOYD:  One moment, Your Honor.

3          THE COURT:  Y'all can huddle and defense counsel can

4     huddle as well.  I'm going to give everybody an opportunity to

5     be heard.

6        (Pause in proceedings.)

7          MR. BOYD:  No, Your Honor.

8          THE COURT:  All right.

9          Anything additional from the defense?

10         MR. WEIR:  No, Your Honor.

11         THE COURT:  All right.

12         This has been a shorter hearing than typical.  I want

13    to make plain the fact that it's been shorter than typical

14    doesn't in any mean -- in any way suggest that it's not an

15    important case.  It certainly is an important case.  And for

16    those of you that are disappointed that it wasn't longer or a

17    more vigorous hearing, I've had at least one lawyer describe my

18    PI hearings as roughly akin to giving birth.

19         But -- I know we didn't do that today, but I've read

20    your papers; I'm familiar with your arguments, and so I believe

21    I have the answers to the questions I had.  So thank you for

22    your presentation.

23         I start a trial on Monday that is going to run two

24    weeks, and we are going to have to run long trial days, from

25    8:00 a.m. to 7:00 p.m.  And then I immediately start another

1  products liability trial, so I've a month straight when I'll be

2  in court.  That doesn't mean I'm going to wait a month to issue

3  this order.  I'll do my best to get out an order as quickly as

4  possible.  I was just letting you know it may be taking me a

5  little bit longer, again, since I'm going to be in court for a

6  solid month starting on Monday.  So I'll do my best to get it

7  out as soon as possible.

8          Thank you.  I hope everyone has a safe trip home.

9          Court is in recess.

10     (Proceedings concluded at 9:45 AM on Friday, March 29,

11  2024.)

12                    * * * * * * * *

13          I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
14  Any redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy is noted within the
15  transcript.

16

17  /s/ Megan A. Hague                    March 29, 2024

18  Megan A. Hague, RPR, FCRR, CSR
    Official U.S. Court Reporter
19

20

21

22

23

24

25

# TAB 82

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**KATIE WOOD, et al.,**

    *Plaintiffs*,

v.                                                  Case No.: 4:23cv526-MW/MAF

**FLORIDA DEPARTMENT OF
EUCATION, et al.,**

    *Defendants*.

_____/

## ORDER ON MOTIONS FOR PRELIMINARY INJUNCTION

Once again, the State of Florida has a First Amendment problem. Of late, it has happened so frequently, some might say you can set your clock by it.[1]

This time, the State of Florida declares that it has the absolute authority to redefine your identity if you choose to teach in a public school. So, the question before this Court is whether the First Amendment permits the State to dictate,

---

[1] *See, Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024) (concluding that Florida's Individual Freedom Act "exceeds the bounds of the First Amendment" and affirming preliminary injunction); *Netchoice, LLC v. Attorney General, Florida*, 34 F.4th 1196 (11th Cir. 2022) (concluding provisions of Florida's SB 7072 likely violate First Amendment and affirming preliminary injunction blocking those provisions); *HM Florida-Orl, LLC v. Governor of Florida*, No. 23-12160, 2023 WL 6785071 (11th Cir. Oct. 11, 2023) (denying motion for partial stay of preliminary injunction blocking enforcement of Florida's law prohibiting knowingly admitting a child to an "adult live performance"); *Pernell v. Fla. Bd. of Govs. of St. Univ.*, No. 22-13992-J, No. 22-13994-J, 2023 WL 2543659 (11th Cir. Mar. 16, 2023) (denying motions to stay preliminary injunction blocking enforcement of provisions of Florida's Individual Freedom Act that restrict class instruction in public universities). This list, of course, is by no means exhaustive.

without limitation, how public-school teachers refer to themselves when communicating to students.[2] The answer is a thunderous "no."

I

The State of Florida has determined that the "policy" of every public K-12 institution is that "a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." § 1000.071(1), Florida Statutes (2023). In furtherance of this "policy," the State of Florida adopted section 1000.071(3), Florida Statutes (2023), which mandates that "[a]n employee or contractor of a public K-12 educational institution may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex." Following the enactment of section 1000.071(3), the Commissioner of Education (the "Commissioner") and the State Board of Education amended the Principles of Professional Conduct for the Education Profession in Florida to make violations of the statute grounds for a disciplinary violation. *See* Fla. Admin. Code R. 6A-10.081(2)(a)14. (Aug. 22, 2023). Disciplinary violations may be grounds for suspension or revocation of a teaching certificate, *see* § 1012.795(1)(j), Fla. Stat. (2023), or termination by school boards, *see* § 1012.33(1)(a), Fla. Stat. (2023).

---

[2] The First Amendment issue in this case is *not* about whether a public school teacher can require students—or anyone—to use their preferred pronouns and title when speaking to or about them.

County-level school districts are required to report violations of section 1000.071(3) to the Florida Department of Education. § 1012.796(1)(d)1., Fla. Stat. (2023). The Florida Department of Education must then investigate potential violations of section 1000.071(3) and advise the Commissioner of its findings. § 1012.796(1)(a). From there, the Commissioner is tasked with determining whether there is probable cause for a violation and, if so, filing and prosecuting a complaint before an administrative law judge. § 1012.796(6). The administrative law judge sends recommendations to the Education Practices Commission (the "Commission"). The Commission, in turn, reviews the complaint and decides whether to dismiss the complaint or impose penalties that range from a fine to revoking a teacher's certificate. § 1012.796(7).

The State Board of Education also ensures that county-level school districts enforce section 1000.071(3). *See* §§ 1001.03(8), 1008.32, Fla. Stat. (2023). The Commissioner investigates allegations that county-level school districts have failed to report violations of section 1000.071(3), determines whether there is probable cause, and reports his finding to the State Board of Education. § 1008.32(2)(a). If a school district does not comply, the State Board of Education may report the violation of section 1000.071(3) to the Florida Legislature, withhold funds, declare the school board ineligible for competitive grants, or require periodic reporting until the noncompliance is remedied. § 1008.32(4).

Section 1000.071(3)'s prohibitions and the enforcement scheme put in place in August 2023 have directly impacted the Plaintiffs in this case. Plaintiffs Katie Wood and AV Schwandes were public school teachers at the beginning of the 2023–2024 school year. Ms. Wood is still a teacher at a public high school in Hillsborough County. But Mx. Schwandes lost their job as a public school teacher for Florida Virtual School.

Katie Wood is a transgender woman who is known at school—indeed, in every aspect of her life—as "Ms. Wood." She uses she/her pronouns to refer to herself and would prefer that others do as well. AV Schwandes is nonbinary and is known as "Mx. Schwandes." Mx. Schwandes uses they/them pronouns to refer to themself and would prefer that others do as well. This Court uses the parties' preferred pronouns throughout this Order.

Ms. Wood teaches the second half of Algebra I to tenth graders at Lennard High School in Hillsborough County, Florida. During the 2021–2022 and 2022–2023 school years, Ms. Wood referred to herself by her preferred title—Ms. Wood—and used her preferred pronouns when interacting with students. Ms. Wood wrote her title and pronouns in the corner of her classroom whiteboard and wore a pin with her pronouns on her lanyard. Nearly all of Ms. Wood's students referred to her by her preferred title and pronouns. If a student misgendered her, Ms. Wood could and would correct the student.

That all changed at the start of the 2023–2024 school year. The Hillsborough County School Board made clear to Ms. Wood that section 1000.071(3) prevented her from using her preferred pronouns and titles when communicating with students at school. Ms. Wood now refrains from intentionally using her preferred pronouns and title when interacting with students to avoid running afoul of section 1000.071(3).

Mx. Schwandes was a teacher at Florida Virtual School (FLVS) from July 2021 until October 2023. When Mx. Schwandes first started at FLVS, they used the titles "Professor" or "Mrs." without comment from their employer. In 2023, however, Mx. Schwandes's long-held feelings that they did not conform with either gender culminated in them coming out as nonbinary. Starting in early July 2023, Mx. Schwandes began to use the title "Mx." at FLVS.

FLVS opposed Mx. Schwandes's use of their preferred title. After Mx. Schwandes refused to comply with an FLVS directive to change their title in the school's systems, FLVS suspended them without pay. FLVS then fired Mx. Schwandes on October 24, 2023. On January 13, 2024, Mx. Schwandes received a letter from the Florida Department of Education indicating that the Office of Professional Services had opened an investigation into their "failure to follow directives from [their] employer." *See* ECF No. 45-1 ¶ 23.

Given the restrictions section 1000.071(3) has placed on both Ms. Wood and Mx. Schwandes, as employees of public schools, they filed suit challenging section 1000.071(3) under Title VII, Title IX, the First Amendment, and the Fourteenth Amendment. ECF No. 1. Shortly thereafter, Ms. Wood and Mx. Schwandes filed motions for preliminary injunction, arguing that they are entitled to emergency relief to remedy the ongoing harms caused by continued application of section 1000.071(3) to them. *See* ECF No. 11 and 45. For purposes of their motions, both Plaintiffs argue that they are entitled to relief based on their substantive Title VII and First Amendment claims.

II

A district court may grant a preliminary injunction if the movant shows: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Although a "preliminary injunction is an extraordinary and drastic remedy," it should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). No one factor, however, is controlling;

this Court must consider the factors jointly, and a strong showing on one factor may compensate for a weaker showing on another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Finally, "[a]lthough the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (citing *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)). Applying this standard, this Court first considers whether Plaintiffs have established a likelihood of success on the merits.

## A

As to substantial likelihood of success on the merits, this Court addresses this factor first because, typically, if a plaintiff cannot "establish a likelihood of success on the merits," this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). And because standing is always "an indispensable part of the plaintiff's case," this Court begins its merits analysis with standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). This Court does not address either Plaintiff's standing to proceed on their Title VII claims because, as set out *infra*, they have failed to show a substantial likelihood of success in proving an

adverse employment action on this record.[3] This Court starts with Ms. Wood's standing on her First Amendment claim, then it addresses Mx. Schwandes's standing on their First Amendment claim.

1

First, Ms. Wood's standing to bring her First Amendment claim. Any evaluation of Ms. Wood's First Amendment claim necessitates an inquiry into her ability to bring such claims—even when, as here, most parties do not raise any dispute as to her standing to proceed.[4]

Over time, the Supreme Court has developed a three-part test for determining when standing exists. Under that test, a plaintiff must show (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan*, 504 U.S. at 560–61. And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.' " *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d

---

[3] Of course, this Court will address standing in detail in its order on the pending motions to dismiss. But here, there are other issues with Plaintiffs' Title VII claims, so this Court refrains from passing on Plaintiffs' Title VII standing for purposes of this motion.

[4] The Hillsborough County School Board disputes Ms. Wood's standing on two elements— namely, traceability and redressability. The Hillsborough County School Board does not dispute that Ms. Wood has suffered an injury in fact.

905, 912 (D.C. Cir. 2015)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Thus, "a plaintiff cannot 'rest on such mere allegations, [as would be appropriate at the pleading stage,] but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.' " *Cacchillo*, 638 F.3d at 404 (some alteration in original) (quoting *Lujan*, 504 U.S. at 561).

When First Amendment rights are involved, courts apply the injury-in-fact requirement most loosely, "lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). As such, an actual injury can exist when a plaintiff avoids expression to avoid potential legal consequences of the expression. *Id.*

Here, Defendants do not dispute that Ms. Wood has suffered an injury in fact.[5] And for good reason. Ms. Wood challenges Defendants' implementation of section 1000.071(3), which, she says, chills her First Amendment right to speak freely. Ms. Wood submitted a sworn declaration attesting to the burden this provision imposes upon her. *See* ECF No. 11-1. Ms. Wood avers that (1) her supervisors made clear

---

[5] This Court pauses to note that it does not consider Plaintiffs' standing to sue Defendants the Florida Department of Education, the State Board of Education, and the Education Practices Commission because any claim against these entities—rather than the members of each entity that Plaintiffs sue in their official capacities—would be barred by Eleventh Amendment sovereign immunity. *See, e.g.*, *Williams v. Dist. Bd. of Trustees of Edison Cmty. Coll.*, 421 F.3d 1190, 1193 (11th Cir. 2005) ("[T]he State Board of Education . . . is clearly an arm of the state."). For this same reason, the preliminary injunctive relief set out *infra* omits these entities and instead focuses on the members of these entities sued in their official capacities pursuant to *Ex parte Young*.

that section 1000.071(3)'s speech restrictions apply to her; (2) before Defendants'

implementation of section 1000.071(3), she used her preferred pronouns and title

when speaking with students; and (3) Defendants' threat of mandatory discipline if

she engages in her proposed speech prevents her from speaking. This is a classic

speech injury—Ms. Wood spoke in the past and wants to speak in the future, but she

is deterred by a credible threat of discipline. This Court concludes that Ms. Wood

has submitted sufficient evidence to establish an injury-in-fact.

As to traceability, this requires a showing that Ms. Wood's "injury [is] fairly

traceable to the challenged action of the defendant, and not the result of the

independent action of some third party not before the court." *31 Foster Children v.

Bush*, 329 F.3d 1255, 1263 (11th Cir. 2003). Here, without dispute, Ms. Wood's

injury fairly traceable to the State Defendants' conduct.[6] As Ms. Wood spells out in

her papers, each State Defendant plays a role in enforcing section 1000.071(3)'s

mandate by either (a) investigating any violation or (b) punishing her by revoking

her teaching license or imposing other forms of professional discipline.

As for the Hillsborough County School Board, it argues that Ms. Wood's harm

is not fairly traceable to it because it is merely following state law—not some

county-specific policy—when it ensures that Ms. Wood follows section

---

[6] For purposes of this Order, the State Defendants include all Defendants as parties to the
motions for preliminary injunction except for the Hillsborough County School Board.

1000.071(3). Wrong. What the Hillsborough County School Board describes as just "following Florida law" is actually *enforcement* of the law. The Hillsborough County School Board enforces section 1000.071(3) through Ms. Wood's supervisor—an agent of the Board—informing Ms. Wood about section 1000.071(3)'s requirements on several occasions, telling her which titles she can use, and directing Ms. Wood to erase "Ms. Wood" and her preferred pronouns from her classroom whiteboard. ECF No. 11-1. Further, the Hillsborough County School Board concedes that it *must* report any violation of section 1000.071(3) to the State Defendants, which would trigger disciplinary proceedings against Ms. Wood. Enforcement like this is crucial to the traceability and redressability analyses—when a "plaintiff has sued to enjoin a government official from enforcing a law, [she] must show, at the very least, that the official has the authority to enforce the particular provision that [she] has challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). Even if the impetus for the Hillsborough County School Board's actions comes from state law, its compliance still qualifies as enforcing state law.  Based on this showing, Ms. Wood's chilled speech injury is fairly traceable to the Hillsborough County School Board's actions.

Finally, redressability. Redressability considers "whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns*

*Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (emphasis removed). The State Defendants don't dispute that an injunction prohibiting them from enforcing section 1000.071(3) against Ms. Wood would likely redress her injury. This makes sense because, as set out above, each State Defendant plays a role in enforcing section 1000.071(3)'s mandate. And for the same reasons that Ms. Wood's injury is fairly traceable to the Hillsborough County School Board, an injunction prohibiting it from enforcing section 1000.071(3) against her would provide substantial redress. Accordingly, Ms. Wood has satisfied all three elements of Article III standing to proceed with her motion for preliminary injunction on her First Amendment claim.

2

Next, Mx. Schwandes's standing to bring their First Amendment claim. In their motion for a preliminary injunction, Mx. Schwandes claims that their speech is being chilled by the State Defendants' enforcement of section 1000.071(3). *See* ECF No. 45 at 2. Mx. Schwandes frames this claim as a prior restraint on their speech. *Id.*

Mx. Schwandes has not submitted sufficient evidence, however, for this Court to find that their speech is being chilled by the State Defendants' enforcement of section 1000.071(3). When a plaintiff claims to be suffering an ongoing chilled speech injury, the injury-in-fact analysis turns on whether a plaintiff has demonstrated an "unambiguous intention at a reasonably foreseeable time to engage in a course of conduct arguably affected with a constitutional interest, but proscribed

by a statute or rule . . . ." *Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011). Here, Mx. Schwandes has not identified any speech that they *would* engage in at a foreseeable time that is barred by section 1000.071(3).[7] Unlike Ms. Wood, Mx. Schwandes has not averred that they are subject to section 1000.071(3)'s speech restrictions by virtue of any current public employment. Nor has Mx. Schwandes averred that they are currently looking for employment at a school where they would be subject to section 1000.071(3)'s speech restrictions. Nor has Mx. Schwandes averred that they would either speak notwithstanding section 1000.071(3)'s prohibitions and face discipline or alter their speech to avoid discipline in the event they are employed as a public school teacher in Florida in the foreseeable future. In short, Mx. Schwandes has not come forward with any evidence showing that they intend to engage in speech in the foreseeable future that would violate section 1000.071(3).

Without evidence demonstrating that Mx. Schwandes is either currently subject to section 1000.071(3)'s speech restrictions or that they face an imminent injury at a foreseeable time in the future, this Court cannot find that Mx. Schwandes

---

[7] To be sure, Mx. Schwandes has identified past speech that arguably violates section 1000.071(3)—they claim that FLVS fired them for it. *See* ECF No. 45 at 3–5. But in their motion for preliminary injunction, Mx. Schwandes doesn't frame their First Amendment claim as a retaliation claim involving ongoing harm from past speech. Instead, Mx. Schwandes frames their First Amendment claim as challenging section 1000.071(3)'s *prior restraint* on their speech, which necessarily implicates their right to speak now and in the foreseeable future. Under this framework, the only plausible ongoing First Amendment injury Mx. Schwandes could invoke is a chilled speech injury.

has met their burden to show an ongoing actual or imminent First Amendment injury for purposes of a preliminary injunction. Accordingly, Mx. Schwandes's motion for a preliminary injunction on their First Amendment claim is due to be denied for lack of standing.

Next, this Court turns to the merits of Plaintiffs' Title VII claims.

B

As to the merits of Plaintiffs' Title VII claims, neither Plaintiff has demonstrated a substantial likelihood of success with respect to their Title VII claims.

First, Ms. Wood. Ms. Wood argues that requiring her to comply with section 1000.071(3) by referring to herself as "Teacher Wood" is an adverse employment action under Title VII. Ms. Wood further argues she faces an "ongoing and irreparable" Title VII injury because she is "forced to live under threat of termination and delicensing" while she is at work. ECF No. 11 at 30. This requirement causes Ms. Wood extreme anxiety. ECF No. 11-1 ¶ 10. Ms. Wood also argues that the impact of section 1000.071(3) is not limited to her subjective feelings—a reasonable person in her position would find their terms and conditions of employment adverse if they were required to introduce themselves using different pronouns.

To succeed under Title VII, Ms. Wood must do more than demonstrate that compliance with section 1000.071(3) is painful. She must assert facts sufficient to

show that the policy constitutes "a serious and material change in the terms, conditions, or privileges of employment." *Crawford v. Carroll*, 529 F.3d 961, 970–71 (11th Cir. 2008). While no bright-line test has been adopted for what type of change counts as "serious and material," in this Circuit, adverse employment actions are generally those "that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone." *Davis v. Legal Servs. Alabama, Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021). Direct economic consequences are not necessarily required for such a showing. Standing alone, a seemingly neutral action, such as a transfer to a different position, may be adverse if it involves reduction in prestige or responsibility. *See Holland v. Gee*, 677 F.3d 1047, 1057 (11th Cir. 2012).

At this stage, Ms. Wood has not demonstrated that her required compliance with section 1000.071(3), standing alone, has impacted her salary or her status as a teacher. The record before this Court does not indicate that Ms. Wood was transferred, demoted, or passed over for training or promotion. Further, Ms. Wood has not asserted that the prestige or responsibility of her position as an educator has been diminished. In short, Ms. Wood has not sufficiently demonstrated that she suffered the type of adverse employment action that is actionable under Title VII.

Even though she has not met her burden with respect to suffering an adverse employment action, Ms. Wood could still pursue relief under Title VII on a hostile work environment theory.[8] This would require Ms. Wood to demonstrate that she experiences mistreatment based on her sex and that the mistreatment is "sufficiently severe or pervasive that it can be said to alter the terms, conditions, or privileges of employment." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020). Under this theory, Ms. Wood would not need to prove she suffered a "tangible effect[]" with respect to her employment. *Copeland v. Georgia Dep't of Corr.*, --- F.4th ---, 2024 WL 1316677, at *5 (11th Cir. Mar. 28, 2024) (internal citation omitted).

But succeeding on this theory requires a showing that the workplace is "permeated with discriminatory intimidation, ridicule, and insult . . . ," *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002), and that the misconduct is either severe or pervasive, *Copeland*, 2024 WL 1316677 at *5. Further, a court must look to all of the relevant circumstances to determine whether an environment is hostile or abusive. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). These circumstances include "the frequency of the discriminatory conduct; its severity;

---

[8] This Court notes that Ms. Wood has not specifically raised a hostile work environment theory in her motion or the complaint. This theory only appears in passing in her reply to Defendant's response in opposition to the motion for preliminary injunction, ECF No. 69 at 27.

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

Based on the record before this Court, Ms. Wood has simply not presented sufficient facts to demonstrate a substantial likelihood of success under a hostile work environment theory. This Court credits Ms. Wood's declaration. And, after reading Ms. Wood's declaration, this Court can imagine that her workplace may have become hostile after section 1000.071(3) was implemented. However, Ms. Wood has not met her burden to demonstrate as much. Success on the merits cannot rest on this Court's imagination. There is no doubt that Ms. Wood must comply with the law and use the title "Teacher" on a daily basis. There is no doubt that Ms. Wood is not permitted to correct students who misgender her when they accidentally or intentionally refer to her as "Mr." or as "him." Beyond that, however, the record does not reveal how often she is misgendered, or otherwise mistreated, by others in the workplace.[9]

---

[9] The Eleventh Circuit's recent decision in *Copeland* provides useful guidance regarding what level of specificity will suffice. In *Copeland*, a transgender plaintiff demonstrated frequent and severe harassment by "identifying 34 individuals he says harassed him at work," "describ[ing] how each of these individuals participated in his harassment . . . ," and "identif[ying] a list of instances of harassment he prepared that spans seven typed pages." 2024 WL 1316677 at *6. Additionally, "he testified that the radio harassment he experienced occurred 'daily'—'three or four' times each day for at least a year." *Id. Cf. Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1335 (11th Cir. 2023) (concluding that testimony that plaintiff's coworkers made racist comments multiple times "lacked specificity necessary to show frequency").

Nor has Ms. Wood sufficiently established, based on this record, that the conduct was severe. Ms. Wood notes that "several students have referred to me using he/him pronouns or by Mr." ECF No. 11-1 at 5. While misgendering can be evidence of sex-based harassment, the circumstances surrounding the misgendering remain unclear. For example, it is not clear whether the misgendering was intentional, or whether Ms. Wood's supervisors condoned, or were even aware of, the specific incidents asserted.

At this stage, Ms. Wood bears the burden to prove that she suffered an adverse employment action or that she faces a hostile work environment. As mentioned above, this Court credits Ms. Wood's declaration. However, this evidence lacks the detail necessary for Ms. Wood to carry her burden here. As a result, Ms. Wood has not demonstrated a substantial likelihood of success with respect to her Title VII claim.

Mx. Schwandes's Title VII claim fails, at this stage, for the same reason. Namely, Mx. Schwandes has not demonstrated that they are likely to succeed on the merits with respect to their claim that they suffered an adverse employment action traceable to the State Defendants. Mx. Schwandes argues that the investigation initiated and handled by the State Defendants is an adverse employment action under Title VII. Thus, the question for this Court is whether, standing alone, an investigation into an employee's conduct for the purpose of professional licensure is

the type of "serious and material" change cognizable as an adverse employment action under Title VII. *Davis v. Legal Servs. Alabama, Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021).

There is no binding case law directly on point. The Eleventh Circuit has issued opinions addressing somewhat analogous internal investigatory and disciplinary procedures in the workplace. *See, e.g.*, *Davis*, 19 F.4th at 1267 (holding that suspension with pay is not an adverse employment action); *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1300–1301 (11th Cir. 2005) (holding that "reprimands[,]" "negative evaluations[,]" "threat of job loss[,]" and "threats of suspensions without pay" were not an adverse employment action—even considered in the aggregate); *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) ("*Lake Park*") (holding that where an employee received two negative job performance memoranda criticizing his performance, had a "demotion" in title and work assignments but "did not suffer any reduction in salary, loss of benefits [or] denial of promotions" there was no adverse employment action), *overruled on other grounds as recognized by Crawford*, 529 F.3d at 974.

Most notably, in *Davis v. Legal Services Alabama, Inc.*, the Eleventh Circuit was faced with a Title VII plaintiff who was placed on administrative leave, with pay, pending an investigation into the employee's conduct. The employee argued that this period of compelled leave qualifies as an adverse employment action. The

court in *Davis* rejected that such circumstances, standing alone, could constitute an adverse employment action.[10] Instead, the court reasoned that a paid suspension represented "a useful tool" an employer could use to "investigate when an employee has been accused of wrongdoing" and that employers should not be exposed to Title VII liability for using it. *Davis*, 19 F.4th at 1267.

Implicit in *Davis* is the proposition that an internal investigation into an employee's conduct is not an adverse employment action. *Id.* The investigative leave in *Davis* and the ongoing investigation into Mx. Schwandes's teaching license both represent intermediate steps before more concrete employment action may be taken.[11] The investigation into Mx. Schwandes is, if anything, a less significant intrusion into the terms and conditions of their employment than the intrusion faced by the employee in *Davis*, who was both investigated and placed on leave. And if being placed on leave *and* subjected to an investigation is not an adverse employment action under Title VII, this Court must conclude that being subjected

---

[10] The Eleventh Circuit also noted that "[n]o Circuit has held that a simple paid suspension, in and of itself, constitutes an adverse employment action." 19 F.4th at 1266.

[11] This Court acknowledges that this analogy is far from perfect. In large part, this is because the State Defendants are not Mx. Schwandes's employers in the traditional sense of the word. Mx. Schwandes's traditional employer (FLVS) is not a party to this motion for preliminary injunction. Rather, Mx. Schwandes's Title VII claim rests on a novel application of a somewhat esoteric theory on the bounds of third-party "employer" liability under Title VII, where liability can extend beyond the "immediate employer-employee relationship." *See* ECF No. 45 at 16–18 (quoting *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988).

to investigation alone would not suffice.[12] Further, Mx. Schwandes has provided no evidence that the *ongoing* investigation prevents them from teaching *now*. Instead, they argue that a *potential* suspension of their teaching license in the *future* might prevent them from teaching at some later date. But as the Eleventh Circuit recognized in *Akins*, threats of future adverse employment actions are not generally adverse employment actions in and of themselves. *See* 420 F.3d at 1301. Therefore, until the time their license is actually suspended, or some other more tangible action is taken, the investigation into Mx. Schwandes is not an adverse employment action under Title VII's substantive discrimination provision.

In saying that, this Court in no way means to minimize the investigation into Mx. Schwandes or imply it is no big deal. It certainly is a big deal. And this Court is cognizant of the immense psychological distress that someone can experience when facing potential suspension of their professional license. Moreover, while being subjected to an investigation of this type may easily be described as harmful, injurious, or even adverse in colloquial terms, under the meaning of Title VII, such

---

[12] Given the theory of employer liability discussed *supra*, this Court ignores those employment actions taken against Mx. Schwandes by FLVS and analyzes the Title VII liability of the State Defendants based only on the actions of the State Defendants. Mx. Schwandes has not made any arguments that the employment actions of FLVS can be imputed onto the State Defendants. Accordingly, the only conduct at issue for purposes of the motion for preliminary injunction are the State Defendants' initiation of the investigation into Mx. Schwandes, and the threat of a potential license suspension in the future. FLVS's decision to terminate them in October 2023 only provides context here—it is not at issue.

an investigation is not an "adverse employment action."[13]   The Eleventh Circuit made clear that "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Lake Park*, 245 F.3d at 1238. That is true even when that conduct is motivated by discriminatory intent.

In sum, the law recognizes only a specific subset of antagonistic conduct by an employer as conduct actionable as substantive discrimination under Title VII. *Davis*, 19 F.4th at 1266–69. The pending investigation into Mx. Schwandes is simply not the type of conduct that Title VII recognizes as actionable. Accordingly, Mx. Schwandes has failed to demonstrate that they are substantially likely to succeed on the merits of their Title VII claim for purposes of the motion for preliminary injunction. As to Ms. Wood, her evidence could arguably contribute to proving a hostile work environment, which is conduct actionable under Title VII. However, Ms. Wood has not carried her burden, at this juncture, to establish that she is subject to a hostile work environment or any other actionable conduct under Title VII.

---

[13] In no way does this Court mean to suggest that a subsequent suspension of Mx. Schwandes's teaching license would not constitute an adverse employment action. That issue is not before this Court. Nor does this Court mean to suggest that the current investigation, even absent a suspension, might not fulfill the adverse employment action element of a Title VII retaliation claim. Title VII retaliation claims are subject to a more flexible standard to determine what employment actions are actionable—namely, whether "the mistreatment 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63 (2006)). That question is also not before this Court in Mx. Schwandes's amended motion for preliminary injunction.

Accordingly, both Plaintiffs have failed to demonstrate a likelihood of success on the merits with respect to their Title VII claims.

Next, this Court considers the merits of Ms. Wood's First Amendment claim.

C

Turning to the merits of Ms. Wood's First Amendment challenge, the issue before this Court is whether section 1000.071(3) violates Ms. Wood's First Amendment right to free speech. Both sides agree that Ms. Wood's First Amendment claim is properly analyzed under the two-step framework from *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Under *Garcetti*, the first step requires this Court to consider "whether the employee spoke as a citizen on a matter of public concern." *Id*. If not, the speech at issue is not protected by the First Amendment. But if this Court concludes that Ms. Wood is speaking as a citizen on a matter of public concern, the second step requires this Court to determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id*. (citing *Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968)). That is, whether the speech restriction at issue is "necessary for [the government] employer[] to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)).

Starting with *Garcetti*'s first step, whether Ms. Wood is speaking as a citizen on a matter of public concern when she shares her pronouns and title with students while at work, this Court must answer two questions. First, is Ms. Wood speaking as a citizen when she shares her preferred pronouns and title with students while at work? Second, is sharing her title and pronouns speech on a matter of public concern?

1

As to the first question, this Court is guided by *Garcetti* and the Supreme Court's recent decision in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022). In *Kennedy*, the Court reiterated that determining whether a public employee's speech is pursuant to official duties requires a "practical inquiry," because to otherwise focus on the terms of a formal job description "would be to allow public employers to use 'excessively broad job descriptions' to subvert the Constitution's protections." *Id*. at 529. This "practical inquiry" requires this Court to analyze the speech at issue in context, taking into consideration the facts surrounding the substance of the speech and the nature of its utterance.

For example, in *Kennedy*, the Supreme Court engaged in a practical inquiry into the public employee's speech at issue—namely, public prayers after football games where the public employee was responsible, and on duty, as a public high school football coach. Notably, while publicly praying on duty as the high school

24

football coach, the Supreme Court found that the coach "did not speak pursuant to government policy," nor did he seek "to convey a government-created message," nor was he "instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach." *Id*. at 529–30. After considering the context of the speech at issue— including the personal nature of his prayers, and the timing and circumstances during which his prayers were uttered—the Supreme Court determined that the coach's "prayers did not owe their existence to Mr. Kennedy's responsibilities as a public employee." 597 U.S. at 530. Ultimately, the Court concluded that he had carried his "threshold burden" to demonstrate that he was speaking as a private citizen on a matter of public concern while publicly praying at work as a public high school football coach. Thus, *Kennedy* teaches that the inquiry into whether public employee speech is private or made pursuant to official duties is nuanced.[14]

---

[14] This Court does not want to believe the cynical suggestion by some commentators that *Kennedy* represents only a strained, results-oriented decision to permit school-sponsored prayer. *See, e.g.*, Mark Joseph Stern, *Supreme Court Lets Public Schools Coerce Students into Practicing Christianity*, Slate, June 27, 2022, 4:19 PM, https://slate.com/news-and-politics/2022/06/coach-kennedy-bremerton-prayer-football-public-school.html (last visited March 30, 2024). Instead, this Court reiterates that *Kennedy* makes plain that speech made while on the job or "in the office" as a public employee is not automatically outside of the First Amendment's protection pursuant to *Garcetti*. *See, e.g.*, 547 U.S. at 420–21 ("Employees in some cases may receive First Amendment protection for expressions made at work." Indeed, "it would not serve the goal of treating public employees like 'any member of the general public,' to hold that all speech within the office is automatically exposed to restriction.") (quoting *Pickering*, 391 U.S. at 573)). Instead, courts must look to the full context in which the speech occurs to determine whether it falls within the First Amendment's protection.

Here, Defendants argue that Ms. Wood's speech falls squarely within the scope of her official duties. ECF No. 60 at 37. Defendants' argument is simple— "Teachers are hired to speak to students; it's their job." *Id*. Thus, according to Defendants, every word that comes out of a teacher's mouth while speaking to students at school is subject to government restriction without First Amendment protection, end of story. But *Kennedy* rejects the notion that anything a teacher says at school is automatically government speech.[15] So, the question becomes whether identifying yourself to students throughout the school day is government speech. Defendants say it is. In their view, because you decided to work as a public school teacher, the State can dictate how you describe yourself to students. Taken to its extreme, Defendants' argument permits the State to rename public school teachers by virtue of the fact that they have been hired to teach—and therefore speak—to students. But it is not so simple as that. Once again, *Kennedy* and *Garcetti* provide guidance when analyzing this argument.

Both *Kennedy* and *Garcetti* teach us to look to the kind of speech the employee uttered and the time and circumstances under which she uttered this speech to determine whether it is private speech. But the Supreme Court has not held these factors to be exhaustive. Instead, pursuant to *Kennedy* and *Garcetti*, the "practical

---

[15] "[T]his argument commits the error of positing an 'excessively broad job description' by treating everything teachers and coaches say in the workplace as government speech subject to government control." 597 U.S. at 530–31.

inquiry" this Court must perform involves a context-specific and fact-intensive review to determine whether a public employee's speech is made pursuant to their official duties. Accordingly, as *Kennedy* and *Garcetti* require, this Court proceeds with its own "practical inquiry" to determine whether Ms. Wood is speaking pursuant to her official duties whenever she provides her pronouns or title to students while at work.

Consider the nature of the expression. Ms. Wood wishes to refer to herself as "Ms. Wood" and disclose her preference to be referred to with "she/her" pronouns. She does this because, for her, the title "Ms." and the pronouns "she/her" are directly tied—indeed, "essential"—to her identity as a woman. *See* ECF No. 11-1 ¶ 2 ("I am a transgender woman. My gender identity is female, but my sex assigned at birth is male. I socially transitioned to being a woman in 2020, everywhere in my life . . . . Being able to express myself as a woman publicly, including by using my Ms. title and she/her pronouns, is essential to my identity."). Like Coach Kennedy's professed faith, Ms. Wood's preferred pronouns and title are uniquely personal to her. In the same sense that Coach Kennedy's public prayers identify him as a man of faith, Ms. Wood's expression of her preferred title and pronouns identify her as a woman.

This self-referential speech is unique to Ms. Wood, as it is for every individual, and owes its existence to her personal identity, not her official duties as a public school teacher. She identifies as a woman both inside and outside of the

classroom. It is no answer to say she would have no occasion to provide her pronouns and preferred title to students but for her role as a public school teacher. The same could be said of Coach Kennedy and his choice to pray publicly, alongside his student athletes, on the football field at the conclusion of his team's games. Absent his employment as a high school football coach, Coach Kennedy would have no platform to pray publicly on the school's field alongside his students. But, as *Garcetti* established, expression of speech within the office—or in this case, within the schoolhouse—is not dispositive of the inquiry. 547 U.S. at 420 ("Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees 'like any member of the general public' to hold that all speech within the office is automatically exposed to restriction.").

This Court recognizes that Ms. Wood's self-referential speech may occur while she teaches Algebra. But the sharing of her preferred pronouns and title to students—the simple act of introducing herself as "Ms. Wood" and telling students her preference to be referred to with "she/her" pronouns—is not speech limited to her duties in teaching the lesson for the day. Rather, as Ms. Wood attests, "[a]s a teacher, [her] title is how [she] is known." ECF No. 11-1 ¶ 19. She "hear[s] and use[s] [her] title hundreds of times a day." *Id*. As many teachers do, Ms. Wood ordinarily writes her name—"Ms. Wood"—on her whiteboard for all to see in her classroom. *Id*. ¶ 7. She also writes her preferred pronouns alongside her name. *Id*.

Before the challenged provision went into effect, she referred to herself as "Ms. Wood" in any communications she had with students. *Id*. Thus, her speech occurred throughout the school day, during *any* communications Ms. Wood had with students, regardless of whether Ms. Wood was instructing her class.

Certainly, no one would mistake Ms. Wood's reference to herself—based on her personal identity—to be conveying the government's message regarding her identity. Moreover, neither Coach Kennedy's public prayers nor Ms. Wood's expression of preferred pronouns in school seeks "to convey a government-created message." Both Coach Kennedy and Ms. Wood are expressing their own personal messages about their own personal identities to their students—identities that exist independent from their roles as coach or teacher. Coincidentally, in both cases, the message of both their public prayer and their preferred title and pronouns appears to be at odds with the messages the government would have them express about their identities while at work.

Apparently recognizing the limitations *Kennedy* and *Garcetti* place on the extent to which the government can control its employees' speech, Defendants attempt to redefine their speech code as a regulation of "curricular" speech in line with the State of Florida's "pedagogical interest" in controlling the message on sex and gender identity at school. Why do Defendants attempt to force Ms. Wood's desired speech into the "curriculum" category? Perhaps they believe that reframing

the issue as one of competing pedagogical choices would avoid the First Amendment problem that the State of Florida has, once again, created for itself. But Defendants' position is undercut by the scope of the challenged restriction.

Section 1000.071(3) does not apply solely to teachers or coaches—public school employees that one may ordinarily associate with *teaching* students. The restriction applies to *all* employees and contractors of public K-12 educational institutions. *See* § 1000.071(3), Fla. Stat. ("*An employee or contractor of a public K-12 educational institution* may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex.") (emphasis added). That means *every* public school employee—from the custodian to the school nurse, and the cafeteria worker to the bus driver—is restricted from expressing their preferred pronouns or titles to students if the pronouns or titles do not correspond with the State of Florida's understanding of sex. This restriction applies *regardless* of whether the employee has any responsibility at all for *teaching* students. The plain language of the statute undermines Defendants' assertion that the pronoun and title restrictions represent a "pedagogical" choice on the part of the State of Florida.

This Court is further unpersuaded by several, readily distinguishable cases Defendants cite in furtherance of their "pedagogical interest" argument. *See* ECF No. 60 at 37–38 (discussing *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted*

30

*Village Sch. Dist.*, 624 F.3d 332 (6th Cir. 2010) and *Mayer v. Monroe Cnty. Comm. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007)). These cases deal with true "curricular" disputes regarding the materials or subjects the teachers had been hired to teach and do not answer the question before this Court. Given the personal, self-identifying speech at issue in this case, and the broad application of this restriction to every employee or contractor in the public K-12 context regardless of whether they are responsible for teaching students, this Court concludes that the restriction itself is not simply a "pedagogical" or "curricular" choice.[16]

Similarly, it is no answer that the State of Florida has labeled this speech restriction as the "policy" of all public K-12 institutions. The official "policy" label does not necessarily transform Ms. Wood's speech into a government message whenever she introduces herself or provides her pronouns to students. *See* § 1000.071(1), Fla. Stat. ("It shall be the policy of every public K-12 educational institution that is provided or authorized by the Constitution and laws of Florida that

---

[16] Here, nobody has suggested that Ms. Wood has ever attempted to hijack her class instruction of Algebra to teach a different, off-topic subject, or that she has decided to use controversial teaching methods that do not meet the school's expectations. Indeed, Ms. Wood does not even argue that this case poses a question concerning "academic freedom," or that her speech falls within *Garcetti*'s "scholarship and teaching" carve-out that this Court has recently applied to claims involving professors in the public college and university context. *See, e.g.*, *Pernell v. Fla. Bd. of Govs. of St. Univ. Sys.*, 641 F. Supp. 3d 1218, 1243 (N.D. Fla. 2022). Instead, the unrebutted evidence in this record demonstrates that Ms. Wood was hired to teach Algebra to tenth graders. ECF No. 11-1 ¶ 2. Her personal identity as a woman and the use of speech consistent with that identity has nothing to do with the job for which she has been hired to do—namely, to teach Algebra to tenth graders.

a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex."). Indeed, relabeling any public employee speech restriction as a "state policy" or a "government message" amounts to using an "excessively broad job description to subvert the Constitution's protections," contrary to *Kennedy* and *Garcetti*. *See Kennedy*, 597 U.S. at 529; *Garcetti*, 547 U.S. at 419 ("The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens.").

Moreover, this Court reiterates that Defendants have not demonstrated that anyone would think Ms. Wood is speaking for the State or conveying a government message when she refers to herself as "Ms. Wood" or shares her preferred pronouns.[17] Considering the full context of Ms. Wood's speech—particularly the personal, self-referential nature of the speech and the circumstances during which she engages in such speech in and out of the classroom—this Court concludes that Ms. Wood has carried her threshold burden to demonstrate that she is speaking as a citizen, and not pursuant to her official duties, when she provides her preferred title

---

[17] This Court recognizes that some public employees do owe their official titles to their public employment, and thus, the speech they use to identify themselves to citizens and coworkers pursuant to these titles is arguably subject to government control. For example, police departments ordinarily utilize a hierarchical structure that assigns specific titles to police officers based on their assigned ranks (sergeant, detective, etc.). But, here, Defendants have offered no argument that the customary address of "Mr. Smith" or "Ms. Wood" owes its existence to a public school employee's job at the school, rather than to the common usage of signaling polite manners or respect to an adult.

and pronouns to students. Her self-identifying speech, which effectively signals her personal identity as a woman, is independent from the speech she has been hired to provide. It owes its existence not to her professional responsibilities as a math teacher, but instead to her identity as a woman—an identity that remains true to Ms. Wood both inside and outside the classroom.

In short, this Court finds that Ms. Wood is speaking as a citizen when she provides her preferred title and pronouns to students. Next, this Court considers whether such speech is a matter of public concern.

2

Having concluded that Ms. Wood is speaking as a citizen when she shares her title ("Ms. Wood") and preferred pronouns ("she/her") with her students, this Court must next determine whether this speech is on a matter of public concern. *Garcetti*, 547 U.S. at 418. Speech that can be "fairly considered as relating to any matter of political, social, or other concern to the community," or which "is a subject of legitimate news interest; that is, subject of general interest and of value and concern to the public," is considered speech on a matter of public concern. *See Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). This Court must "examine the content, form, and context of that speech, as revealed by the whole record," to decide "whether speech is of public or private concern." *Snyder*, 562 U.S. at 453 (internal quotation marks and citation omitted);

33

*see also Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1283 (11th Cir. 2006) (quoting *Connick*, 461 U.S. at 147–48).

The Eleventh Circuit has recognized that "[c]ontent is undoubtedly the most important factor in assessing whether particular speech touches on a matter of public concern." *Mitchell*, 478 F.3d at 1284. When assessing content, this Court looks to "whether the speech communicates 'a subject of legitimate news interest, a subject of general interest and of value and concern to the public at the time." *Id*. (cleaned up). Here, the content of Ms. Wood's speech includes referring to herself as "Ms. Wood" to her students, writing "Ms. Wood" and "she/her" on her whiteboard, and communicating her preference to be referred to by "she/her" pronouns at school. Without question, the content of Ms. Wood's speech communicates "a subject of general interest and of value and concern to the public at the time." *Id*.

"Never before have titles and pronouns been scrutinized as closely as they are today for their power to validate—or invalidate—someone's perceived sex or gender identity." *Meriwether v. Hartop*, 992 F.3d 492, 509 (6th Cir. 2021); *see also* Chan Tov McNamara, *Misgendering*, 109 Cal. L. Rev. 2227, 2232–33 (2021) (noting that "misgendering has played a sizable role in the culture war surrounding the social equality of gender minorities," and that "[o]n the one hand, the increased awareness of gender-diverse identities has launched a movement for the use of gender-appropriate language that has spread across campuses and workplaces and entered

the national conversation," but "[o]n the other hand, many critics have decried gender-appropriate language as 'political correctness run amok' among many other less courteous critiques"). Defendants agree that "the use of preferred pronouns and titles 'has produced a passionate political and social debate.' " ECF No. 60 at 9 (quoting *Meriwether*, 992 F.3d at 508).

Here, the State of Florida has decided to weigh in on this "passionate political and social debate." Indeed, Ms. Wood points to the fact that the State of Florida has determined that pronoun and gendered title usage is of such importance to the public as to enact an official policy to control this speech in public schools. ECF No. 11 at 25–26 (citing § 1000.017(1), Fla. Stat.). Arguably, the challenged provision, itself, is the best evidence that Ms. Wood's speech is "fairly considered as relating to [a] matter of political, social, or other concern to the community" and is a "subject of general interest and of value and concern to the public." *See Lane*, 537 U.S. at 241.

The form of Ms. Wood's speech—publicly sharing her title and preferred pronouns to students—also weighs in favor of concluding that Ms. Wood is speaking on a matter of public concern. She does not wish to communicate her preference or express her identity only to trusted friends, family, or coworkers. Rather, she publicly transitioned in 2020 and has been living openly as a transgender woman since that time. ECF No. 11-1 ¶ 2. She desires to express that identity publicly in every facet of her life, including work. *Id*. Of course, Defendants recognize that by

communicating her preferred pronouns and title to her students, Ms. Wood is sending a message to the public—in this case, a message that they claim the State of Florida has the right to control. *See* ECF No. 60 at 33 (noting that section 1000.071(3) "ensures that public employees do not provide students with messages that contradict State policy on the topic of sex"); *id*. at 41 (asserting Ms. Wood's speech "conveys a government-created message").

The context of Ms. Wood's speech further underscores that her speech is on a matter of public concern. Here, the context is intermeshed with the content and form of Ms. Wood's speech. This Court reiterates that Ms. Wood is a transgender woman who has socially transitioned in every aspect of her life. ECF No. 11-1 ¶ 2. Being able to express herself as a woman publicly, including by using her Ms. title and she/her pronouns, "is essential to [her] identity." *Id*.

In addition, the broader context in which Ms. Wood finds herself speaking— as a transgender public school teacher in Florida—further informs this Court's inquiry. *See Rankin v. McPherson*, 483 U.S. 378, 386 (1987) (considering broader context in which statement was made, including the fact that an attempt had recently been made on the President's life); *Mitchell*, 468 F.3d at 1279, 1285–86 (considering statements within broader context of Public Access funding debate that had been the subject of several news stories two weeks before employee's termination). For Ms. Wood, the freedom to use the title "Ms." and to share her preferred pronouns at

36

school is essential to her "basic humanity," as it publicly declares her existence as "a transgender person." ECF No. 11-1 ¶ 21. And nobody seems to dispute that the existence of transgender people in public schools is a matter of public concern in Florida. *See, e.g.*, *Adams ex rel. Kasper v. Sch. Bd. of St. Johns County*, 57 F.4th 791, 817–21 (11th Cir. 2022) (Lagoa, J., specially concurring) (noting concerns about equating "sex" to "transgender status" with respect to Title IX's protections in public schools, which could lead to "a commingling of the biological sexes in the female athletics arena" that "would significantly undermine the benefits afforded to female athletes under Title IX's allowance for sex-separated sports teams"); *id*. at 838–39 (Pryor, J., dissenting) (discussing evidence of Florida school district's task force formed to review policies relating to, among other issues, policies "concerning the treatment of transgender students"); *see also* ECF No. 77-1 at 5 (settlement agreement from Case No.: 4:22cv134-AW/MJF addressing scope of Florida law limiting classroom instruction on "gender identity," and narrowing scope of law so as to permit "transgender teachers [to put] a family photo on their desk . . . or [to] refer[] to themselves and their spouse (and their own children)").

Here, the record demonstrates that Ms. Wood is motivated to speak publicly about her identity, as the purpose of sharing her preferred title and pronouns serves to publicly affirm her identity as a transgender woman. That Ms. Wood's gender identity is a deeply personal matter for her does not eliminate the public concern

attendant to Ms. Wood's self-referential speech. Nor does the personal nature of the speech nullify Ms. Wood's intent to declare her existence as a transgender person to the public.[18]

Ms. Wood's case is distinguishable from the "employee grievance" cases in this Circuit where, for instance, plaintiffs used internal channels to raise complaints about their employer's operations and management, *see, e.g.*, *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1166–67 (11th Cir. 2015), or where plaintiffs' complaints of workplace disputes only incidentally touch on matters of public concern, s*ee, e.g., Pearson v. Macon-Bibb Cnty. Hosp. Auth.*, 952 F.2d 1274, 1279–80 (11th Cir. 1992). As this Court has explained, *supra*, Ms. Wood's speech is not intended to convey a grievance about her workplace. Instead, it is intended to bring attention to her identity as a transgender woman.

Defendants make the circular argument that while the pronouns and titles Ms. Wood uses in school are a matter of public concern for the State of Florida, they cannot be a matter of public concern for Ms. Wood. **But the State of Florida can't**

---

[18] While the Court did not reach the issue of public concern in *Kennedy*, the same is arguably true with respect to Coach Kennedy's deeply personal and "private religious expression." 597 U.S. at 517. No doubt, the personal nature of his giving "thanks through prayer" at the conclusion of his team's games did not nullify Coach Kennedy's apparent intent to send a message about his religious identity by "taking a knee at the 50-yard line and praying quietly for approximately 30 seconds." *Id*. at 514–15.

politicize deeply personal matters only to then deprive citizens of First Amendment protections on the ground that those matters are indeed deeply personal.

Defendants' argument in opposition also necessarily depends upon this Court first concluding that the speech at issue is pursuant to official duties. *See* ECF No. 60 at 43–44 (citing *Evans-Marshall*, 624 F.3d at 342). But, as this Court has already explained at length, Ms. Wood *is* speaking as a citizen when she shares her preferred pronouns and refers to herself as "Ms. Wood" at work.

Accordingly, for the reasons set out above, considering the whole record, and given the undisputed "passionate political and social debate" surrounding gender identity and pronoun usage, this Court finds that Ms. Wood's speech is on a matter of public concern. Having determined that Ms. Wood is speaking as a citizen on a matter of public concern when she shares her preferred title and pronouns to students, this Court turns to *Garcetti*'s second step and asks whether Defendants' asserted interests justify the challenged restriction on her speech.

3

Having determined that Ms. Wood is speaking as a citizen on a matter of public concern when she shares her preferred title and pronouns with students, this Court moves to *Garcetti*'s second step to determine whether Defendants have " 'an adequate justification for treating [Ms. Wood] different from any other member of the public' based on [Defendants'] needs as an employer." *Lane*, 573 U.S. at 242

(quoting *Garcetti*, 547 U.S. at 418)); *see also Green v. Finkelstein*, 73 F.4th 1258, 1267 (11th Cir. 2023). This Court must consider whether Defendants' "interest in the effective and efficient fulfillment of its responsibilities to the public" outweighs Ms. Wood's interest in speaking. *Connick*, 461 U.S. at 150. In doing so, this Court may consider whether Ms. Wood's speech would "impair discipline by superiors or harmony among co-workers, have a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede the performance of the speaker's duties or interfere with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388 (cleaned up). And this Court must also keep in mind that "a stronger showing of government interests may be necessary if the employee's speech more substantially involves matters of public concern." *Lane*, 573 U.S. at 242 (cleaned up) (quoting *Connick*, 461 U.S. at 152). Finally, this Court is mindful of Justice Alito's warning that "[n]othing in the *Pickering* line of cases requires us to uphold every speech restriction the government imposes as an employer." *Janus v. Am. Fed. of St., Cnty., and Mun. Employees, Council 31*, 585 U.S. 878, 916 (2018).

Here, Defendants first attempt to justify the restriction on Ms. Wood's speech by citing the fact that public school teachers generally have diminished rights in the public school context as compared with private citizens. ECF No.60 at 46. To the extent Defendants suggest that because you're a public school teacher the

government's interests *always* trump your interests in speaking as a citizen on a matter of public concern, Defendants are incorrect. *See Kennedy*, 597 U.S. at 543–44.

Next, Defendants claim that Ms. Wood's speech would impede her job duties, because one of her duties is to "further the State's pedagogical agenda in interactions with students." ECF No. 60 at 46–47. To the extent Defendants simply repackage their failed government speech argument, that dog won't hunt.[19] As explained at length *supra*, if the matter of Ms. Wood's pronouns and title were of a curricular nature, Ms. Wood's claim likely would not make it past *Garcetti*'s step one.

Finally, Defendants' argument also suggests that even if a teacher is speaking as a citizen on a matter of public concern, and that speech conflicts with the State's official viewpoint on a given topic, then the State's interest in furthering its viewpoint necessarily trumps the teacher's interest in speaking. In doing so, the Defendants cite no case that supports the proposition that the State's interest in

---

[19] This Court repeats, reiterates, and says again, just because you label something as a "pedagogical interest," or "curriculum," does not make it so. The statute, itself, does not claim a "pedagogical" interest, nor does it refer to instruction or curriculum. *Compare* § 1000.071, Fla. Stat. *with* § 1003.4238, Fla. Stat. (setting out coursework requirements for standard high school diploma) and § 1003.46, Fla. Stat. (setting out standards for health education and instruction about AIDS). Instead, its plain terms identify only an official "policy." *See* § 1000.071(1), Fla. Stat.

Moreover, the "policy" is enacted under the chapter setting out "general provisions" governing the Florida K-20 education system rather than the chapter governing public K-12 instruction. And, as this Court noted *supra*, the scope of the statute and its application to *all* public school employees and contractors, regardless of job duties, undermine Defendants' argument that the restriction is necessary to further a pedagogical interest.

furthering its own viewpoint, standing alone, is an adequate justification for restricting *private* speech on a matter of public concern.[20] Nor has this Court's own research yielded any decision that approves of Defendants' novel theory. The relevant interests under *Garcetti*'s second step are the interests of the state as an *employer*—namely, whether the private speech will have a negative impact on the normal operations of the workplace. *See, e.g., Rankin*, 483 U.S. at 388 (considering whether speech would "impair discipline by superiors or harmony among co-workers, have a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede the performance of the speaker's duties or interfere with the regular operation of the enterprise"). But here, while Defendants have identified that Ms. Wood's speech conflicts with the State's viewpoint on pronouns, Defendants have provided no evidence for this Court to find that Ms. Wood's speech has impeded her duties as a teacher, or the normal operations of Lennard High School, or the state's interests generally as an employer.

Furthermore, Ms. Wood has provided evidence that her speech, prior to the enactment of section 1000.071(3), did not, in fact, impede her job duties as a high school math teacher. Specifically, her unrebutted declaration attests that since her employment began with the Hillsborough County School Board in 2021, she was

---

[20] Indeed, Defendants instead misplace their reliance on cases that turned on employees speaking pursuant to their official duties rather than as citizens on matters of public concern. ECF No. 60 at 47 (citing *Evans-Marshall* and *Mayer*).

open about being a transgender woman and has never hidden that fact from her superiors, coworkers, or students. ECF No. 11-1 ¶¶ 3, 6. According to Ms. Wood, her principal told her she would be supported in this regard. *Id.* ¶ 6. During her time at Lennard High School, Ms. Wood has referred to herself as "Ms. Wood" and with she/her pronouns. *Id.* ¶ 7. Almost all her colleagues and her students also referred to her as Ms. Wood. *Id.* Although some parents have had their children moved out of her classroom because of her status as a transgender woman, Lennard High School has continued to rate Ms. Wood as an "effective" teacher in her performance evaluations and her students have test scores above the district average. *Id.* ¶¶ 5, 8. Rather than impede her duties as a math teacher, Ms. Wood's freedom to publicly express her identity as a woman apparently had no effect on her ability to teach her students effectively and efficiently.[21] Based on this record, Defendants have offered no meaningful justification for the restriction on Ms. Wood's speech.[22]

---

[21] Indeed, the record demonstrates that if anything has impeded her ability to efficiently perform her duties as a math teacher, it's her attempt to comply with the challenged provision. Now that she must refer to herself as "Teacher Wood," Ms. Wood attests that many of her students have seemed confused. ECF No. 11-1 ¶ 14. The questions her students have raised about her change in title, as a direct result of section 1000.071(3), have taken away from instructional time. *Id.* Arguably, the confusion would only be more pronounced had Hillsborough County not accommodated her by allowing her to go by "Teacher Wood," but instead forced her to go by "Mr. Wood," which is what the statute appears to require.

[22] This Court does not mean to suggest that public schools would never be justified in restricting a teacher's speech with respect to how they refer to themselves. For instance, this would be a different case had a teacher been terminated for insisting that his students refer to him with profanity or some inappropriate moniker, like "Mr. Butthead." But that is not this case.

This is particularly troubling given that section 1000.071(3) incorporates a viewpoint discriminatory prohibition on Ms. Wood's speech. The State of Florida has expressly adopted a viewpoint on the use of pronouns that do not align with a person's sex assigned at birth. § 1000.071(1), Fla. Stat. ("[I]t is false to ascribe to a person a pronoun that does not correspond to such person's sex."). And Section 1000.071(3) extends the State's viewpoint to censor speech that runs counter to it. As the Eleventh Circuit recently noted, government penalization of certain viewpoints is "the greatest First Amendment sin." *Honeyfund.com Inc.*, 94 F.4th at 1277. But here, Defendants suggest that the State can penalize Ms. Wood for expressing a contrary viewpoint with respect to her pronouns.

What's more, this prohibition applies to everyone who works in public K-12 institutions. Such "widespread impact" on all school employee speech "gives rise to far more serious concerns than could any single supervisory decision." *Janus*, 585 U.S. at 907. "[W]hen such a law is at issue, the government must shoulder a correspondingly 'heavier' burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights." *Id*. (cleaned up). Here, Defendants fail to satisfy even the more lenient standard under *Pickering* and *Garcetti*.

In short, Ms. Wood has demonstrated that her interest in publicly expressing her identity as a woman by referring to herself as "Ms. Wood" and sharing her

preferred pronouns with students outweighs the State of Florida's interests in enforcing a viewpoint-based restriction on her speech. Accordingly, Ms. Wood is substantially likely to succeed on the merits of her First Amendment claim.

### III

Recall that the remaining preliminary injunction factors are (1) that Ms. Wood will suffer irreparable injury absent an injunction; (2) that the harm to Ms. Wood of not granting an injunction outweighs the harm an injunction would cause Defendants; and (3) that the injunction would not be adverse to the public interest. *Siegel*, 234 F.3d at 1176. Here, the remaining preliminary injunction factors are thoroughly intertwined with considerations already discussed regarding the merits of Ms. Wood's First Amendment claim. On balance, these factors weigh in favor of granting Ms. Wood's motion for preliminary injunction.

### A

This Court starts with irreparable injury absent an injunction, the second preliminary injunction factor.[23] Ms. Wood asserts that absent injunctive relief she will continue to suffer the ongoing, daily harm of refraining from using the pronouns and title that she would use in every other area of life while she is at work. As

---

[23] Insofar as Mx. Schwandes has failed to demonstrate both (1) standing with respect to their First Amendment claim and (2) a substantial likelihood of success on the merits with respect to their Title VII claim, this Court need not, and does not, consider the irreparable harm factor as to them. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005) ("Controlling precedent is clear that injunctive relief may not be granted unless the plaintiff establishes the substantial likelihood of success criterion.").

outlined above, Ms. Wood has established that she is substantially likely to succeed on her First Amendment claim because section 1000.071(3), by its text, prohibits her from providing her preferred personal pronouns and title to her students. That is "an unconstitutional direct penalization of protected speech," which, as the Eleventh Circuit has repeatedly concluded, "constitutes a per se irreparable injury." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) (quotation marks omitted). This Court finds that the undisputed fact that Ms. Wood must continue to alter her speech on a daily basis at work with respect to her preferred title and pronouns constitutes an imminent, irreparable harm. Absent an injunction, Ms. Wood's speech will continue to be chilled based on a state law that directly penalizes her protected speech in violation of her First Amendment rights.

Nonetheless, Defendants argue that the delay between the passage of section 1000.071(3)—May 17, 2023—and the filing of Ms. Wood's motion for preliminary injunction—December 21, 2023, ECF No. 11—"forecloses a finding of irreparable harm." ECF No. 60 at 48. Not so.

Although "delay in seeking a preliminary injunction should be considered, it's 'not necessarily fatal.'" *Larweth v. Magellan Health, Inc.*, 841 F. App'x 146, 159 (11th Cir. 2021) (quoting *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016)). A delay does not, as a rule, preclude a finding of irreparable harm. Instead, as the State Defendants agree, each case hinges on the facts—the length of

the delay and the reason, if one is given, for it. Transcript (Tr.) at 23[24]; *see also*

*Wreal, LLC*, 840 F.3d at 1248–49 (holding that district court did not err in finding

lack of irreparable harm because of five-month delay where plaintiff failed to "offer

any explanation" for delay and that record did not present "any justification" for it).

Thus, Defendants cannot defeat a finding of irreparable harm merely by pointing out

that "Plaintiffs' delays are equivalent to or longer than delays that have precluded

preliminary injunctive relief." ECF No. 60 at 48.

Defendants' argument is particularly weak considering the foregoing merits

analysis. Again, binding precedent holds that ongoing "direct penalization of

protected speech . . . constitutes a per se irreparable injury." *Otto*, 981 F.3d at 870.

Defendants recognize this precedent but submit that the delay here still defeats a

finding of irreparable harm. ECF No. 60 at 51. But they point to no case where a

court has found a direct-penalization First Amendment violation but nonetheless

declined to find irreparable harm because of a delay. Nor has this Court's own

research revealed such a case. On the contrary, this Court's research suggests that

*all* courts in this Circuit that found a direct-penalization First Amendment violation

at the preliminary injunction stage also found irreparable harm. *See, e.g.*, *Bill Salter

Advertising, Inc. v. City of Brewton*, 486 F. Supp. 2d 1314, 1317–18, 1329 (S.D. Ala.

---

[24] The transcript of the hearing on the preliminary injunction motions is located at ECF No. 80.

2007) (holding that Eleventh Circuit caselaw on direct-penalization First Amendment violations required a finding of irreparable harm despite a seven-month delay) (citing *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)). Simply put, a few months' delay does not, as a rule, preclude a finding of irreparable harm. It is, at most, one factor to "be considered." *Larweth*, 841 F. App'x at 159.

Here, this Court finds that Ms. Wood's delay does not undermine her showing of irreparable harm. Start with the length of the delay. The Governor signed the bill enacting section 1000.071(3) on May 17, 2023. That law became effective on July 1, 2023. The school year began in August 2023. Ms. Wood filed her initial complaint on December 13, 2023. Finally, Ms. Wood moved for a preliminary injunction on December 21, 2023. As Defendants indicate, this timeline yields a delay of over seven months between the enactment of section 1000.071(3) and Ms. Wood's motion for preliminary injunction. ECF No. 60 at 48.

Defendants argue, and this Court agrees, that this timeline—from enactment to preliminary injunction—is the relevant one here.[25] *See Dream Defenders v.*

---

[25] In their response, Defendants cite several cases in which the court denied preliminary injunction motions because of delays of six months or less. ECF No. 60 at 48–49. These cases are not persuasive comparison points. They deal with causes of action relating to trademark, trade secrets, and noncompete agreements, not to allegedly unconstitutional government action. This distinction matters. In trademark, trade secret, and noncompete cases, the relevant delay—between the filing of the complaint and the filing of the motion for preliminary injunction—speaks to the direness of the injury. *See, e.g.*, *Seiko Kabushiki Kaisha v. Swiss Watch Intern., Inc.*, 188 F. Supp. 2d 1350, 1355–56 ("[A] plaintiff's delay in a trademark case 'tends to neutralize any presumption

*DeSantis*, 559 F. Supp. 3d 1238, 1285 (N.D. Fla. 2021) (examining time between bill's signing into law and filing of motion for preliminary injunction). This is not an inconsequential delay, but it is not "a dramatic delay[,]" either. *See Chancey v. Ill. State Bd. of Elections*, 635 F. Supp. 3d 627, 643 (N.D. Ill. 2022) (describing eight-and-a-half-month delay between effective date of new campaign contribution limit and filing of pre-enforcement chilled-speech First Amendment challenge to it).

Now, the justifications. In her declaration, which this Court finds credible and unrebutted, Ms. Wood declares that she was informed of the restriction on her use of pronouns at a faculty meeting near the start of the new school year in August 2023. ECF No. 11-1 ¶ 9. She continued using her preferred title and pronouns for "another week or two" after the faculty meeting. ECF No. 11-1 ¶ 11. "Several weeks later," she e-mailed each member of Defendant Hillsborough County School Board about her concerns with the title and pronoun restriction. *Id.* ¶ 12. Ms. Wood's efforts were unsuccessful. As she notes, "[s]everal members of the school board responded and spoke with [her] . . . [but t]hey all said there was nothing they could do because it was a state law." *Id.*

---

that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.' ") (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)). Chilled speech in direct-penalization cases, in contrast, "constitutes a per se irreparable injury"—leaving no room for doubt as to its seriousness. *See Otto*, 981 F.3d at 870. As explained *supra*, each case hinges on the facts. Defendants cannot artificially transplant a timeline from one type of case into another.

One week later, Ms. Wood's principal and assistant principal of curriculum told her that she needed to erase "Ms. Wood" and "she/her" from her whiteboard to comply with state law and that she could have her teaching certificate taken away if she did not do so. *Id.* ¶ 13. Afterward, Ms. Wood followed up with a meeting with her Chief of Staff for the school district regarding the challenged provision. *Id.* ¶ 16. She was again "told the title and pronoun policy was state law and out of the district's hands." *Id.* It was at this point, according to Ms. Wood, that she "realized there was nothing the district could do [and] resolved to fight the state law." *Id.*

Based on the record at this stage, this Court finds that Ms. Wood acted with "reasonable diligence" in seeking preliminary injunctive relief. *See Benisek v. Lamone*, 585 U.S. 155, 159 (2018). Far from spending the semester sitting on her hands, Ms. Wood engaged in a thorough dialogue at the local level—that is, with her school and her school district—to find a solution. That those efforts were unsuccessful does not undermine their validity as a reason for her delay. The law does not penalize a plaintiff who seeks to ameliorate a statute's chill on her speech by engaging in good faith with the authorities enforcing that statute. That is what Ms. Wood did here.

The law does not demand that a plaintiff move for preliminary injunction the moment a challenged statute is enacted. Such an approach often poses ripeness issues. *See, e.g.*, *Falls v. DeSantis*, Case No.: 4:22cv166-MW/MJF, 2023 WL

3568526, *6 (N.D. Fla. May 19, 2023) (Walker, C.J.) (dismissing case for lack of jurisdiction where plaintiff's theory of standing for First Amendment claim depended on a regulation amended after plaintiff filed complaint). Here, Ms. Wood's First Amendment claim may not have ripened until July 1, 2023, the date the law went into effect, or August 22, 2023, when implementing regulations were finalized. This Court rejects the notion that a delay between the passage of the challenged provision and its effective date militates against a finding of irreparable harm.

Similarly, the law does not demand that a plaintiff seeking preliminary injunctive relief from an allegedly unconstitutional law must file suit before the law goes into effect. Although the law permits plaintiffs to bring pre-enforcement challenges, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), it does not *require* them to do so. Holding otherwise would overlook the Eleventh Circuit's caution concerning such challenges in other cases. *See, e.g.*, *Hallandale Prof. Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759–60 (11th Cir. 1991) ("Because the Union's facial attack on the City's policy is anticipatory, it raises serious questions of justiciability . . . . In the specific context of the Union's facial challenge to the City's unenforced policy, the justiciability concern chiefly at issue is one of ripeness.").

Indeed, moving quickly by bringing a pre-enforcement challenge carries its own risks, including that of not showing a "credible threat of enforcement."

*Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (quoting *Susan B. Anthony List*, 573 U.S. at 159); *see NFC Freedom, Inc. v. Diaz*, --- F. Supp. 3d ---, Case No.: 4:23cv360-MW/MJF, 2023 WL 7283920 (N.D. Fla. Nov. 3, 2023) (Walker, C.J.) (denying motion for preliminary injunction because lack of factual development on threat of prosecution precluded standing to bring a pre-enforcement challenge).

Finally, after plaintiffs retain counsel, they are allowed some time to consider their options, prepare their lawsuit, and prepare their motion. *See Georgia v. United States*, 398 F. Supp. 3d 1330, 1347 (S.D. Ga. 2019) ("The Court considers that roughly two-and-a-half month period to be a reasonable time for Plaintiffs to consider their options under the [applicable law] and decide to prepare for and pursue injunctive relief while their arbitration was pending."). And given that Defendants themselves requested an extra thirty-nine days to respond to Ms. Wood's motion for preliminary injunction, this Court infers the complexity of this case justifies a similar delay by Ms. Wood in moving for a preliminary injunction after searching for and obtaining counsel.

This Court finds that Ms. Wood's attempt to find a solution with her supervisors and school board after they enforced section 1000.071(3) against her at the start of the 2023–2024 school year constitutes a justification for her delay in moving for preliminary injunction. So do the complexity of her claim and the time

it took her to secure counsel and file suit. This Court has considered the delay and weighed it against Ms. Wood's justifications for the delay, while also mindful of the principle that "direct penalization of protected speech . . . constitutes a per se irreparable injury." *Otto*, 981 F.3d at 870 (citation omitted). On balance, this Court finds that Ms. Wood has demonstrated that she would suffer an irreparable injury absent an injunction, notwithstanding her delay in seeking relief. Accordingly, the irreparable harm factor weighs in favor of an injunction here.

As to the remaining preliminary injunction factors, weighing Ms. Wood's First Amendment injury against Defendants' interest, the scale tips decisively in Ms. Wood's favor. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). This is because the state "has no legitimate interest in enforcing an unconstitutional ordinance." *Id.* And an injunction would not be adverse to the public interest. After all, as noted above, "[t]he public has no interest in enforcing an unconstitutional ordinance." *Id.* at 1272–73. As the Supreme Court has recognized, "[t]he First Amendment, in particular, serves significant societal interests." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978).

In sum, because Ms. Wood has carried her burden as to all four of the preliminary injunction factors with respect to her First Amendment claim, this Court finds that she is entitled to a preliminary injunction.

B

Having determined that Ms. Wood is entitled to a preliminary injunction, this Court must now decide the scope of relief to which Ms. Wood is entitled. At the hearing on Ms. Wood's motion for preliminary injunction, she asserted that she seeks facial relief—in essence, an injunction prohibiting Defendants from enforcing section 1000.071(3)'s prohibition across the state. Tr. at 37–39. In so doing, Ms. Wood's counsel likened this case to *HM Florida-ORL, LLC v. Griffin*, --- F. Supp. 3d ---, 2023 WL 4157542, *1 (M.D. Fla. 2023), in which the district court granted a statewide injunction against the Department of Business and Professional Regulation Secretary's enforcement of a law[26] that the district court concluded was facially content-based, unconstitutionally vague, and overbroad. The Eleventh Circuit permitted the district court's statewide injunction to stand, pending appeal, in light of the unchallenged conclusion that the plaintiff had demonstrated a substantial likelihood of success on the merits as to its overbreadth claim. *See HM Florida-Orl, LLC*, 2023 WL 6785071 at *3 (denying motion for partial stay of injunction and noting that "a successful overbreadth challenge 'suffices to invalidate *all* enforcement of the law until and unless a limiting construction or

---

[26] Judge Presnell noted that the law at issue was "specifically designed to suppress the speech of drag queen performers." 2023 WL 4157542, at *1.

partial invalidation so narrows it as to remove the threat or deterrence to constitutionally protected expression' ").

In Ms. Wood's case, she has not alleged a First Amendment overbreadth claim in her complaint. *See* ECF No. 1. Nor has she persuasively explained why she is entitled to a statewide injunction. As the Eleventh Circuit reiterated in *HM Florida-Orl, LLC*, injunctions should generally "be limited in scope to the extent necessary to protect the interests of the parties." 2023 WL 6785071, at *3 (quoting *Garrido v. Dudek*, 731 F.3d 1152, 1159 (11th Cir. 2013)). It doesn't matter that Ms. Wood described her claim as a "facial challenge" at the hearing on her motion—a party's characterization of their challenge as facial or as-applied is not determinative, *Jacobs v. Florida Bar*, 50 F.3d 901, 905 n.17 (11th Cir. 1995).

Here, by Ms. Wood's counsel's own admission, her First Amendment claim focuses on "the core application" of section 1000.071(3) on her use of "pronouns in the classroom . . . ." Tr. at 38. That's best characterized as an as-applied challenge, particularly where Ms. Wood's papers lack any discussion of whether section 1000.071(3) is facially constitutional under the First Amendment and not just as applied to her. *See Pernell*, 641 F. Supp. at 1287–88 (discussing scope of relief and Plaintiffs' demonstration of entitlement to facial relief). Accordingly, based on this record, the scope of the preliminary injunction in this case need extend no further

than prohibiting Defendants from enforcing the challenged provision against Ms. Wood to protect her interests while this case remains pending.

IV

This Court next considers whether Ms. Wood must secure a bond in furtherance of the preliminary injunction. Rule 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). But "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.' " *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, 425 F. 3d 964, 971 (11th Cir. 2005) (alteration in original) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)). Moreover, "[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Curling v. Raffensperger*, 491 F. Supp. 3d 1289, 1326 n.25 (N.D. Ga. 2020) (quoting *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009)).

This Court recognizes that the Hillsborough County School Board is in the unenviable position of having to choose between complying with a federal court order or potentially facing financial penalties for noncompliance with section

1000.071(3). *See* ECF No. 61 at 7. However, section 1000.071(3)'s unlawful impact on Ms. Wood's First Amendment rights weighs against requiring a bond, so this Court waives the bond requirement.

V

Finally, having determined a preliminary injunction is warranted, this Court addresses whether it will stay that injunction pending appeal. Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency v. CVG Industria Venezolana de Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal. That rings true here. Because no exceptional circumstances justify staying this Order pending appeal, *see Brenner*, 999 F. Supp. 2d at 1292 (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country), this Court refuses to do so. This is particularly true here, given the balance of the interests and the limited scope of relief insofar as Defendants are enjoined only from enforcing the challenged provision

against a single person—Ms. Wood. Defendants have every right to appeal, and this Court sees no reason to delay Defendants in seeking an appeal by requiring them to move to stay under Rule 62.

VI

This Court is reminded of Walt Whitman's "Song of Myself," a gleefully sweeping masterpiece of American poetry that opens with these lines:

> I celebrate myself, and sing myself,
> And what I assume you shall assume,
> For every atom belonging to me as good belongs to you.

In sharing her preferred title and pronouns, Ms. Wood celebrates herself and sings herself—not in a disruptive or coercive way, but in a way that subtly vindicates her identity, her dignity, and her humanity. Section 1000.071(3) has silenced her and, by silencing her, forced her to inhabit an identity that is not her own. The State of Florida has not justified this grave restraint, and so the United States Constitution does not tolerate it. Ours is a Union of individuals, celebrating ourselves and singing ourselves and being ourselves without apology.

Accordingly,

**IT IS ORDERED:**

1. Plaintiff Katie Wood's motion for a preliminary injunction, ECF No. 11, is **GRANTED in part** and **DENIED in part**.

2. Ms. Wood's motion for a preliminary injunction is **GRANTED** insofar as she is entitled to a preliminary injunction on her First Amendment claim.

3. Defendants Hillsborough County School Board; the Commissioner of Education, in his official capacity as a member of the Florida Department of Education; Monesia Brown, Esther Byrd, Grazie Christie, Kelly Garcia, Benjamin Gibson, MaryLynn Magar, and Ryan Petty, in their official capacities as members of the State Board of Education; Aadil Ameerally, Jared Barr, Michael Butcher, Elayne Colon, Ann Copenhaver, Joseph Goodwin, Benjamin Henry, Timothy Holley, Lisa Innerst, Jeffrey Johnson, Kenneth LaPee, Mason Lewis, Sallie Murphy, Christine Plaza, Kevin Rowe, Charles Shaw, Orenthya Sloan, Marc Snyder, Malcolm Thomas, Jordan Tompkins, and Kathy Wilks, in their official capacities as members of the Education Practices Commission; must take no steps to enforce section 1000.071(3), Florida Statutes (2023) against Ms. Wood until ordered otherwise.

4. The preliminary injunction binds the above-listed Defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

5. Ms. Wood's motion, ECF No. 11, is otherwise **DENIED**.

6. Plaintiff AV Schwandes's motion for a preliminary injunction, ECF No. 45,

   is **DENIED**.

   **SO ORDERED on April 9, 2024.**

**s/Mark E. Walker**_____
**Chief United States District Judge**

# TAB 84

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

Wood, *et al.*,

          *Plaintiffs,*

          v.

Florida Department of Education, *et al.*,

          *Defendants.*

Case No. 4:23-cv-526-MW-MAF

## NOTICE OF APPEAL

Notice is hereby given that Defendants Florida Department of Education, State Board of Education, Monesia Brown, Esther Byrd, Grazie Christie, Kelly Garcia, Benjamin Gibson, Mary-Lynn Magar, Ryan Petty, Commissioner of Education, Education Practices Commission, Aadil Ameerally, Ana Armbrister Bland, Jared Barr, Michael Butcher, Yvonne Caldwell, Elayne Colon, Ann Copenhaver, Joseph Goodwin, Benjamin Henry, Timothy Holley, Lisa Innerst, Jeffrey Johnson, Kenneth LaPee, Mason Lewis, Sallie Murphy, Christine Plaza, Kevin Rowe, Charles Shaw, Orenthya Sloan, Marc Snyder, Malcolm Thomas, Jordan Tompkins, and Kathy Wilks (the State Defendants) appeal to the United States Court of Appeals for the Eleventh Circuit

from the order granting Plaintiff Katie Wood's motion for preliminary injunction entered April 9, 2024. *See* Dkt. 82.

Dated: April 17, 2024                 Respectfully submitted,



/s/ Bryan Weir
Bryan Weir*
Daniel Shapiro
Daniel M. Vitagliano*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: 703.243.9423
bryan@consovoymccarthy.com
daniel@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Counsel for the State Defendants*

*Admitted pro hac vice

## CERTIFICATE OF SERVICE

I filed this appendix with the Court via ECF, which will email

everyone requiring notice.

Dated: June 3, 2024
/s/ Bryan Weir

*Counsel for*
*Defendants-Appellants*