# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

KATIE WOOD, *Plaintiff-Appellee*,

AV SCHWANDES, *et al.*, *Plaintiffs*,

v.

FLORIDA DEPARTMENT OF EDUCATION, FLORIDA STATE BOARD OF EDUCATION, COMMISSIONER OF EDUCATION, EDUCATION PRACTICES COMMISSION, MONESIA BROWN, *in their official capacity as member of Defendant Education Practices Commission, et al., Defendant-Appellants*,

HILLSBOROUGH COUNTY SCHOOL BOARD, *et al.*, *Defendants*.

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:23-cv-00526-MW-MAF

## BRIEF OF APPELLEE

Simone Chriss
Jodi Siegel
SOUTHERN LEGAL COUNSEL, INC.
1229 NW 12th Ave.
Gainesville, FL 32601
(352) 271-8890

James M. Finberg
James Baltzer
ALTSHULER BERZON LLP
177 Post St., Ste. 300
San Francisco, CA 94108
(415) 421-7151

Sam Boyd
Carli Raben
SOUTHERN POVERTY LAW CENTER
2 S. Biscayne Blvd. Ste. 3750
Miami, FL 33131
(786) 347-2056

Diego A. Soto
Jessica L. Stone
SOUTHERN POVERTY LAW CENTER
150 E. Ponce De Leon Ave. Ste. 340
Decatur, GA 30030
(404) 521-6700

*Counsel for Plaintiff-Appellee and Plaintiffs*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Per Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Appellee certifies that the following have an interest in the outcome of this appeal:

1.    Akerman LLP, *Counsel for Defendant*

2.    Altschuler Berzon LLP, *Counsel for Plaintiffs and Plaintiff-Appellee*

3.    Ameerally, Aadil, *Defendant-Appellant*

4.    Baltzer, James, *Attorney for Plaintiffs and Plaintiff-Appellee*

5.    Barr, Jared, *Defendant-Appellant*

6.    Boyd, Sam, *Attorney for Plaintiffs and Plaintiff-Appellee*

7.    Brown, Monesia, *Defendant-Appellant*

8.    Butcher, Michael, *Defendant-Appellant*

9.    Byrd, Esther, *Defendant-Appellant*

10.    Chriss, Simone, *Attorney for Plaintiffs and Plaintiff-Appellee*

11.    Christie, Grazie, *Defendant-Appellant*

12.    Colon, Elayne, *Defendant-Appellant*

13.    Commissioner of Education, *Defendant-Appellant*

14.    Consovoy McCarthy PLLC, *Counsel for Defendants-Appellants*

15.    Copenhaver, Ann, *Defendant-Appellant*

16.    Diaz Jr., Manny, *Florida Commissioner of Education*

17.    Doe, Jane, *Plaintiff*

18.    Education Practices Commission, *Defendant-Appellant*

19.    Finberg, James M., *Attorney for Plaintiffs and Plaintiff-Appellee*

20.    Fleisher, Aaron S., *Attorney for Plaintiffs and Plaintiff-Appellee*

21.    Florida Department of Education, *Defendant-Appellant*

22.    Florida Virtual School Board of Trustees, *Defendant*

23.    Fox, James D., *Attorney for Defendant*

24.    Garcia, Kelly, *Defendant-Appellant*

25.    Gibson, Benjamin, *Defendant-Appellant*

26.    Goodwin, Joseph, *Defendant-Appellant*

27.    Grosholz, Jeffrey J., *Attorney for Defendant*

28.    Henry, Benjamin, *Defendant-Appellant*

29.    Hillsborough County School Board, *Defendant*

30.    Holley, Timothy, *Defendant-Appellant*

31.    Holshouser, Eric J., *Attorney for Defendant*

32.    Innerst, Lisa, *Defendant-Appellant*

33.  Johnson, Jeffrey, *Defendant-Appellant*

34.  Jones, Colin, *Attorney for Plaintiffs and Plaintiff-Appellee*

35.  LaPee, Kenneth, *Defendant-Appellant*

36.  Lee County School Board, *Defendant*

37.  Lewis, Mason, *Defendant-Appellant*

38.  Magar, MaryLynn, *Defendant-Appellant*

39.  Makar, Mikala, *Attorney for Defendant*

40.  Margolin, Jason L., *Attorney for Defendant*

41.  Marsey, J. David, *Attorney for Defendant*

42.  McCoy, Scott D., *Attorney for Plaintiffs and Plaintiff-Appellee*

43.  Monfared, Neema M., *Attorney for Defendant*

44.  Murphy, Sallie, *Defendant-Appellant*

45.  Petty, Ryan, *Defendant-Appellant*

46.  Plaza, Christine, *Defendant-Appellant*

47.  Raben, Carli, *Attorney for Plaintiffs and Plaintiff-Appellee*

48.  Roetzel & Andress PA, *Counsel for Defendant*

49.  Rogers Towers PA, *Counsel for Defendant*

50.  Rosenthal, Jonathan, *Attorney for Plaintiffs and Plaintiff-Appellee*

51. Rowe, Kevin, *Defendant-Appellant*

52. Rumberger Kirk & Caldwell PA, *Counsel for Defendant*

53. Schwandes, AV, *Plaintiff-Appellee*

54. Shapiro, Daniel, *Attorney for Defendants-Appellants*

55. Shaw, Charles, *Defendant-Appellant*

56. Siegel, Jodi, *Attorney for Plaintiffs and Plaintiff-Appellee*

57. Sloan, Orenthya, *Defendant-Appellant*

58. Snyder, Marc, *Defendant-Appellant*

59. Soto, Diego, *Attorney for Plaintiffs and Plaintiff-Appellee*

60. State Board of Education, *Defendant-Appellant*

61. Stone, Jessica, *Attorney for Plaintiffs and Plaintiff-Appellee*

62. Southern Poverty Law Center, *Counsel for Plaintiffs and Plaintiff-Appellee*

63. Thomas, Malcolm, *Defendant-Appellant*

64. Tompkins, Jordan, *Defendant-Appellant*

65. Vitagliano, Daniel M., *Attorney for Defendants-Appellants*

66. Walker, Hon. Mark E., *United States District Judge (N.D. Fla.)*

67. Weir, Bryan, *Attorney for Defendants-Appellants*

68. Wilks, Kathy, *Defendant-Appellant*

69.    Wood, Katie, *Plaintiff*

Appellants are government officials or entities of the State of Florida, and Plaintiffs and Plaintiff-Appellee are individuals. No publicly traded company or corporation has an interest in the outcome of this case or appeal. Per Circuit Rule 26.1-2, Plaintiff-Appellee certify that the CIP contained herein is complete.

Dated: July 24, 2024                    /s/ *Sam Boyd*
                                         *Sam Boyd*
                                         *Counsel for Plaintiff-Appellee*

**STATEMENT REGARDING ORAL ARGUMENT**

This Court granted Defendant-Appellants' unopposed request for an expedited oral argument on May 31, 2024. 11th Cir. Doc. 22. Oral argument is currently scheduled for September 24, 2024.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ....................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ............................. C-6

TABLE OF CONTENTS ...................................................................... i

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION .............................................................................. 1

STATEMENT OF THE ISSUES ......................................................... 3

STATEMENT OF THE CASE ............................................................ 3

I.    COURSE OF PROCEEDINGS ................................................... 3

II.   STATEMENT OF THE FACTS ................................................... 5

    A.    Legislative history and enforcement of subsection 3 and implementing regulations ........................................... 5

    B.    Subsection 3's impact on Ms. Wood .................................. 8

STANDARD OF REVIEW ................................................................. 9

SUMMARY OF ARGUMENT ............................................................ 10

ARGUMENT .................................................................................... 13

I.    Ms. Wood is likely to succeed on her Free Speech claim. ......... 13

    A.    Ms. Wood speaks as a private citizen ............................... 13

        1.    The content and context of Ms. Wood's speech are private .............................................................. 15

        2.    Florida may not convert Ms. Wood's title and pronouns from private to public speech by redefining them as curricular. ................................ 23

        3.    Florida has no curricular interest in restricting Ms. Wood's title or pronoun use. ........................... 27

        4.    Cases involving speech about topics other than teachers' identity are not relevant. ........................ 29

    B.    Ms. Wood speaks on a matter of public concern. ............. 32

i

1. The content of Ms. Wood's speech is on a matter of public concern. ..........................................33

2. Ms. Wood's motivation for speaking does not mean her speech was not on a matter of public concern. ....................................................37

3. The context of Ms. Wood's speech does not transform it from a matter of public concern into one of private concern. ....................................39

C. The balance of the interests favors Ms. Wood. ...............40

1. Subsection 3 is subjected to a higher degree of scrutiny because it compels speech of a large group on a topic of the greatest public concern. .....41

2. Subsection 3 does not advance any legitimate state interest..............................................44

a. Subsection 3 does not advance a state interest on the mutability of biology..............46

b. Subsection 3 does not advance an interest in preventing "confusion" or "disruption."....................................47

3. Ms. Wood's interests outweigh any state interest..................................................52

II. The district court did not abuse its discretion by finding that Ms. Wood has shown a likelihood of irreparable harm. ..........................................................54

CONCLUSION .........................................................61

CERTIFICATE OF COMPLIANCE.......................................63

CERTIFICATE OF SERVICE.............................................63

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Abdur-Rahman v. Walker,*
   567 F.3d 1278 (11th Cir. 2009) ............................................................ 18

*Adams v. Trs. of the Univ. of N.C.-Wilmington,*
   640 F.3d 550 (4th Cir. 2011) ................................................................. 35

*Alves v. Bd. of Regents of the Univ. Sys. of Ga.,*
   804 F.3d 1149 (11th Cir. 2015) .............................................. 14, 19, 38

*Anderson v. Burke Cnty.,*
   239 F.3d 1216 (11th Cir. 2001) ....................................................... 49, 50

*Andrews v. Drew Mun. Separate Sch. Dist.,*
   507 F.2d 611 (5th Cir. 1975) ................................................................. 21

*Ballard v. Blount,*
   581 F. Supp. 160 (N.D. Ga. 1983) ...................................................... 35

*Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens,*
   496 U.S. 226 (1990) ................................................................................. 25

*Berdin v. Duggan,*
   701 F.2d 909 (11th Cir. 1983) .............................................................. 51

*Bethel Sch. Dist. No. 403 v. Fraser,*
   478 U.S. 675 (1986) ................................................................................. 53

*Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.,*
   No. 22-14257, 2023 WL 3704912 (11th Cir. May 30, 2023) ............... 56

*Bill Salter Advertising, Inc. v. City of Brewton,*
   486 F. Supp. 2d 1314 (S.D. Ala. 2007) ............................................... 55

*Bishop v. Aronov,*
   926 F.2d 1066 (11th Cir. 1991) ............................................................ 31

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) ........................................................... 46

*Boyce v. Andrew*,
  510 F.3d 1333 (11th Cir. 2007) ....................................... 53

*Bushong v. Del. City Sch. Dist.*,
  No. 2:19-cv-858, 2020 WL 419754 (S.D. Ohio Jan. 27, 2020) ............ 31

*Cate v. Oldham*,
  707 F.2d 1176 (11th Cir. 1983) ....................................... 55

*Citizens Concerned About Our Child. v. Sch. Bd. of Broward Cnty.*,
  193 F.3d 1285 (11th Cir. 1999) .................................... 56, 57

*Clay v. Greendale Sch. Dist.*,
  602 F. Supp. 3d 1110 (E.D. Wis. 2022) .............................. 24

*\*Connick v. Myers*,
  461 U.S. 138 (1983) ........................................ 32, 39, 50, 51

*Copeland v. Ga. Dep't of Corr.*,
  97 F.4th 766 (11th Cir. 2024) ......................................... 47

*Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*,
  304 F.3d 1167 (11th Cir. 2002) ....................................... 10

*Does 1-6 v. Mills*,
  16 F.4th 20 (1st Cir. 2021) ........................................... 55

*Dream Defs. v. DeSantis*,
  559 F. Supp. 3d 1238 (N.D. Fla. 2021) .............................. 61

*Edwards v. Cal. Univ. of Pa.*,
  156 F.3d 488 (3d Cir. 1998) ........................................... 31

*Elrod v. Burns*,
  427 U.S. 347 (1976) ................................................... 54

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*,
  624 F.3d 332 (6th Cir. 2010) ...................................... 18, 53

iv

*Fernandez v. Sch. Bd. of Miami-Dade Cnty.*,
  898 F.3d 1324 (11th Cir. 2018) ........................................... 19

*FF Cosms. FL, Inc. v. City of Miami Beach*,
  866 F.3d 1290 (11th Cir. 2017) ........................................... 55

*Florida v. United States*,
  No. 23-11528, 2023 WL 3813774 (11th Cir. June 5, 2023) ................ 56

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
  901 F.3d 1235 (11th Cir. 2018) ........................................... 21

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) ...................................................... 44

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ............................... 10, 13, 14, 18, 20, 53

*Gegas v. St. Matthew's Univ. Sch. of Med.*,
  No. 6:22-cv-2299, 2023 WL 6294410 (M.D. Fla. Sept. 4, 2023) .......... 57

*GRACE, Inc. v. City of Miami*,
  674 F. Supp. 3d 1141 (S.D. Fla. 2023) ................................. 57

*Green v. Finkelstein*,
  73 F.4th 1258 (11th Cir. 2023) .......................................... 39

*Hohe v. Casey*,
  868 F.2d 69 (3d Cir. 1989) ............................................... 55

*Honeyfund.com Inc. v. Governor*,
  94 F.4th 1272 (11th Cir. 2024) ...................................... 9, 44

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  585 U.S. 878 (2018) ........................................ 11, 32, 42, 43

*Kastl v. Maricopa Cnty. Comty. Coll. Dist.*,
  No. Civ.02-1531, 2004 WL 2008954 (D. Ariz. June 3, 2004) ........ 35, 54

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ........... 1, 3, 10, 13, 15, 16, 20, 21, 25, 26, 33, 40, 46

*Kent v. Martin,*
  252 F.3d 1141 (10th Cir. 2001) ........................................................ 51

*Keohane v. Florida Dep't of Corr. Sec'y,*
  952 F.3d 1257 (11th Cir. 2020) ....................................................... 47

*KH Outdoor, LLC v. City of Trussville,*
  458 F.3d 1261 (11th Cir. 2006) ....................................................... 55

*Kluge v. Brownsburg Cmty. Sch. Corp.,*
  432 F. Supp. 3d 823 (S.D. Ind. 2020) ......................................... 29, 30

*Koe v. Noggle,*
  688 F. Supp.3d 1321 (N.D. Ga. 2023) ............................................. 61

*\*Kurtz v. Vickrey,*
  855 F.2d 723 (11th Cir. 1988) ................................................... 33, 40

*Lange v. Houston Cnty.,*
  101 F.4th 793 (11th Cir. 2024) ...................................................... 46

*Larweth v. Magellan Health, Inc.,*
  841 F. App'x 146 (11th Cir. 2021) .................................................. 57

*Lee v. Weisman,*
  505 U.S. 577 (1992) ................................................................. 3, 4, 46

*Lee v. York Cnty. Sch. Div.,*
  484 F.3d 687 (4th Cir. 2007) ...................................................... 24, 25

*Maggio v. Sipple,*
  211 F.3d 1346 (11th Cir. 2000) ...................................................... 38

*Maples v. Martin,*
  858 F.2d 1546 (11th Cir. 1988) ................................................... 34, 35

*\*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ................................................ 11, 36, 38

*\*Mitchell v. Hillsborough Cnty.,*
  468 F.3d 1276 (11th Cir. 2006) ................................................ 11, 33

*Monegain v. Dep't of Motor Vehicles,*
    491 F. Supp. 3d 117 (E.D. Va. 2020) .......................................... 35, 54

*Morgan v. Ford,*
    6 F.3d 750 (11th Cir. 1993) ....................................................... 38, 39

*Mosholder v. Barnhardt,*
    679 F.3d 443 (6th Cir. 2012) ............................................................ 34

*Moss v. City of Pembroke Pines,*
    782 F.3d 613 (11th Cir. 2015) ............................................... 18, 49, 50

*Nebraska Press Ass'n v. Stuart,*
    427 U.S. 539 (1976) ......................................................................... 44

*Ng v. Bd. of Regents of Univ. of Minn.,*
    64 F.4th 992 (8th Cir. 2023) ................................................ 57, 58, 59

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ................................................... 12, 54

*Phillips v. City of Dawsonville,*
    499 F.3d 1239 (11th Cir. 2007) ........................................................ 19

*Pickering v. Bd. of Educ.,*
    391 U.S. 563 (1968) ............................................................ 10, 18, 43

*Promotions, Ltd. v. Conrad,*
    420 U.S. 546 (1975) ......................................................................... 44

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ......................................................................... 39

*Rode v. Dellarciprete,*
    845 F.2d 1195 (3d Cir. 1988) ........................................................... 33

*Romer v. Evans,*
    517 U.S. 620 (1996) ......................................................................... 45

*Santos-Zacaria v. Garland,*
    598 U.S. 411 (2023) ......................................................................... 46

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) .......................................... 54, 55

*Smiley v. Jenner*,
  684 F. Supp. 3d 835 (S.D. Ind. 2023) .................................... 31

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ....................................................... 32

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
  60 F.3d 27 (2d Cir. 1995) ................................................ 59

*\*United States v. Nat'l Treasury Emps. Union*,
  513 U.S. 454 (1995) .................................................... 42, 43

*Utah Gospel Mission v. Salt Lake City Corp.*,
  316 F. Supp. 2d 1201 (D. Utah 2004) ................................... 58

*Vernonia Sch. Dist. 47J v. Acton*,
  515 U.S. 646 (1995) ...................................................... 53

*Weaver v. Nebo Sch. Dist.*,
  29 F. Supp. 2d 1279 (D. Utah 1998) ................................... 34, 37

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*,
  680 F. Supp. 3d 1250 (D. Wyo. 2023) ................................. 29, 30

*Wilson v. Douglas Cnty. Sch. Dist.*,
  No. 3:05-cv-00220, 2007 WL 9757472 (D. Nev. Mar. 29, 2007) .......... 32

*Wozniak v. Adesida*,
  932 F.3d 1008 (7th Cir. 2019) ......................................... 30, 32

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) .................... 10, 12, 56, 57, 59

*Zalewska v. Cnty. of Sullivan*,
  316 F.3d 314 (2d Cir. 2003) ........................................... 22, 36

*Zen Group, Inc. v. Agency for Health Care Admin.*,
  80 F.4th 1319 (11th Cir. 2023) ......................................... 35

## State Cases

*Doe ex rel. Doe v. Yunits*,
   No.1060A, 2000 WL 33162199 (Mass. Super. Oct. 11, 2000) ............ 36

## State Statutes

Fla. Stat. § 1000.21(9) ................................................................. 46

Fla. Stat. § 1000.46(2)(a) ............................................................ 46

Fla. Stat. § 1000.71(3) ................................................................... 1

Fla. Stat. § 1000.071 ................................................................. 5, 8

Fla. Stat. § 1000.071(1) ...................................................... 6, 28, 44

Fla. Stat. § 1000.071(2) .................................................................. 6

Fla. Stat. § 1000.071(3) .................................................................. 6

Fla. Stat. § 1000.071(6) ................................................................ 19

Fla. Stat. § 1000.21(9) ................................................................. 46

Fla. Stat. § 1000.71(3) ................................................................... 1

Fla. Stat. § 1001.42 ................................................................ 27, 28

Fla. Stat. § 1003.42(2)(n)(3) ........................................................ 26

Fla. Stat. § 1001.42(8)(c)(3) .................................................... 11, 27

Fla. Stat. § 1003.43(n)3 ......................................................... 26, 27

Fla. Stat. § 1003.46(2) ................................................................. 26

Fla. Stat. § 1012.55(1)(b) ............................................................... 8

Fla. Stat. § 1012.795(1)(j)................................................8

**Federal Rules**

11th Cir. Rule 26-1.2 ..............................................C-1

Fed. R. App. P. 26.1 .............................................. C-1

**State Regulations**

Fla. Admin. Code r. 6A-10.081(2)(a)(14) ..................8

**Other Authorities**

Florida House Bill 1069 (2023) ...............................5

*Hearing on HB 1069 Before the H. Educ. & Emp. Comm.*, 2023 Reg. Sess., Video at 1:26:51-1:26:58 (Fla. Mar. 23, 2023, 8:00 AM) (statement of Rep. Anderson), https://bit.ly/4bXHa5F H.R. 2023 ........7

*Hearing on HB 1069 Before the H. Educ. & Emp. Comm.*, 2023 Reg. Sess., Video at 1:26:47-1:27:38 (Fla. Mar. 23, 2023, 8:00 AM), https://bit.ly/4bXHa5F ........................................48

H.R. 2023 Reg. Sess., Sess. Video at 1:09:42-1:10:03 (Fla. Mar. 31, 2023, 11:30 AM), https://bit.ly/3wkKV4YJ ....................................7

**INTRODUCTION**

The State of Florida has told Plaintiff-Appellee Katie Wood that she must choose between losing her job and misrepresenting a basic element of her identity at work by avoiding using a title and pronouns which Florida believes do not "correspond" to her sex assigned at birth. Fla. Stat. § 1000.71(3) ("subsection 3"). It has done so because it disagrees with the message she sends by referring to herself at work using the same title and pronouns she uses in every aspect of her life. It claims that it may do so to prevent students from inferring that it agrees with that message. But in *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022), the Supreme Court rejected precisely this approach, holding that a school district could not justify censoring Mr. Kennedy's public prayer on the ground that students might mistakenly believe that it endorsed his message. The Court confirmed that this holding extends into speech in the classroom, explaining that barring a Muslim teacher from wearing a headscarf while teaching would violate the First Amendment's Free Speech Clause, even though the headscarf clearly conveys a message to students. *Id.* at 531.

Subsection 3 is also untethered to the "curricular" interests the

1

appealing state government defendants ("State Defendants") argue render Ms. Wood's speech unprotected. It prohibits her from referring to herself using she/her pronouns and the title Ms., but it does not prohibit anyone else from using those words to refer to her, nor does it prohibit her from using a transgender student or coworker's titles and pronouns, regardless of the state's view of their sex. And no state standard or curriculum provides for teaching students that gender or pronouns must correspond to sex as determined by biology. To the contrary, Florida law actually prohibits such instruction. Simply passing a law declaring that Ms. Wood's use of her title and pronouns is prohibited does not render her speech curricular.

Reversing the district court's ruling would have profound and chilling implications. It would mean that schools could also regulate transgender teachers' dress, appearance, and choice of names to serve the same goals State Defendants articulate for subsection 3—effectively banning transgender people from the workplace. By the same logic, a state could bar all outward expressions of sexual orientation, religion, national origin, or other characteristics it believes imply views it disagrees with. But "learning how to tolerate diverse expressive activities

has always been 'part of learning how to live in a pluralistic society.'" *Id.* at 538 (quoting *Lee v. Weisman*, 505 U.S. 577, 590 (1992)). The district court correctly held that Ms. Wood is likely to succeed on the merits of her claim that subsection 3 violates her First Amendment right to free speech.

## STATEMENT OF THE ISSUES

I.     Whether the district court was within its discretion when it held that Plaintiff Katie Wood is substantially likely to succeed on the merits of her claim that she has a First Amendment right to refer to herself at work using the title and pronouns that express her gender.

II.     Whether the district court was within its discretion in holding that prohibiting Plaintiff Katie Wood, on pain of losing her job, from using her title and pronouns penalizes speech and, if unconstitutional, imposes a per se irreparable injury on her or, in the alternative, that any delay seeking a preliminary injunction did not conflict with a finding that she would suffer irreparable harm absent an injunction.

## STATEMENT OF THE CASE

## I.     COURSE OF PROCEEDINGS

On December 13, 2023, Ms. Wood filed a complaint against State

Defendants. R.1.[1] She filed a First Amended Complaint on February 6, 2024, R.56, and a Second Amended Complaint on April 30, 2024, R.94. Ms. Wood's complaint asserted claims under the First and Fourteenth Amendments, Title VII, and Title IX. *Id.*

On December 21, 2023, Ms. Wood filed a motion to preliminarily enjoin State Defendants and Hillsborough County School Board from enforcing subsection 3 against her, on the basis that it violates her right to free speech and unlawfully discriminates on the basis of sex. R.11. At the request of State Defendants, to which Plaintiffs did not object, the District Court set an extended briefing schedule, and a hearing on that motion was held on March 29, 2024. R.80.

The district court ruled in Ms. Wood's favor on her Free Speech claim and entered an order preliminarily enjoining State Defendants and the Hillsborough County School Board from enforcing subsection 3 against her. R.82 at 58-59. The district court preemptively denied a stay of the preliminary injunction pending appeal, given the balance of

---

[1] R.1 refers to docket number 1 in the district court. Pages refer to ECF pagination or internal paragraph numbers where available. All cited portions of the record are in State Defendants' appendix, except for R.60, R.77, and R.77-1, which are in Ms. Wood's appendix.

interests, the limited scope of relief, and the fact that there were "no exceptional circumstances" to justify a stay. *Id.* at 57. The State Defendants filed a notice of appeal on April 17, 2024. R.84. Hillsborough County School Board did not appeal the decision.

This Court requested jurisdictional briefs on May 13, 2024. 11th Cir. Doc. 17-1. The parties filed a joint response to the jurisdictional question on May 23, 2024. 11th Cir. Doc. 21.

## II.   STATEMENT OF THE FACTS

Ms. Wood is an Algebra I teacher at Lennard High School in Florida. R.11-1 ¶¶3, 5. She is passionate about her job and has consistently been rated a highly effective teacher. *Id.* ¶¶5-10. Ms. Wood is also a transgender woman. *Id.* ¶¶2, 6. She lives, dresses, and presents as a woman in all aspects of her life. *Id.* ¶2. Until the enactment of subsection 3, this included introducing herself as Ms. Wood and using female pronouns to refer to herself at work. *Id.* ¶¶6-7.

### A.   Legislative history and enforcement of subsection 3 and implementing regulations

Section 1000.071 was enacted by the Florida Legislature as part of Florida House Bill 1069 (2023). Subsection 1 of that section makes it the "policy" of every public K-12 institution "that a person's sex is an

immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Fla. Stat. § 1000.071(1). In furtherance of that "policy," subsection 3 mandates that:

> An employee or contractor of a public K-12 educational institution may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex.

Fla. Stat. § 1000.071(3). Subsection 2 provides that employees, contractors, and students may not be required to use a person's title or pronouns if they do not "correspond" to the person's sex. Fla. Stat. § 1000.071(2).

Legislative debate over the bill primarily concerned the pronouns used by students, not teachers. In fact, the legislative history, including that cited by State Defendants, has very little to say about the legislative intent about subsection 3 specifically. For example, State Defendants cite one legislator as explaining that the law was "pro teacher," Opening Brief of Defendant-Appellants ("Br.") 27, but omit a portion of his comments that make clear that he was talking about teachers' use of students' pronouns: "It takes the pressure off of the teachers who in many places are being forced … to decide whether … for the sake of saving their jobs

… they are going to choose to engage in a social war." H.R. 2023 Reg. Sess., Sess. Video at 1:09:42-1:10:03 (Fla. Mar. 31, 2023, 11:30 AM), https://bit.ly/3wKV4YJ.

Indeed, the legislative history is largely devoid of any comments specifically addressing subsection 3. Even when one legislator warned that subsection 3 "denies [teachers'] right to self-identification," sponsors of the bill ignored him. *Id.* at 1:12:48-1:13:03. No legislator addressed why subsection 3 restricts teachers' use of their own pronouns and titles, but not students' or others', or why it allows everyone but a teacher to refer to that teacher using a title and pronouns that express that teacher's gender.

State Defendants also rely on legislative history indicating that the legislature was concerned with "the confusion that's going on" over pronoun usage. Br.26. But this discussion concerned not the use of he/him or she/her pronouns by transgender students or teachers, but the use of nonbinary pronouns other than they/them. *Hearing on HB 1069 Before the H. Educ. & Emp. Comm.*, 2023 Reg. Sess., Video at 1:26:51-1:26:58 (Fla. Mar. 23, 2023, 8:00 AM) (statement of Rep. Anderson), https://bit.ly/4bXHa5F ("So when we think about pronouns and when I

first started working on this bill, you think about the common pronouns, right? Him, her, they, perhaps."). None of these comments about "confusion" over pronouns addressed teachers' pronouns.

On August 22, 2023, after the start of the 2023-2024 school year, Defendants Commissioner of Education and the State Board of Education amended the Principles of Professional Conduct of the Education Profession in Florida to make violations of section 1000.071 grounds for a disciplinary violation. Fla. Admin. Code r. 6A-10.081(2)(a)(14). The disciplinary violations may be grounds for suspension or revocation of a teaching certificate, *see* Fla. Stat. § 1012.795(1)(j), which is generally a requirement for employment as a Florida public school teacher, *see* Fla. Stat. § 1012.55(1)(b). The district court summarized this enforcement scheme in more detail. *See* R.82 at 3.

## B. Subsection 3's impact on Ms. Wood

Ms. Wood first learned of subsection 3's impact on her at a faculty meeting near the beginning of the 2023-2024 school year. R.11-1 ¶9. There, she was informed that because the state deemed her to be male, under subsection 3 she was prohibited from telling students she uses the title Ms. or female pronouns. *Id.* Ms. Wood was overcome with anxiety

and took several days leave from work. *Id.* ¶10. Several weeks later, following communications with school and district staff confirming that her failure to comply with subsection 3 could result in the loss of her teaching certificate, Ms. Wood chose compliance over loss of her livelihood. *Id.* ¶¶12-15.

Ms. Wood switched from using the title Ms. to Teacher, removed all references to her pronouns from her classroom, and removed her "she/her" pin from her lanyard. *Id.* ¶¶9, 14-15. The title change confused students and produced classroom interruptions. *Id.* For Ms. Wood, the change from being able to introduce herself using her title and pronouns was "extremely painful," "dehumanizing," "disempowering," and "t[ook] away [her] basic humanity." *Id.* ¶¶17, 21. Having to stop using her own title was also "unnatural" and "difficult to remember" to do consistently. *Id.* ¶¶17-18. She feared an accidental slip of the tongue could result in her losing her teaching certificate. *Id.* ¶¶18-19.

## STANDARD OF REVIEW

A "district court's order granting a preliminary injunction is reviewed for abuse of discretion." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024). "Appellate review of a preliminary-

injunction decision in particular is exceedingly narrow because of the expedited nature of the proceedings in the district court." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). This Court's "review is deferential since a district court often must make difficult judgments about the viability of a plaintiff's claims based on a limited record and 'without the luxury of abundant time for reflection.'" *Id.* (quoting *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171-72 (11th Cir. 2002)).

## SUMMARY OF ARGUMENT

**I.** The district court correctly held that, under the *Pickering-Garcetti* test, Ms. Wood is likely to succeed on the merits of her First Amendment claim because when she uses her title and pronouns she speaks as a private citizen on a matter of public concern and the balance of interests favors her. *See Kennedy*, 597 U.S. at 527-28 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Garcetti v. Ceballos*, 547 U.S. 410 (2006)).

Ms. Wood speaks as a private citizen because the content and context of her speech are private. *Id.* at 529-30. Her title and pronouns are not something the government selects, and she shares them in a

context—at the start of class, on a pin, and on her whiteboard—when teachers may share other messages. They do not become curricular merely because Florida deems them so, any more than Mr. Kennedy's prayers became curricular merely because his school district sought to ban them. Nor does Florida in fact have a curricular interest in advancing the view that gender identity is immutable and based on biological traits: that view is not a part of Florida's public-school curriculum. To the contrary, instruction that gender identity is immutable based on biological traits is banned in Florida. *See* Fla. Stat. § 1001.42(8)(c)(3).

Ms. Wood's speech is also on a matter of public concern. The very fact that Florida passed a law restricting it demonstrates that. *See Meriwether v. Hartop*, 992 F.3d 492, 509 (6th Cir. 2021). State Defendants' focus on the purported motivations for Ms. Wood's speech ignores this Court's admonishment that content, not motive, is the most important element of public concern analysis. *See Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1284 (11th Cir. 2006).

Finally, the balance of interests favors Ms. Wood. Courts have never held that a government may compel an employee to speak its message as a private citizen. *See Janus v. Am. Fed'n of State, Cnty., &*

*Mun. Emps., Council 31*, 585 U.S. 878, 913-14 (2018). Subsection 3 does not serve any purported state interest in advancing a message about sex, titles, and pronouns, since it restricts only self-referential title and pronoun use by teachers, not any other references to transgender people. Nor does it prevent "confusion." In fact, it does the opposite by creating a situation in which different titles are being used for Ms. Wood by her students and colleagues and she is not permitted to clarify the question for confused students. Her interest in not being forced to misrepresent her understanding of who she is outweighs any marginal remaining state interest.

**II.** The district court was also correct to rule that the time that passed between subsection 3's enactment and Ms. Wood's preliminary injunction motion did not conflict with a finding that she would suffer irreparable harm absent an injunction. First, subsection 3 penalizes speech and thus creates a per se irreparable harm. *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). Second, the leading case on delay in this circuit, and others State Defendants cite, count from the date of complaint filing, not the underlying events. *Wreal, LLC*, 840 F.3d at 1248. Here, that delay was just two weeks. Third, while subsection 3

was enacted in May 2024, Ms. Wood did not learn about it until after the start of the school year, only a few months before her preliminary injunction motion was filed. Finally, any delay in filing does not conflict with a finding of irreparable harm given the complexities of the case and Ms. Wood's need to identify counsel who could bring it.

## ARGUMENT

## I. Ms. Wood is likely to succeed on her Free Speech claim.

Under the *Pickering-Garcetti* test, courts ask whether the "employee speaks 'pursuant to … official duties,'" or whether the "employee 'speaks as a citizen addressing a matter of public concern.'" *Kennedy*, 597 U.S. at 527-28 (quoting *Garcetti*, 547 U.S. at 421, 423). If the employee speaks as a private citizen on a matter of public concern, courts ask whether the "employee's speech interests are outweighed by 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* at 528 (quoting *Garcetti*, 547 U.S. at 417).

### A. Ms. Wood speaks as a private citizen.

The district court properly centered its analysis of Ms. Wood's speech on *Kennedy*, the Supreme Court's most recent and most definitive statement on the First Amendment rights of public-school teachers. State

Defendants, in contrast, do not mention *Kennedy* until more than twelve pages into their discussion of the first *Pickering-Garcetti* prong. Instead, State Defendants use language from pre-*Kennedy* lower court decisions to advance arguments that *Kennedy* explicitly rejected, including that if speech would not have occurred but-for a teacher's employment, it is unprotected; that schools may regulate any speech they define as part of an employee's job; and that schools have an unlimited right to restrict teachers' speech based on teachers' status as role models.

As this Court has explained, *Garcetti*'s "exception to First Amendment protection … must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1162 (11th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 421-22). Ms. Wood's speaks as a private citizen when she uses her title and pronouns because (1) the content and context of her speech is personal, not pursuant to her official job duties; (2) Florida's effort to redefine her speech as curricular does not convert it from private to government speech; (3) Florida does not in fact have a

curricular interest in preventing her from using her title and pronouns; and (4) other cases cited by State Defendants actually support her position or are irrelevant.

### 1. The content and context of Ms. Wood's speech are private.

As the district court explained, "[i]n *Kennedy*, the Court reiterated that determining whether a public employee's speech is pursuant to official duties requires a 'practical inquiry,' because to otherwise focus on the terms of a formal job description 'would be to allow public employers to use "excessively broad job descriptions" to subvert the Constitution's protections.'" R.82 at 24 (quoting *Kennedy*, 597 U.S. at 529). The relevant questions in determining whether speech is private focus on the content (whether the speech "convey[s] a government-created message") and context (whether it occurs when the employee is "free to engage in … private speech"). *Kennedy*, 597 U.S. at 529-30. For this reason, just as a school may not "fire a Muslim teacher for wearing a headscarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria," *id.* at 531, it may not fire Ms. Wood for sharing her title and pronouns, writing them on her whiteboard, or wearing a "she/her" pin.

As to content, "Ms. Wood's expression of her preferred title and pronouns identify her as a woman[,] [t]his self-referential speech is unique to Ms. Wood, as it is for every individual, and [it] owes its existence to her personal identity, not her official duties as a public school teacher." R.82 at 27. The government did not "create" Ms. Wood's message: it did not select her gender or pick her title or pronouns any more than the school in *Kennedy* selected the content of Mr. Kennedy's prayers or the God to whom he prayed.

State Defendants claim Florida determines the content of Ms. Wood's speech because subsection 3 seeks to regulate it. Br.37. But this is tautological. If simply regulating speech were enough to convert any private speech into government speech, then the school district's policy against prayer would have done so in *Kennedy*. The question is instead whether the state actually selected Ms. Wood's title and pronouns. It did not, just as the school did not select Mr. Kennedy's religion. Instead, subsection 3 singles out for prohibition a very specific kind of speech: a teacher's expression of their own gender identity other than that associated with their sex assigned at birth. Other teachers may use their own titles and pronouns, and all teachers may use the titles and pronouns

of students, other teachers, literary characters, or prominent persons.

Ms. Wood also speaks in a context in which teachers are free to share a variety of messages. She introduces herself to her students using her title and pronouns, writes them on her whiteboard, and wears a "she/her" pin on her lanyard. R.11-1 ¶7. No government policy limits teacher speech in these contexts to only state-created or state-approved content. State Defendants have never disputed that teachers are free to introduce themselves to students by sharing their hometowns, the names of their pets, or their favorite sports teams; that they may place photos of family members or favorite quotes on their white boards; and that they may wear crosses or American flag pins. State Defendants' only response to this argument is to simply assert, counterfactually and without citation to any state law or regulation, that teachers are permitted only to engage in curricular speech in the classroom. Br.49-50.

State Defendants resist this straightforward application of *Kennedy* with pre-*Kennedy* caselaw and arguments inconsistent with *Kennedy*. First, they advocate a but-for test: "[w]hen a teacher instructs students, she does 'something she was hired (and paid) to do, something she could not have done but for the [school's] decision to hire her as a

public school teacher.'" Br.39 (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340 (6th Cir. 2010)). But this is true of Mr. Kennedy: but for his employment as a coach, he would not have been on the football field praying. *Kennedy* thus "rejects the notion that anything a teacher says at school is automatically government speech." R.82 at 26; *see also Garcetti*, 547 U.S. at 420 ("[I]t would not serve the goal of treating public employees like 'any member of the general public' to hold that all speech within the office is automatically exposed to restriction." (quoting *Pickering*, 391 U.S. at 573)).[2] State Defendants' argument that Ms. Wood's speech is "for the purpose of fulfilling [her] assigned job duties" because she uses her title and pronouns when she tells a student how to ask her for help, Br.38 (quoting *Abdur-Rahman v. Walker*, 567 F.3d 1278, 1283 (11th Cir. 2009)), is wrong for the same reason. Just as teachers need to give their titles to

---

[2] State Defendants, Br.36, quote *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015), as holding that "[t]he central inquiry is whether the speech at issue 'owes its existence' to the employee's professional responsibilities," but the following sentence explains that "[f]actors such as the employee's job description, whether the speech occurred at the workplace, and whether the speech concerns the subject matter of the employee's job may be relevant …." (citing *Garcetti*, 547 U.S. at 420-21). *Moss* thus also rejects a but-for test since all speech at the workplace would not occur but-for a plaintiff's employment.

do their jobs, they also need to be physically present in the classroom and seen by their students. But that does not mean anything a teacher wears in the classroom is government speech. Like a Muslim teacher's religion, Ms. Wood's titles and pronouns are not something the state selects, and so the fact that she discloses them to students in the classroom while doing her job does not make that speech government speech. In contrast, the cases State Defendants rely on concern speech much more closely tied to the subject matter of employment. *See Fernandez v. Sch. Bd. of Miami-Dade Cnty.*, 898 F.3d 1324, 1333 (11th Cir. 2018) (principal's advocacy for conversion of school to charter school was part of his official duties); *Phillips v. City of Dawsonville*, 499 F.3d 1239, 1242 (11th Cir. 2007) (per curiam) (inquiring about misuse of funds was part of city clerk's official duties); *Alves*, 804 F.3d at 1164 (complaints by employees about management of their counseling center).

State Defendants also argue that because section 1000.071(6) limits subsection 3's reach to "the actions of an employee ... acting within the scope of their employment duties with the public K-12 educational institution[,]" this "should be the end of the matter" about whether Ms. Wood speaks as a government employee. Br.37 (quoting Fla. Stat. §

1000.071(6)). This argument is similarly foreclosed by *Kennedy*.[3] There, as here, the government sought to define the employee's job to include the relevant speech. *See Kennedy*, 597 U.S. at 518-19 (explaining that the District "forbade Mr. Kennedy from engaging in 'any overt actions' that could 'appear to a reasonable observer to endorse prayer while he is on duty'" (citations omitted)). The question was not whether the government had sought to define Mr. Kennedy's speech to be part of his job—it did— but whether it was permitted to do so. The Court ruled that it could not because "[t]o proceed otherwise would be to allow public employers to use 'excessively broad job descriptions' to subvert the Constitution's protections." *Id.* at 529 (quoting *Garcetti*, 547 U.S. at 424).

The fact that Ms. Wood speaks in a classroom, while Mr. Kennedy spoke on the field, is not dispositive either. First, as a coach, his classroom was the field. *Kennedy*, 597 U.S. at 530 (finding that "field of play" was "'within the office' environment" (quoting *Garcetti*, 547 U.S. at 421)). Second, insisting that any speech a teacher conveys to a student in

---

[3] The only alternative to this conclusion would be to interpret subsection 3 to not apply to Ms. Wood's use of her own title and pronouns—a position which State Defendants reject and which would render subsection 3 largely surplusage.

the classroom is government speech would imply that the First Amendment permits (and indeed may require) states to restrict religious expressions such as Mr. Kennedy's prayer or a Muslim teacher's headscarf. Alternatively, it might allow the government to permit Islamic but not Christian prayer. Likewise, such a view would incorrectly imply that schools may prohibit an unmarried pregnant teacher from revealing her pregnancy to advance an interest in preventing unmarried pregnancies. *Cf. Andrews v. Drew Mun. Separate Sch. Dist.*, 507 F.2d 611, 616-17 (5th Cir. 1975) (finding that equal protection clause prohibits firing unwed pregnant teacher and state's argument that "the likelihood of inferred learning that unwed parenthood is necessarily good or praiseworthy, [wa]s highly improbable, if not speculative").

State Defendants' argument that Ms. Wood, unlike Mr. Kennedy, was "actively communicating with students," Br.49, fares no better. Mr. Kennedy prayed in view of and beside his players and so was also "actively communicating" with them, just as a Muslim teacher is "actively communicating" her religion by wearing a headscarf. *Kennedy*, 597 U.S. at 515, 531; *cf. Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) ("[A] sharp line

between words and expressive acts cannot … be justified ….” (citation omitted)).

Though the state may not prohibit Ms. Wood from using her title or pronouns or a Muslim teacher from wearing a headscarf, that does not mean schools are without power to impose reasonable restrictions on teachers' expression. For example, clothing or jewelry may be private speech, but may not necessarily implicate a matter of public concern. *See Zalewska v. Cnty. of Sullivan*, 316 F.3d 314, 320 (2d Cir. 2003) (distinguishing “vague and unfocused” message employee desired to convey by wearing a dress from clear message communicated by student who wore clothing matching gender identity). And a reasonable, non-discriminatory dress code would satisfy the interest-balancing step of *Pickering-Garcetti*.

State Defendants' slippery-slope arguments about teachers demanding to be called “Emperor,” “Governor,” or “Mr. Butthead,” Br. 47-48, are similarly unpersuasive—those teachers would not be communicating on a matter of public concern no matter how “genuine[]” their views. *Id*. Even if use of those titles somehow addressed a matter of public concern, they would have little interest in being referred to by

them and would lose under the interest-balancing prong of *Pickering-Garcetti*. That State Defendants resort to such an easily-refuted hypothetical shows that their arguments rely on the assumption that Ms. Wood's use of her title and pronouns reflects only an idiosyncratic preference rather than a deep-seated part of her identity.

> **2. Florida may not convert Ms. Wood's title and pronouns from private to public speech by redefining them as curricular.**

As the district court noted, "nobody has suggested that Ms. Wood has ever attempted to hijack her class instruction of Algebra to teach a different, off-topic subject, or that she has decided to use controversial teaching methods that do not meet the school's expectations." R.82 at 31 n.16. Nor does Ms. Wood argue that she is entitled to lecture students about her views on gender identity or on transgender status more generally. She simply wants to communicate that she is a woman through her title and pronouns as other women do.

In other words, while the state could perhaps require health classes to teach a specific message about gender identity without violating

teachers' First Amendment rights,[4] that does not mean it can compel transgender teachers to be closeted. Similarly, while the state could prohibit a teacher from sharing their opinions about gay marriage with students without violating the First Amendment, *Clay v. Greendale Sch. Dist.*, 602 F. Supp. 3d 1110, 1123 (E.D. Wis. 2022), it could not permit straight teachers to share photos of their spouses but prohibit gay ones from doing so or prohibit teachers from dressing modestly, even if required by their religious convictions, merely because the state believes it is "false" that women attract sexual harassment by their clothing.

State Defendants argue that learning that Ms. Wood views herself as a woman might lead students to "reasonably perceive … governmental approval of the proposition that a female title and pronouns can refer to a male …[,]" which it contends conflicts with its curricular interests. Br.44-45. Similarly, it analogizes Ms. Wood's title and pronouns on a chalkboard to a "display of religious materials" in a classroom. *Id.* (citing *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 698-99 (4th Cir. 2007)).[5] But

_____

[4] Advancing such a message might violate other Constitutional or statutory provisions, however.

[5] The materials at issue in *Lee* went far beyond simply announcing a teacher's religion or gender identity, like Mr. Kennedy and Ms. Wood's

*Kennedy* rejected using a risk of perception of state endorsement as a reason to censor teachers' speech. Though the Court agreed that "[t]eachers and coaches often serve as vital role models" and are "clothed with the mantle of one who imparts knowledge and wisdom," it held (in the Free Speech Clause section of its opinion) that to use this fact to justify restricting all religious speech by teachers "would be to treat religious expression as second-class speech ...." 597 U.S. at 530-31 (citation omitted); *see also id.* at 538 ("'[S]econdary school students are mature enough to understand that a school does not endorse,' let alone coerce them to participate in, 'speech that it merely permits on a nondiscriminatory basis.'" (quoting *Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens*, 496 U.S. 226, 250 (1990)) (plurality opinion)).

State Defendants also claim that Ms. Wood's position implies that "[a] teacher who wishes to tell his students his opinion on the Civil War" would be "exempt from *Garcetti* because that opinion 'owes its existence'

---

speech, and included materials authored by and about missionary groups. 484 F.3d at 690. Moreover, the district had a policy limiting materials posted on bulletin boards to those relevant to the teacher's curriculum, which these materials were not. *Id.*

to that teacher" as the opinion was not created by the state. Br.43. But the state does in fact create the opinions teachers share about history by issuing detailed standards. The fact that a specific teacher may have a view that differs from those curricular standards does not mean that teachers' speech in general on the Civil War is entirely non-state-created and hence personal. In contrast, Florida never determines teachers' titles and pronouns. Those titles and pronouns are not curricular because Florida attempts to regulate one specific set of them any more than a Muslim teacher's clothing would become curricular because the state asserted a policy about women's independence or the like that purportedly required restricting it.

State Defendants' arguments would allow them to regulate any disfavored speech by simply declaring a state policy that such speech is false. This would imply that if the school district in *Kennedy* had simply asserted that Mr. Kennedy's prayer interfered with a curricular interest about the separation of church and state or the importance of avoiding religious coercion, the case would have come out the other way. These repellant implications of State Defendants' view show why their defense of subsection 3 is inconsistent with *Kennedy*.

### 3. Florida has no curricular interest in restricting Ms. Wood's title or pronoun use.

State Defendants' curricular speech argument also fails because Florida in fact has no curricular interest in restricting Ms. Wood's title and pronoun use. "[J]ust because you label something as a 'pedagogical interest' or 'curriculum' does not make it so." R.82 at 41 n.19. The only Florida law that explicitly addresses instruction or curriculum on gender identity explicitly *prohibits* the instruction State Defendants claim is a vital interest. Fla. Stat. § 1001.42(8)(c)(3).[6] Defendant State Board of Education has accordingly represented to a district court in litigation settlement that "it would violate [section 1001.42] to instruct students that … gender identity is immutable based on biological traits." R.77-1

---

[6] That provision:

> Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in prekindergarten through grade 8, except when required by ss. 1003.42(2)(n)3. and 1003.46. If such instruction is provided in grades 9 through 12, the instruction must be age-appropriate or developmentally appropriate for students in accordance with state standards.

Subsection 1003.43(n)3 concerns "awareness of the benefits of sexual abstinence." Section 1000.46(2)(a) concerns the use of a biological definition of sex in health classes, not gender. No state standards require instruction on sexual orientation or gender identity in grades 9-12.

at 4 (citation omitted). The agreement also provides that "[r]eferences to LGBTQ identity do not violate the [S]tatute," rejecting State Defendants' argument here that merely using a title or pronoun violates section 1001.42. *Id.* (citation omitted).

Hence, the only state policy possibly contradicted by Ms. Wood's title and pronoun use is subsection 1's statement that it is "false" to "ascribe to a person a pronoun that does not correspond to such person's sex." Fla. Stat. § 1000.071(1). But, as the district court noted, while subsection 1 announces a "policy" about titles and pronouns, it says nothing about informing a single student of that "policy," unlike the many other statutes that set out clear standards on what content must be taught. R.82 at 41 n.19. Indeed, the only way Florida advances this supposed "policy" is by restricting the speech of transgender employees. In any school in which transgender teachers are not employed, nothing whatsoever is done to communicate this supposedly important curricular interest. Even in Ms. Wood's school, every other teacher is entirely free to contradict this supposed state interest by referring to Ms. Wood using her title and pronouns, and Ms. Wood herself may freely refer to other transgender people using titles and pronouns that do not "correspond" to

the State's understanding of their sex.

### 4. Cases involving speech about topics other than teachers' identity are not relevant.

Finally, State Defendants point to district court cases in which courts have held that teachers speak as part of their official duties when using students' pronouns, simply asserting without explanation that "[i]f policies that require teachers to use students' biologically incongruous pronouns pass muster under *Garcetti*, then so must subsection 3, which merely requires using biologically aligned pronouns." Br.42; *see id.* at 40-41 (citing *Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 839 (S.D. Ind. 2020); *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1287 (D. Wyo. 2023)). But there is no conflict between the premise that Ms. Wood has a right to use her title and pronouns and the idea that she is not free to ignore others'. For the same reason, though Mr. Kennedy was free to pray on the field, he was not free to interfere with students' religious observance, and a Muslim teacher who is free to wear a headscarf in the classroom would not be free to prohibit a Jewish student from wearing a yarmulke or refuse to address one who did.

*Willey*, the only case State Defendants cite decided after *Kennedy*,

did not explain in detail why it held that the teacher did not speak as a private citizen, arguing only that "[t]he Policy only implicates Mrs. Willey's interactions with students inside her classroom, and the communications she has pursuant to those duties with parents," *id.* at 1287, and primarily relyied on the interest-balancing step of the *Pickering-Garcetti* analysis. In *Kluge*, the court similarly relied on the fact that "addressing students is necessary to communicate with them and teach them the material," that "how teachers relate to students *is* part of their jobs," and that "running a classroom is a 'core academic dut[y].'" 432 F. Supp. 3d at 839 (citing *Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019)).

To the extent that *Willey* or *Kluge* imply that because teachers must interact with students in the classroom to do their jobs those interactions are always government speech, they are not reconcilable with *Kennedy*. But the key difference between, on the one hand, Mr. Kennedy and Ms. Wood and, on the other, the teachers in *Willey* and *Kluge* is that the only reason a teacher would use a particular student's pronouns is because they are employed to teach that student. Hence, that speech cannot exist outside the employment relationship. Ms. Wood or a Muslim teacher, in

contrast, engages in their speech in all aspects of their lives. They do not lose the right to do so merely because they have chosen public employment. Moreover, to the extent the Court believes that teachers' use of their own titles and pronouns cannot be distinguished from teachers' use of students' titles and pronouns, the only way to reconcile that holding with *Kennedy* is to find that both sets of teachers speak as private citizens, leaving potential distinctions to interest-balancing.

Finally, State Defendants cite other cases for general language about teachers' responsibilities beyond curriculum or the need for the state to set curricula, but none are comparable to this case. Some concern explicitly curricular speech. *See Bishop v. Aronov*, 926 F.2d 1066, 1075-76 (11th Cir. 1991) (professor incorporated religious views into his physiology instruction); *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 490 (3d Cir. 1998) (use of "'doctrinaire materials' of a religious nature"); *Smiley v. Jenner*, 684 F. Supp. 3d 835, 842-43 (S.D. Ind. 2023) (teacher sought to impart "educational message" about LGBTQ affirmance). Others involve non-curricular student discipline or related speech. *See Bushong v. Del. City Sch. Dist.*, No. 2:19-cv-858, 2020 WL 419754, at *5-6 (S.D. Ohio Jan. 27, 2020) (disputes with a superior over "classroom

discipline and control"); *Wozniak*, 932 F.3d at 1009 (professor "waged an extended campaign against students who did not give him an award"); *Wilson v. Douglas Cnty. Sch. Dist.*, No. 3:05-cv-00220, 2007 WL 9757472, at *4 (D. Nev. Mar. 29, 2007) (teacher complained about another teacher's inappropriate physical conduct with students).

### B.   Ms. Wood speaks on a matter of public concern.

The titles and pronouns of transgender teachers are plainly of concern to the State of Florida, which considered this topic so important that it passed legislation to address it. Ms. Wood's intention in her speech is to communicate that she is a woman and that she wishes to be addressed using the same title and pronouns as other women. Speech about "controversial subjects such as … sexual orientation and gender identity," which are "of profound 'value and concern to the public' …[,] 'occupies the highest rung of the hierarchy of First Amendment values' and merits 'special protection.'" *Janus*, 585 U.S. at 913-14 (quoting *Snyder v. Phelps*, 562 U.S. 443, 452-53 (2011)).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement …." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Here,

consideration of these factors shows that Ms. Wood's speech is on a matter of public concern. State Defendants' arguments to the contrary based on the supposedly "personal" and "private" nature of Ms. Wood's expression, Br.51-61, again ignore *Kennedy*. Mr. Kennedy's prayer was a "short, private, [and] personal," piece of "private religious expression." *Kennedy*, 597 U.S. at 517. As with Ms. Wood, Mr. Kennedy's "motivation" for his prayer was "entirely personal," the "main thrust" of his speech was "essentially private," it was not "aimed at [a] public debate over" Christianity, religion, or any other topic, and it was "communicated to students at work, not to the public." Br.52-54. State Defendants' arguments again imply, implausibly, that *Kennedy* would have come out the other way if the school district had simply made different arguments.

### 1. The content of Ms. Wood's speech is on a matter of public concern.

"Content is undoubtedly the most important factor in assessing whether particular speech touches on a matter of public concern." *Mitchell*, 468 F.3d at 1284; *see also Kurtz v. Vickrey*, 855 F.2d 723, 727 & n.2 (11th Cir. 1988) (stating it is "inappropriate for court to place complete reliance on employee's motivation for speaking" (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1201-02 (3d Cir. 1988))). Even State

Defendants do not deny that which titles and pronouns transgender teachers use in the classroom is "of public interest." Br.53. Hence, the content of Ms. Wood's speech shows it to be on a matter of public concern.

State Defendants nonetheless claim that the "main thrust" of Ms. Wood's speech was "essentially private" and that it is a "personal message" about her "personal identity." Br.53, 56. But there is simply no contradiction between the idea that her identity is personal and that it is also of public interest. It is often precisely the most personal topics, like religion, race, or gender, that are of the greatest political importance. *Cf. Mosholder v. Barnhardt*, 679 F.3d 443, 450-51 (6th Cir. 2012) (disgruntled employee's complaint was of public interest even though it had partially personal motives); *Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1284 (D. Utah 1998) (volleyball coach's statement to student that she was gay was a matter of public concern). State Defendants also argue that "[a]t most, how [Ms.] Wood would like to be addressed 'concerns internal administration of the educational system,' which is not of public concern." Br.56 (quoting *Maples v. Martin*, 858 F.2d 1546, 1552 (11th Cir. 1988)). But that case in fact distinguishes purely internal matters such as salary levels and course assignments from "matters of

political or social import" like those at issue here. *Maples*, 858 F.2d at 1552 (quoting *Ballard v. Blount*, 581 F. Supp. 160, 164 (N.D. Ga. 1983)).[7]

For this reason, courts that have considered whether transgender government employees' actions in conformance with their gender identities are a matter of public concern have universally concluded that they are. *Monegain v. Dep't of Motor Vehicles* held that the plaintiff's "decision to begin presenting as female, and resulting speech, was not a 'matter of personal interest' or one limited to her employment … but a thoughtful ultimate expression of her gender identity to society." 491 F. Supp. 3d 117, 135 (E.D. Va. 2020) (quoting *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 561 (4th Cir. 2011)). Similarly, *Kastl v. Maricopa Cnty. Comty. Coll. Dist.*, No. Civ.02-1531, 2004 WL 2008954, at *9 (D. Ariz. June 3, 2004), held that the "[p]laintiff's expression of her gender, unlike employee complaints about dress codes, scheduling, or other personnel issues, has its genesis not in the minutiae of workplace life, but in her everyday existence," and that her "[e]xpression of her

---

[7] State Defendants also cite *Zen Group, Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1330 (11th Cir. 2023), *see* Br.56, but it did not concern education, and their citation is only to its dicta summarizing *Maples*.

gender and change of gender occurs both on and off the job, is directed to the public at large as well as her co-workers, and cannot be said to be 'about' her employment." *See also Zalewska*, 316 F.3d at 320 ("student's decision to wear traditionally female clothes to school as an expression of female gender identity" was a "sufficient proxy for speech to enjoy full constitutional protection" (citing *Doe ex rel. Doe v. Yunits*, No.1060A, 2000 WL 33162199 (Mass. Super. Oct. 11, 2000))).

Similarly, *Meriwether v. Hartop*, 992 F.3d at 508-09, held that a professor's expression of an opposing view about gender—that a transgender woman should not be addressed using female titles and pronouns—was speech on a matter of public concern. The "mode of address *was* the message" and "reflected his conviction that one's sex cannot be changed." *Id.* at 508 (emphasis in original). *Meriwether* observed the incoherence of requiring an employee to avoid expressing a particular position but then arguing that position was not of public concern, noting that "even the university appear[ed] to think this pronoun debate is a hot issue" because "[o]therwise, why would it forbid Meriwether from explaining his 'personal and religious beliefs about gender identity' in his syllabus?" *Id.* at 509 (citation omitted); *see also*

*Weaver*, 29 F. Supp. 2d at 1284 ("[D]efendants' actions converted this issue [of teacher's sexual orientation] to a matter of public concern.").

### 2. Ms. Wood's motivation for speaking does not mean her speech was not on a matter of public concern.

State Defendants nonetheless argue that Ms. Wood's speech is the rare case in which speech whose content is in the core of the Free Speech Clause is nonetheless not of public concern because of her purportedly purely personal motives. But Mr. Kennedy too prayed out of a personal conviction. State Defendants' arguments would remove constitutional protection from speech conveying facts about one's personal identity, since such facts are ordinarily shared for personal reasons.

State Defendants' efforts to distinguish *Meriwether* are instructive here. Br.59-60. They argue that Professor Meriwether's goal in announcing that he refused to use students' preferred pronouns was to convey his beliefs about sex. *Id.* Ms. Wood, in contrast, they claim is "motivated entirely by personal interests." Br.60. Certainly, as a transgender woman, Ms. Wood has an interest in being addressed courteously. But Professor Meriwether had personal interests too: he was a "devout Christian" who "str[o]ve[] to live out his faith each day" and, because of that view, he "believe[d] he [could] not 'affirm as true ideas

and concepts that are not true.'" *Meriwether*, 992 F.3d at 498. Ms. Wood, similarly, declared that not using her pronouns and titles "feels like a betrayal of who I am," "unnatural," and "a betrayal of myself." R.11-1 ¶¶14, 17, 20.

The cases State Defendants rely on do not support the proposition that speech undertaken for personal reasons cannot be speech on a matter of public concern. Instead, they use it as one element of the analysis and in situations where the public's interest in the topic of the speech is far more ambiguous. *See Alves*, 804 F.3d at 1167 (memorandum criticizing leadership was not addressed to public's concerns because it primarily focused on the plaintiffs' "personal grievances and frustrations with … management"); *Maggio v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000) (employee's testimony in grievance hearing was not of public concern though "the public arguably might be interested in the fair and honest implementation of [government employer's] personnel policies"); *Morgan v. Ford*, 6 F.3d 750, 754-55 (11th Cir. 1993) (public's general interest in sexual harassment did not mean specific complaints by employee about sexual harassment in her workplace were of public concern).

### 3. The context of Ms. Wood's speech does not transform it from a matter of public concern into one of private concern.

State Defendants finally argue that Ms. Wood's speech is not on a matter of public concern because "[s]ubsection 3 touches only private speech communicated to students at work, not the public." Br.54. But if this were dispositive, speech in the workplace to coworkers would never be of public concern. That is not the law.

State Defendants rely on cases holding that speech made with an intent for it to be widely distributed is more likely to be on a matter of public concern. *Compare Green v. Finkelstein*, 73 F.4th 1258, 1265-66 (11th Cir. 2023) (podcast interview) *with Morgan*, 6 F.3d at 755 (concerns about sexual harassment not a matter of public concern in part because plaintiff complained to official bodies, not "the public"). But courts regularly hold that speech from one employee to another can be of public concern. *See, e.g., Rankin v. McPherson*, 483 U.S. 378, 385-87 (1987) (employee's statement to coworker that she hoped the president would be assassinated was of public concern); *Connick*, 461 U.S. at 149 (one question on survey distributed only to coworkers was nonetheless of public concern because it touched on "matter of interest to the

community"); *Kurtz*, 855 F.2d at 728-29 (message sent only to university president about public dollars not being used for educational purposes was of public concern).

## C. The balance of the interests favors Ms. Wood.

Florida does not advance any legitimate interest through subsection 3. As explained above subsection 3 serves no interest of a curricular nature because Florida's public-school curriculum does not involve teaching students that pronouns and titles must in some way correspond to a particular view of biological sex. *See supra* Section I.A.3. Florida law in fact forbids Florida schools from teaching such a view. *Id.* Moreover, subsection 3 serves no interest in avoiding confusion in public schools because unrebutted evidence in the record shows that it actually does the opposite.[8]

While Florida cannot explain any interest actually advanced by

---

[8] Nor would it have served State Defendants to reframe this as an interest in avoiding "controversy." Such an argument is not far from the school district's in *Kennedy*. Forbidding a Muslim teacher from wearing a headscarf could also theoretically function to avert potential controversies or confusion that might arise from such a teacher's mode of dress, but *Kennedy* was clear that the First Amendment's Free Speech Clause does not permit such a policy. 597 U.S. at 531.

subsection 3, Ms. Wood's interests are substantial. Subsection 3 denies her the right to identify as a woman at school as she does in every other aspect of her life, harming her directly by limiting her expression and forcing her to endorse a state message about her gender which she finds repugnant. Under *Pickering-Garcetti*'s interest balancing test, Ms. Wood's strong interest outweighs the Defendants' nonexistent ones.

Moreover, this is not a typical *Pickering-Garcetti* case. Subsection 3 compels Ms. Wood to speak the government's message in her capacity as a private citizen, an action the Supreme Court has never said is permissible. And this compulsion takes the form of a viewpoint-discriminatory, widely applicable policy, which the Court has also said subjects it to higher scrutiny.

> **1. Subsection 3 is subjected to a higher degree of scrutiny because it compels speech of a large group on a topic of the greatest public concern.**

The district court correctly rejected the view that "the State's interest in furthering its own viewpoint, standing alone, is an adequate justification for restricting *private* speech on a matter of public concern." R.82 at 41-42 (emphasis in original). State Defendants cited no authority for this proposition below and do not do so now. Instead, they rely on

cases about the state's interest in advancing particular curricula or other related concepts. But just because a state may advance a particular curriculum does not mean it may use viewpoint-discriminatory restrictions on the *private speech* of teachers to do so. Moreover, by compelling Ms. Wood to remain silent when asked if she is a woman or uses she/her pronouns and compelling her to use a title that distinguishes her from other female teachers, subsection 3 compels her to endorse the state's message about her gender. This fact alone all but resolves the interest-balancing analysis. As the Supreme Court has said, "it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree. And we have never applied *Pickering* in such a case." *Janus*, 585 U.S. at 908.

Even if *Janus*'s exception to *Pickering-Garcetti* interest balancing were inapplicable, "widespread" government policies that "chill[] potential speech before it happens" "give[] rise to far more serious concerns" than the "single supervisory decision" at issue in the standard *Pickering-Garcetti* case. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995). In such cases, "the Government's burden is

greater": it must "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* at 468 (citing *Pickering*, 391 U.S. at 571); *see also Janus*, 585 U.S. at 907 (characterizing this as a "heav[ier]" burden than most *Pickering-Garcetti* cases). "The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis." *Janus*, 585 U.S. at 907.

State Defendants puzzlingly claim that *Janus* does not apply because "[o]nly one employee's speech is at issue here." Br.71. But in *Janus*, like here, individual plaintiffs challenged the application of a broad law to them. 585 U.S. at 888-89. Finally, State Defendants note that *Janus* did not apply *Pickering-Garcetti* balancing. Br.70-71. Just so—it strongly suggests that such balancing is inappropriate where a government seeks to compel an employee's private speech.

In addition, unlike most *Pickering-Garcetti* cases, which involve challenges to disciplinary actions taken in retaliation for plaintiffs' prior speech, Ms. Wood seeks to enjoin a system of prior restraint, "the most

serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "[A]ny system of prior restraint … comes to this Court bearing a heavy presumption against its constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975)). This is especially true of rules such as subsection 3, which are content- *and* viewpoint-based, as "government penalization of certain viewpoints is 'the greatest First Amendment sin.'" R.82 at 44 (quoting *Honeyfund*, 94 F.4th at 1277). State Defendants may respond that governments regularly impose prior restraints on the speech of their employees, but that is true only when the employees speak in their official capacities, when they have no rights under the Free Speech Clause, not when they speak as private citizens.

To resolve this case, the Court need not decide whether Florida is correct that Ms. Wood's gender is "false." Fla. Stat. § 1000.071(1). Instead, it need only conclude that Florida may not compel her to endorse that message when she speaks as a private citizen.

> ### 2. Subsection 3 does not advance any legitimate state interest.

Even discounting the factors requiring an especially stringent

*Pickering-Garcetti* analysis, Ms. Wood prevails because subsection 3 does not advance any legitimate state interest. First, as noted above, *see supra* Section I.A.3, Florida does not in fact have a curriculum of teaching that titles and pronouns are inextricably linked with biology. Second, State Defendants portray subsection 3 as an effort to teach a particular view of the mutability of sex. But it does not achieve that goal, among other reasons, because pronoun use does not make claims about a person's biology of the kind State Defendants assume. Subsection 3 also does not advance a state interest in preventing "confusion" in the classroom because unrebutted record evidence and consideration of how it operates in practice show that it actually creates confusion.

The insubstantial nature of State Defendants' claimed interests leaves only animus toward transgender people, which is not a legitimate state interest. *Romer v. Evans*, 517 U.S. 620, 632 (1996) (a law that "seems inexplicable by anything but animus toward the class it affects … lacks a rational relationship to legitimate state interests"). Florida legislators are entitled to their views on whether Ms. Wood's use of titles and pronouns is "false." But they may not compel her to share that message. "[L]earning how to tolerate diverse expressive activities has

always been 'part of learning how to live in a pluralistic society.'" *Kennedy*, 597 U.S. at 510 (quoting *Lee*, 505 U.S. at 590).

> **a.  Subsection 3 does not advance a state interest on the mutability of biology.**

As State Defendants have previously argued when trying to defend against the argument that subsection 3 discriminates on the basis of sex, "pronouns are wholly divorced from biological sex." R.60 at 20. There is not a scintilla of evidence in the record that any student who hears Ms. Wood, or any other teacher they know to be transgender, use titles and pronouns that match her gender understand that use to contain a claim regarding her "sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth." Fla. Stat. § 1000.21(9) (defining "sex").

State Defendants' position, Br. 66,  supported only by citations to dictionary definitions silent as to transgender people that, consistent with "longstanding English usage," pronouns imply a claim about biology is belied by the many cases of this Court and of others that have used pronouns that are used by the litigants before them without confusion about the litigants' sex. *See, e.g.*, *Bostock v. Clayton Cnty.*, 590 U.S. 644, 653 (2020); *Santos-Zacaria v. Garland*, 598 U.S. 411, 414 (2023); *Lange*

*v. Houston Cnty.*, 101 F.4th 793, 796 (11th Cir. 2024); *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 770 (11th Cir. 2024); *Keohane v. Florida Dep't of Corr. Sec'y*, 952 F.3d 1257, 1262 (11th Cir. 2020).

Even if Florida had a legitimate interest in preventing students from learning that teachers use titles and pronouns that do not "correspond" to their sex assigned at birth, it is the teachers' self-policing of subsection 3, not their pronoun and title use, that will inform students of that. Finally, even if State Defendants' claims about their interests and about the relationships between titles, pronouns, and sex are credited, subsection 3 does little, if anything, to advance them. It prohibits only Ms. Wood from referring to herself using a female title and pronouns. It does not prohibit anyone else from calling her Ms. Wood or using she/her pronouns to refer to her, nor does it prohibit her or anyone else from referring to any other person using titles and pronouns that do not "correspond" to their sex assigned at birth.

### b. Subsection 3 does not advance an interest in preventing "confusion" or "disruption."

State Defendants' backup argument that subsection 3 is necessary to prevent "confusion" relies on arguments and legislative history relating to different pronouns used by a small minority of nonbinary

people. But these nonbinary pronouns are irrelevant to whether the state has an interest in regulating the title and pronoun usage of transgender women like Ms. Wood. Br.63-64. Indeed, the legislative history if anything shows that the legislature understood that "common pronouns" like "him, her, [and] they" do not cause confusion. *Hearing on HB 1069 Before the H. Educ. & Emp. Comm.*, 2023 Reg. Sess., Video at 1:26:47-1:27:38 (Fla. Mar. 23, 2023, 8:00 AM)), https://bit.ly/4bXHa5F.

State Defendants also claim that absent subsection 3, Ms. Wood's title and pronoun usage would "disrupt" the classroom. Defendants note that her declaration explains that before subsection 3, Ms. Wood would sometimes tell a student who referred to her as "Mr." that she "go[es] by Ms. Wood." Br.66 (citing R.11-1 ¶7). Why this simple exchange is somehow "disruptive," let alone so important that it justifies an entire regime of censorship of Ms. Wood's speech, State Defendants do not explain.

Ms. Wood's declaration further explains that it is subsection 3 that is disrupting her classroom and causing confusion. After she began using the title Teacher in class, this change "took away from instructional time because it took many conversations during many periods over several

days for [her] students to stop questioning [her] about it." R.11-1 ¶15. Now, because of subsection 3, students are confused about what she wants to be called and use a variety of pronouns for her. *Id.* Moreover, the distraction of remembering to refer to herself differently at school than she does in every other aspect of her personal and professional life, on pain of discipline or the loss of her teaching license, disrupts her ability to do her actual job—teaching students Algebra. Subsection 3 cannot function "to get our teachers back to focusing on … why we send our children to school … to learn math," Br.27, or to avoid "'all th[e] time and distraction' attributed to pronouns," Br.28, because Ms. Wood's unrebutted declaration shows that it has done the precise opposite.

Having failed to show any evidence that prior to subsection 3, Ms. Wood's speech, or any other transgender teacher's, created confusion or disruption to the classroom, State Defendants fall back on the argument that "[t]he government's legitimate interest in avoiding disruption does not require proof of actual disruption." Br.68 (quoting *Moss*, 782 F.3d at 622 (citing *Anderson v. Burke Cnty.*, 239 F.3d 1216, 1221 (11th Cir. 2001))). But both *Moss* and *Anderson* concerned a few pieces of criticism by government employees of specific policies by their employers, which

were followed shortly afterward by the discipline that led to the suit. *See Moss* 782 F.3d at 616-17 (termination in June for comments made from January to May); *Anderson*, 239 F.3d at 1219 (suspension and demotion in March and April for comments made the previous August and September). Here, in contrast, Ms. Wood taught for two years using her own title and pronouns without any disruptions to her classroom, R.11-1 ¶¶5-7, nor have State Defendants pointed to confusion associated with any other transgender teacher in the history of the state.

The fact that State Defendants cannot point to a single concrete example of harm prior to the enactment of subsection 3 is surely relevant to whether State Defendants have carried their burden to demonstrate a "[r]easonable possibility of adverse harm" in the future. *Moss*, 782 F.3d at 622. While there is no "necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action," *Connick*, 461 U.S. at 152, it does not follow that it is credible to claim that there is such a possibility when such harm has failed to manifest for many years.[9] *See*

---

[9] *Connick* also noted that such deference to fears of harm is not always appropriate and "a stronger showing may be necessary if the employee's

*Berdin v. Duggan*, 701 F.2d 909, 912-13 (11th Cir. 1983) (finding that employee's speech did not cause actual disruption cut in favor of plaintiff on interest balancing); *Kent v. Martin*, 252 F.3d 1141, 1144-46 (10th Cir. 2001) (collecting cases holding that where significant time elapses between employee's speech and termination "it is nonsensical to rely ex post facto on a 'prediction' of disruption").

Moreover, subsection 3 is likely to create the confusion that Florida argues it is intended to prevent. Consider a student new to Ms. Wood's classroom who does not know her sex assigned at birth. Before subsection 3, Ms. Wood would have used the title and pronouns, name, clothing, and overall presentation that express her gender identity. R.11-1 ¶7. Under subsection 3, in contrast, Ms. Wood is required either to use a title and pronouns that do not express her gender, while she remains free to express her female gender identity through her name, clothing, and overall presentation, or to avoid using gendered titles or sharing pronouns entirely, an unnatural expression of English and an unusual experience for students. *Id.* ¶9. Moreover, the student's classmates and

_____

speech more substantially involve[s] matters of public concern." 461 U.S. at 152.

other adults in the school may use a variety of titles and pronouns to refer to Ms. Wood. *Id.* ¶15. That student cannot help but be confused as a direct result of subsection 3.

### 3. Ms. Wood's interests outweigh any state interest.

Like Mr. Kennedy's interest in expressing himself by praying on the football field, Ms. Wood's First Amendment interest in expressing herself by using the title and pronouns that come naturally to her is strong. As she explained in her unrebutted declaration: "Being able to express myself as a woman publicly, including by using my Ms. title and she/her pronouns, is essential to my identity. It is what I need to be true to myself, to be the best version of myself, to love myself, and to experience the joy of living as myself." R.11-1 ¶2. Conversely, using the title Teacher is "extremely painful" and the idea of using the title Mr. "brings up immediate feelings of disgust" and would be "a betrayal." *Id.* ¶¶17, 20.

State Defendants do not deny any of these harms. Instead, they mostly restate their prior arguments on other *Pickering-Garcetti* prongs, including cross-citing to their argument that she did not speak as a private citizen. Br.66 (citing Br.47-48). They also argue that her interest is reduced because teachers "by necessity … accept[] certain limitations

on [their] freedom." *Id.* (quoting *Garcetti*, 547 U.S. at 418). In one irrelevant sense, this is true: under *Pickering-Garcetti*, government employees' interests when speaking as private citizens are balanced against the government's interest in restricting their speech—a standard vastly more deferential than the one that would apply if this law regulated other citizens' speech. But State Defendants go further and appear to argue that when the second *Pickering-Garcetti* step is applied in schools, the government should get yet another thumb on the scale reducing the weight of a teacher's free speech interest. They cite no relevant authority for this proposition.[10]

State Defendants' only other argument is that Ms. Wood's interest in using her title and pronouns is equally unsupported by case law. Br. 66. To the extent they mean specifically as to teachers, this is inevitable:

---

[10] Instead, State Defendants rely on cases about students' constitutional rights in schools. *See* Br.67 (citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995) (concerning drug testing of student-athletes); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986) (discipline of student for swearing)). They do cite to one case, *Evans-Marshall*, 624 F.3d at 341, involving teachers, but it never reached the interest-balancing step because it held the teacher did not speak as a private citizen. *Id.* at 342. Even more irrelevantly they cite *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007), which did not involve schools, and quote language from its discussion of the first *Pickering-Garcetti* prong, not its interest-balancing analysis.

Florida is the first jurisdiction of which Ms. Wood's counsel are aware to seek to restrict their title and pronoun use. And as noted above, two courts have specifically held that transgender government employees do have a strong interest in using their pronouns and titles at work. *See Monegain*, 491 F. Supp. 3d at 136-37; *Kastl*, 2004 WL 2008954, at *9.

## II. The district court did not abuse its discretion by finding that Ms. Wood has shown a likelihood of irreparable harm.

The district court properly rejected State Defendants' delay argument as inapplicable to Ms. Wood's First Amendment claim because "'direct penalization of protected speech … constitutes a per se irreparable injury.'" R.82 at 46 (quoting *Otto*, 981 F.3d at 870); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). State Defendants have not denied that subsection 3, if not enjoined, would penalize Ms. Wood if she exercised her First Amendment right to use her title and pronouns. The inquiry should end there: she suffers per se irreparable harm as long as subsection 3 is in effect.

State Defendants argue that "per se" in *Otto* means "rebuttable presumption," not "per se." Br.73 (citing *Siegel v. LePore*, 234 F.3d 1163,

1178 (11th Cir. 2000)).[11] But *Siegel,* which was not a First Amendment case, says the opposite, explaining that while not all constitutional harms are automatically irreparable, "it is the direct penalization … of First Amendment rights [which] constitutes irreparable injury." 234 F.3d at 1178 (quoting *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989)). Other Eleventh Circuit precedents agree: where a statute or ordinance directly penalizes speech, there is irreparable harm. *See FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) ("an ongoing violation of the First Amendment constitutes an irreparable injury"); *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) ("direct penalization, as opposed to incidental inhibition, of First Amendment rights constitutes irreparable injury"); *see also Bill Salter Advertising, Inc. v. City of Brewton*, 486 F. Supp. 2d 1314, 1329 (S.D. Ala. 2007) (holding that Eleventh Circuit caselaw on direct-penalization First Amendment violations required a finding of irreparable harm (citing *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)).

The district court also did not abuse its discretion in holding that,

---

[11] State Defendants also cite *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021), Br.73, but it did not concern free speech and presumes the relevant presumption is rebuttable.

even if a rebuttable presumption standard applied, State Defendants had not overcome the presumption of irreparable harm. Ms. Wood filed her preliminary injunction motion two weeks after her complaint. R.1, R.11. Under State Defendants' cited cases, that should be the end of the matter, since all of them measure delay in seeking an injunction from the filing of the complaint. *See Wreal*, 840 F.3d at 1246, 1248-49; *Citizens Concerned About Our Child. v. Sch. Bd. of Broward Cnty.*, 193 F.3d 1285, 1290 (11th Cir. 1999); *Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, No. 22-14257, 2023 WL 3704912, at *2 (11th Cir. May 30, 2023) (per curiam).[12] It makes sense to date delay from complaint filing, because that act demonstrates that the plaintiff is aware of the issue and has located sufficient resources to litigate it, such that stronger inferences could be drawn from any further delay.

State Defendants also misunderstand the purpose of the delay inquiry. Courts considering delay ask whether the delay affects the preliminary injunction factors. *See Wreal*, 840 F.3d at 1248 (in a trademark case delay "undermined any showing of irreparable injury");

---

[12] State Defendants also cite *Florida v. United States*, No. 23-11528, 2023 WL 3813774, at *2 (11th Cir. June 5, 2023), Br.72, but it discussed delay in the context of when to appeal.

*Citizens Concerned About Our Child.*, 193 F.3d at 1290 (two-year delay, without additional evidence, showed that "wait[ing] to final judgment for review of the order ruling on standing would [not] have any 'serious consequence.'"). Accordingly, delay is "not necessarily fatal." *Wreal*, 840 F.3d at 1248; *see also Larweth v. Magellan Health, Inc.*, 841 F. App'x 146, 158-59 (11th Cir. 2021) (months-long delay due to negotiations did not undermine finding of irreparable harm); *GRACE, Inc. v. City of Miami*, 674 F. Supp. 3d 1141, 1162 (S.D. Fla. 2023) (nine-month delay justified in voting rights case due to "caution" and a "high evidentiary burden" and where an injunction could still benefit plaintiffs); *Gegas v. St. Matthew's Univ. Sch. of Med.*, No: 6:22-cv-2299, 2023 WL 6294410, at *6 (M.D. Fla. Sept. 4, 2023) (year-long delay did not preclude irreparable harm finding where harm was not yet final).

This is particularly clear in the out-of-circuit cases State Defendants cite for the proposition that delay analysis applies to constitutional claims. State Defendants cite *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 999 (8th Cir. 2023), as holding that a "'delay of at least six months in filing the motion' on equal protection and Title IX claims warranted denial," Br.73, but omit the court's reasoning. Mr. Ng

sought an injunction reversing the elimination of his school's men's gymnastics team only one month before the season started and after "the majority of the coaching staff and other gymnasts had left the University," with the result that it "would have been improbable at best for the team to have competed in" that season. *Ng*, 64 F.4th at 998. Hence, it was impossible "to preserve the status quo," and so his "delay was unreasonable and … consequently defeated Ng's goal of preventing irreparable harm." *Id.* Likewise in *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1221 (D. Utah 2004), *aff'd*, 425 F.3d 1249 (10th Cir. 2005), the court held that a delay of more than six months between the transfer of land previously used for protest to private owner and motion strengthened the argument that the plaintiff did not believe they were harmed where they had "ample alternative sites in the immediate vicinity on which to express their First Amendment rights."

Rather than offer arguments about what Ms. Wood's delay does or does not imply about whether she suffered irreparable harm, State Defendants simply assert that Ms. Wood should be punished for delay, without offering any theory of why Ms. Wood's delay shows, under the facts of this case, that she will not be irreparably harmed if subsection 3

goes back into effect for her. Nor could they: Her declaration establishes that she is harmed every time she is forced to call herself "Teacher" and avoid her title and pronouns at work. R.11-1 ¶¶14-21.

State Defendants' argument that Ms. Wood's delay should be dated from the time Governor DeSantis signed the law enacting subsection 3 in May, not the first weeks of the school year, when she learned of its impact on her, also misses the point of the delay analysis. R.11-1 ¶¶9-13. Her failure to challenge a law before she knew how it would affect her shows nothing about the irreparable harm she experienced when it was applied to her. *See Ng*, 64 F.4th at 998 (delay measured from date plaintiff learned of the harm); *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 32 (2d Cir. 1995) (measuring delay from the time plaintiff "first heard of" alleged trademark infringement); *cf. Wreal*, 840 F.3d at 1248-49 (noting that preliminary injunction motion was based on information available to plaintiff prior to delay);

The district court also correctly found that Ms. Wood, even had she known of subsection 3's impact on her, was reasonable in waiting to begin to find counsel until either the law went into effect or she had made efforts to ameliorate its effect on her. R.82 at 50. State Defendants argue

that she had standing and that her claim was ripe as soon as the law was enacted, so that any delay was unreasonable. Br.75-76. But the question is not whether she perhaps could have filed suit sooner but whether, even had she known of subsection 3 from the time it was signed, her decision, as a non-lawyer, to wait and try and work things out with her supervisor demonstrates that she will not be harmed if the injunction is lifted. To so hold would be to charge her with sophisticated legal knowledge that there is no reason to believe she possessed.

Finally, any delay, whether from May or August or September until she filed her preliminary injunction motion in December, was reasonable. As demonstrated by the tens of thousands of words of briefing in this appeal, which covers only one count of Plaintiffs' seventeen-count complaint, this is a complex case. Ms. Wood is an individual with no particular knowledge of the legal system who had to locate attorneys who not only would take the case but also had the expertise and resources to do so. As the district court noted, the complexity of the case is also demonstrated by the fact that after the preliminary injunction motion was filed on some of her claims, State Defendants asked for and received a thirty-nine-day extension to respond to it. R.82 at 52. All of these factors

show that her delay does not militate against a finding of irreparable harm. *See Koe v. Noggle*, 688 F. Supp.3d 1321, 1358 (N.D. Ga. 2023) (three-month delay after law went into effect was reasonable and not evidence of plaintiffs "sitt[ing] on their rights" given complexity of the case); *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1285 (N.D. Fla. 2021) (same).

## CONCLUSION

The district court did not err in concluding that Ms. Wood has demonstrated a likelihood of success on the merits and that she will be irreparably injured without an injunction. State Defendants have not challenged the district court's ruling on the remaining injunctive relief factors. Therefore, the district court's order should be affirmed.

Respectfully submitted.

Dated: July 24, 2024

/s/ Sam Boyd
Sam Boyd, Fla. Bar No. 1012141
Carli Raben, Fla. Bar No. 1036013
SOUTHERN POVERTY LAW CENTER
2 S. Biscayne Blvd. Ste. 3750
Miami, FL 33131
(786) 347-2056
(786) 237-2949 (fax)
sam.boyd@splcenter.org
carli.raben@splcenter.org

Diego A. Soto

Jessica L. Stone
SOUTHERN POVERTY LAW CENTER
150 E. Ponce De Leon Ave. Ste. 340
Decatur, GA 30030
(404) 521-6700
(404) 377-0708 (fax)
diego.soto@splcenter.org
jessica.stone@splcenter.org

Simone Chriss, Fla. Bar No. 124062
Jodi Siegel, Fla. Bar No. 511617
SOUTHERN LEGAL COUNSEL, INC.
1229 NW 12th Ave.
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)
simone.chriss@southernlegal.org
jodi.siegel@southernlegal.org

James M. Finberg
James Baltzer
ALTSHULER BERZON LLP
177 Post St., Ste. 300
San Francisco, CA 94108
(415) 421-7151
jfinberg@altshulerberzon.com
jbaltzer@altshulerberzon.com

*Counsel for Plaintiff-Appellee and
Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and type-style requirements of Rule 32 and contains 12,796 words.

/s/ Sam Boyd
Sam Boyd

## CERTIFICATE OF SERVICE

I hereby certify that four copies of the foregoing brief were sent to the Clerk of Court, 56 Forsyth Street, N.W., Atlanta, GA 30303, and that the brief was electronically filed with the Court and served on all counsel of record via the CM/ECF system, on this 24th day of July, 2024.

/s/ Sam Boyd
Sam Boyd