No. 24-11239-D

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

KATIE WOOD,
*Plaintiff-Appellee,*

AV SCHWANDES, et al.
*Plaintiffs,*

v.

FLORIDA DEPARTMENT OF EDUCATION,
FLORIDA STATE BOARD OF EDUCATION,
COMMISSIONER OF EDUCATION,
EDUCATION PRACTICES COMMISSION,
MONESIA BROWN,
In their official capacity as member of
defendant education practices, et al.
*Defendants-Appellants,*

HILLSBOROUGH COUNTY SCHOOL BOARD, et al.
*Defendants.*

Appeal from the U.S. District Court for the
Northern District of Florida, No. 4:23-cv-526 (Walker, C.J.)

## REPLY BRIEF OF APPELLANTS

Bryan Weir
Daniel Shapiro
Daniel M. Vitagliano*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: (703) 243-9423
bryan@consovoymccarthy.com

*\* Supervised by principals of the firm
admitted to practice in VA*

*Counsel for Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Per Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Appellants certify that the following have an interest in the outcome of this appeal:

1. Akerman LLP, *Counsel for Defendant*

2. Altschuler Berzon LLP, *Counsel for Plaintiffs-Appellee*

3. Ameerally, Aadil, *Defendant-Appellant*

4. American Federation of Teachers, *Amicus Curiae*

5. Baltzer, James, *Attorney for Plaintiffs-Appellee*

6. Barr, Jared, *Defendant-Appellant*

7. Boyd, Sam, *Attorney for Plaintiffs-Appellee*

8. Brodsky, Alexandra, *Attorney for Amicus Curiae*

9. Brown, Monesia, *Defendant-Appellant*

10. Butcher, Michael, *Defendant-Appellant*

11. Byrd, Esther, *Defendant-Appellant*

12. Center for Constitutional Rights, *Amicus Curiae*

13. Chriss, Simone, *Attorney for Plaintiffs-Appellee*

14. Christie, Grazie, *Defendant-Appellant*

15. Colon, Elayne, *Defendant-Appellant*

16.     Commissioner of Education, *Defendant-Appellant*

17.     Consovoy McCarthy PLLC, *Counsel for Defendants-Appellants*

18.     Copenhaver, Ann, *Defendant-Appellant*

19.     Diaz Jr., Manny, *Florida Commissioner of Education*

20.     Doe, Jane, *Plaintiff*

21.     Education Practices Commission, *Defendant-Appellant*

22.     Finberg, James M., *Attorney for Plaintiffs-Appellee*

23.     Fleisher, Aaron S., *Attorney for Plaintiffs-Appellee*

24.     Florida Department of Education, *Defendant-Appellant*

25.     Florida Education Association, *Amicus Curiae*

26.     Florida Virtual School Board of Trustees, *Defendant*

27.     Fox, James D., *Attorney for Defendant*

28.     Garcia, Kelly, *Defendant-Appellant*

29.     Gibson, Benjamin, *Defendant-Appellant*

30.     Goodwin, Joseph, *Defendant-Appellant*

31.     Grosholz, Jeffrey J., *Attorney for Defendant*

32.     Henry, Benjamin, *Defendant-Appellant*

33.     Hillsborough County School Board, *Defendant*

34.     Holley, Timothy, *Defendant-Appellant*

35.  Holshouser, Eric J., *Attorney for Defendant*

36.  Human Rights Campaign Foundation, *Amicus Curiae*

37.  Innerst, Lisa, *Defendant-Appellant*

38.  Johnson, Jeffrey, *Defendant-Appellant*

39.  Jones, Colin, *Attorney for Plaintiffs-Appellee*

40.  Kennedy, Laura Gervarter, *Attorney for Amicus Curiae*

41.  Kimmel, Adele, *Attorney for Amicus Curiae*

42.  Kramer Levin Naftalis & Frankel LLP, *Counsel for Amicus Curiae*

43.  Lambda Legal Defense and Education Fund, Inc., *Amicus Curiae*

44.  LaPee, Kenneth, *Defendant-Appellant*

45.  Lee County School Board, *Defendant*

46.  Lerman, Daniel A., *Attorney for Amicus Curiae*

47.  Lewis, Mason, *Defendant-Appellant*

48.  Linguistic Society of America, *Amicus Curiae*

49.  Magar, Mary-Lynn, *Defendant-Appellant*

50.  Makar, Mikala, *Attorney for Defendant*

51.  Margolin, Jason L., *Attorney for Defendant*

52.  Marsey, J. David, *Attorney for Defendant*

53.  Maxwell, Nathan A., *Attorney for Amicus Curiae*

54.  McCoy, Scott D., *Attorney for Plaintiffs-Appellee*

55.  McNeil, Daniel J., *Attorney for Amicus Curiae*

56.  McNett, Keira, *Attorney for Amicus Curiae*

57.  Menchion, Kimberly, *Attorney for Amicus Curiae*

58.  Monfared, Neema M., *Attorney for Defendant*

59.  Murphy, Sallie, *Defendant-Appellant*

60.  National Education Association, *Amicus Curiae*

61.  Nevins, Gregory R., *Attorney for Amicus Curiae*

62.  O'Brien, Alice, *Attorney for Amicus Curiae*

63.  Ouellette, Sean, *Attorney for Amicus Curiae*

64.  Petty, Ryan, *Defendant-Appellant*

65.  Plaza, Christine, *Defendant-Appellant*

66.  Public Justice, *Amicus Curiae*

67.  Raben, Carli, *Attorney for Plaintiffs-Appellee*

68.  Roetzel & Andress PA, *Counsel for Defendant*

69.  Rogers Towers PA, *Counsel for Defendant*

70.  Rosenthal, Jonathan, *Attorney for Plaintiffs-Appellee*

71.  Rowe, Kevin, *Defendant-Appellant*

72.  Rumberger Kirk & Caldwell PA, *Counsel for Defendant*

73.     Schwandes, AV, *Plaintiff*

74.     Shapiro, Daniel, *Attorney for Defendants-Appellants*

75.     Shaw, Charles, *Defendant-Appellant*

76.     Siegel, Jodi, *Attorney for Plaintiffs-Appellee*

77.     Sloan, Orenthya, *Defendant-Appellant*

78.     Snyder, Marc, *Defendant-Appellant*

79.     Soto, Diego, *Attorney for Plaintiffs-Appellee*

80.     State Board of Education, *Defendant-Appellant*

81.     Stone, Jessica, *Attorney for Plaintiffs-Appellee*

82.     Southern Poverty Law Center, *Counsel for Plaintiffs-Appellee*

83.     Thomas, Malcolm, *Defendant-Appellant*

84.     Tompkins, Jordan, *Defendant-Appellant*

85.     Trachtman, Jeffrey A., *Attorney for Amicus Curiae*

86.     Vitagliano, Daniel M., *Attorney for Defendants-Appellants*

87.     Walker, Hon. Mark E., *United States District Judge (N.D. Fla.)*

88.     Walta, Jason, *Attorney for Amicus Curiae*

89.     Weir, Bryan, *Attorney for Defendants-Appellants*

90.     Wilks, Kathy, *Defendant-Appellant*

91.     Wood, Katie, *Plaintiff-Appellee*

No. 24-11239-D, *Wood et al. v. Florida Department of Education et al.*

Appellants are government officials or entities of the State of Florida, and Appellee is an individual. No publicly traded company or corporation has an interest in the outcome of this case or appeal. Per Circuit Rule 26.1-2(c), Appellants certify that this CIP is complete.

Dated: August 14, 2024                              */s/ Bryan Weir*
                                                    *Counsel for*
                                                    *Defendants-Appellants*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ...................................... C-1

TABLE OF CONTENTS ............................................................. i

TABLE OF CITATIONS ............................................................ ii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ........................................................................... 3

    I.   Wood has not shown likely success under the First
        Amendment. ................................................................ 3

        A.    Wood speaks as a public employee, not as a
               private citizen .................................................. 3

        B.    Wood's speech is not on a matter of public concern ....... 13

        C.    The State's interests outweigh Wood's .......................... 18

    II.  Wood's delay in seeking preliminary injunctive relief
        undermines any suggestion of irreparable harm. .................. 30

CONCLUSION ......................................................................... 33

CERTIFICATE OF COMPLIANCE ................................................ 35

CERTIFICATE OF SERVICE ....................................................... 35

# TABLE OF CITATIONS

**Cases**

*Abdur-Rahman v. Walker*,
567 F.3d 1278 (11th Cir. 2009)..............................................................5

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022) ...............................................................21

*Adventist Health Sys./Sunbelt, Inc. v. HHS*,
17 F.4th 793 (8th Cir. 2021) .................................................................32

*\*Alves v. Bd. of Regents of the Univ. Sys. of Ga.*,
804 F.3d 1149 (11th Cir. 2015)..............................................3-5, 13-16

*Barnhill v. Cheery*,
2008 WL 759322 (M.D. Fla. Mar. 20, 2008) .....................................24

*Bd. of Cnty. Comm'rs v. Umbehr*,
518 U.S. 668 (1996)........................................................................20, 25

*Benisek v. Lamone*,
585 U.S. 155 (2018).........................................................................30-31

*Berdin v. Duggan*,
701 F.2d 909 (11th Cir. 1983).............................................................28

*Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod
Bethune Nat'l Alumni Ass'n, Inc.*,
2023 WL 3704912 (11th Cir. May 30, 2023).....................................32

*Bishop v. Aronov*,
926 F.2d 1066 (11th Cir. 1991)............................................................12

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006).............................................................31

*Citizens Concerned About Our Child. v. Sch. Bd. of Broward Cnty.*,
193 F.3d 1285 (11th Cir. 1999)...........................................................32

*Dartland v. Metropolitan Dade County*,
   866 F.2d 1321 (11th Cir. 1989)............................................................ 29

*Daunt v. Benson*,
   956 F.3d 396 (6th Cir. 2020)............................................................... 20

*Does 1-6 v. Mills*,
   16 F.4th 20 (1st Cir. 2021)................................................................. 31

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   472 U.S. 749 (1985) ......................................................................... 18

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)......................................................................30-31

*Edwards v. Cal. Univ. of Pa.*,
   156 F.3d 488 (3d Cir. 1998) ................................................................ 4

*Farhat v. Jopke*,
   370 F.3d 580 (6th Cir. 2004)............................................................... 20

*Farmer v. Brennan*,
   511 U.S. 825 (1994)......................................................................... 23

*Gibson v. Collier*,
   920 F.3d 212 (5th Cir. 2019)............................................................... 23

*Green v. Finkelstein*,
   73 F.4th 1258 (11th Cir. 2023) ............................................................ 27

*Gresham v. City of Atlanta*,
   542 F. App'x 817 (11th Cir. 2013) ........................................................ 30

*Hobdy v. State*,
   2019 WL 3755781 (Tex. Ct. App. Aug. 8, 2019) ........................................ 24

*Hood v. Dep't of Child. & Fams.*,
   2014 WL 757914 (M.D. Fla. Feb. 26, 2014) ............................................. 24

*Hoop Culture, Inc. v. GAP Inc.*,
   648 F. App'x 981 (11th Cir. 2016) ........................................................ 31

*Howard v. Ga. Dep't of Corr.*,
  2010 WL 3614159 (M.D. Ga. July 7, 2010) ........................................ 23

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  585 U.S. 878 (2018) ........................................................................ 19

*Jeune v. U.S. Att'y Gen.*,
  810 F.3d 792 (11th Cir. 2016) ..................................................... 23-24

*Johnson v. Poway Unified Sch. Dist.*,
  658 F.3d 954 (9th Cir. 2011) ........................................................... 4

*Kastl v. Maricopa Cnty. Cmty. Coll. Dist.*,
  2004 WL 2008954 (D. Ariz. June 3, 2004) ................................... 17, 29

*\*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ........................................... 1, 8-12, 14

*Kent v. Martin*,
  252 F.3d 1141 (10th Cir. 2001) ...................................................... 28

*King v. Bd. of Cnty. Comm'rs*,
  916 F.3d 1339 (11th Cir. 2019) ................................................... 16-17

*\*Kluge v. Brownsburg Cmty. Sch. Corp.*,
  432 F. Supp. 3d 823 (S.D. Ind. 2020) .............................................. 6

*Kollins v. S.C. Dep't of Mental Health*,
  2007 WL 790010 (D.S.C. Mar. 14, 2007) ........................................ 23

*Konitzer v. Frank*,
  711 F. Supp. 2d 874 (E.D. Wis. 2010) ............................................. 23

*Kosilek v. Maloney*,
  221 F. Supp. 2d 156 (D. Mass. 2002) .............................................. 24

*Long v. Nix*,
  877 F. Supp. 1358 (S.D. Iowa 1995) ............................................... 24

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
  474 F.3d 477 (7th Cir. 2007) ........................................................... 4

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021)...................................14-15, 19

*Monegain v. Dep't of Motor Vehicles*,
491 F. Supp. 3d 117 (E.D. Va. 2020)...........................17, 29

*Morgan v. Ford*,
6 F.3d 750 (11th Cir. 1993)..................................18

*Moss v. City of Pembroke Pines*,
782 F.3d 613 (11th Cir. 2015)...............................27

*Nicholson v. Gant*,
816 F.2d 591 (11th Cir. 1987)...............................19

*Praylor v. Tex. Dep't of Crim. Just.*,
430 F.3d 1208 (5th Cir. 2005)...............................23

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992).........................................25

*Renfroe v. Kirkpatrick*,
722 F.2d 714 (11th Cir. 1984)...............................13

*Satanic Temple, Inc. v. City of Boston*,
2022 WL 20470745 (D. Mass. Dec. 6, 2022) .................1

*Shahar v. Bowers*,
114 F.3d 1097 (11th Cir. 1997)..............................27

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000)..............................31

*State v. Tabberer*,
626 S.W.3d 274 (Mo. Ct. App. 2021) .......................24

*Stevens v. Williams*,
2008 WL 916991 (D. Or. Mar. 27, 2008).....................24

*Supre v. Ricketts*,
792 F.2d 958 (10th Cir. 1986)...............................23

*Tipsword v. Tipsword,*
2013 WL 1320444 (Ariz. Ct. App. Apr. 2, 2013) ................................ 24

*United States v. Howard,*
28 F.4th 180 (11th Cir. 2022) ........................................................... 26

*United States v. Lopez,*
590 F.3d 1238 (11th Cir. 2009) ......................................................... 22

*United States v. Nat'l Treasury Emps. Union,*
513 U.S. 454 (1995) ......................................................................... 19

*United States v. Thomason,*
991 F.3d 910 (8th Cir. 2021) ........................................................ 23-24

*United States v. Varner,*
948 F.3d 250 (5th Cir. 2020) ........................................................ 23-24

*United States v. Verdugo-Urquidez,*
494 U.S. 259 (1990) ......................................................................... 14

*Weaver v. U.S. Info. Agency,*
87 F.3d 1429 (D.C. Cir. 1996) ........................................................... 20

*White v. Farrier,*
849 F.2d 322 (8th Cir. 1988) ............................................................. 23

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.,*
680 F. Supp. 3d 1250 (D. Wyo. 2023) ........................................... 6, 19

*Williams-Yulee v. Fla. Bar,*
575 U.S. 433 (2015) ......................................................................... 25

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ............................................................................. 30

*Wreal, LLC v. Amazon.com, Inc.,*
840 F.3d 1244 (11th Cir. 2016) ..................................................... 31-32

**Statutes**

Fla. Stat. §1000.071(1) ............................................................. 9, 20

Fla. Stat. §1000.071(3) ................................................................ 18

Fla. Stat. §1000.071(6) ................................................................ 19

Fla. Stat. §1000.21(7) .................................................................. 26

Fla. Stat. §1003.46(2)(a) ............................................................. 26

**Other Authorities**

*A Modern Dictionary of the English Language*
(2d ed., Macmillan & Co. 1911) ........................................... 21

*American Heritage Dictionary* (4th ed. 2001) ......................... 21

*Collins English Dictionary* (1st ed. 2006) ............................... 21

Florida ELA Appendices (2019),
https://perma.cc/3EDZ-Z3SB ............................................... 26

Florida's B.E.S.T. Standards: English Language Arts (2020),
https://perma.cc/FS9W-WZCZ .............................................. 26

Jack Wolfsohn, *Merriam-Webster Changes the Definition
of 'Female'*, Nat'l Rev. (July 19, 2022),
https://perma.cc/J6EE-PVET ............................................... 23

Noah Webster, *American Dictionary of the English
Language* (1828) .................................................................. 21

*The Merriam-Webster Dictionary* (Int'l ed. 2016) .................... 21

## INTRODUCTION AND SUMMARY OF ARGUMENT

In their opening brief, the State Defendants addressed the relevant factors under the *Garcetti* framework and the precedent applying them. That analysis and precedent leads to an unsurprising conclusion: a teacher's speech *to* students *at* school is part of that teacher's job, which means the government can regulate it consistent with the First Amendment. In response, Wood relies primarily on *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), and suggests that *Kennedy* marked a sea change to public-employment speech doctrine. It did not. *Kennedy* "merely affirmed the precedents for analyzing government speech." *Satanic Temple, Inc. v. City of Boston*, 2022 WL 20470745, at *3 (D. Mass. Dec. 6, 2022). And *Kennedy* didn't even address the public-concern prong because the parties assumed it was satisfied. 597 U.S. at 528.

Setting aside *Kennedy*, adopting Wood's analysis would create a novel view of schools' authority to regulate teachers' speech to their students. As Wood sees it, a teacher *never* speaks as a teacher when he provides his title and pronouns to students, no matter when or where at school he does so. But courts have overwhelmingly found that a teacher's

duties include not only curricular instruction but also normal interactions with students. *Kennedy* changed none of that.

Nor are Wood's title and pronouns a matter of public concern. They convey a "self-referential," "personal message" about Wood's "personal identity," and Wood's motives are entirely personal. Wood does not seek to contribute to the broader social debate over pronoun usage. And Wood privately disseminates them in a nonpublic forum.

On interest balancing, the State's interests are weighty. Subsection 3 advances Florida's educational policy of using titles and pronouns as they've been used for centuries—that is, aligned with one's sex—and Florida's interest in preventing confusion. Teachers using biologically incongruous titles and pronouns sufficiently implicates those interests. Wood, on the other hand, still cites no support for a teacher's interest in using biologically incongruous titles and pronouns.

The Court should reverse.

# ARGUMENT

## I. Wood has not shown likely success under the First Amendment.

### A. Wood speaks as a public employee, not as a private citizen.

**1.** Wood neglects much of the precedent on whether a public employee speaks pursuant to official job duties. "[T]he critical question under *Garcetti* is whether the speech at issue is *itself* ordinarily within the scope of an employee's duties … ." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1161 (11th Cir. 2015). Speech ordinarily within the scope of an employee's duties is "speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment." *Id.* at 1162.

The State Defendants outlined this Court's precedent applying that standard, including the factors it considers, and applied those factors here. Blue-Br.15, 19-31.[1] The topline of that analysis is predictable: schools educate students through teachers' speech. Unlike other municipal jobs such as a firefighter or a backroom clerk at City Hall, speaking

---

[1] "Blue-Br." refers to Appellants' opening brief; "Red-Br." Appellee's response brief; "Pub.Just.Br.," "Ling.Soc'y-Br.," and "Nat'l-Educ.Ass'n-Br." *amici* briefs; and "R._" the district court docket number. Pincites refer to pagination of the original document.

*is* a teacher's job. It's no surprise then that courts have recognized a "school system does not 'regulate' teachers' speech as much as it *hires* that speech." *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007). And that hired speech extends beyond curriculum. A teacher acts as a public employee when he implements "classroom management techniques," *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) (Alito, J.), and when he "t[akes] attendance, supervise[s] students, or regulate[s] their comings-and-goings," *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 967 (9th Cir. 2011).

In Wood's view, a teacher *never* speaks as a public employee when providing a title or pronouns to students at school, no matter the context—in class, on syllabi, in emails about coursework, while meeting one-on-one to discuss grades, or while supervising at school events. But in each circumstance, Wood's speech here is "required by [Wood's] position" or undertaken "in the course of *trying* to perform" Wood's "employment responsibilities." *Alves*, 804 F.3d. at 1164-65. The speech is therefore as a public employee.

Wood suggests personal titles and pronoun are categorically private speech, even if they are provided while fulfilling ordinary duties of a

teacher. *See* Red-Br.10-11, 14-16. Yet this Court has rejected approaches that "parse[]" the employee's speech "too finely." *Abdur-Rahman v. Walker*, 567 F.3d 1278, 1284 (11th Cir. 2009). Under Wood's view, in effect, "certain sentences in a conversation" between teachers and students "[a]re protected, and other sentences [a]re not." *Id.* But that would unreasonably "separate[]" Wood's speech "from the job duties" of a teacher. *Id.* When providing a personal title and pronouns to students—which necessarily is for the students to use to address any teacher—Wood speaks "in the course of performing [Wood's] job." *Alves*, 804 F.3d at 1164.

Nor do the State Defendants try to "redefin[e]" Wood's title and pronouns as "curricular." *Contra* Red-Br.23. There's no need to (though Florida's policy is in part curricular, *infra* pp.25-26 & n.7). The overwhelming weight of authority establishes that teachers speak as public employees when they are not only teaching the curriculum but also casually conversing with students at school. Blue-Br.21-25. If it were otherwise, schools would be powerless to prevent teachers from using profanity, discussing sexually explicit topics, or expressing views that undermine state curriculum.

According to Wood, however, any "[c]ases involving speech about topics other than teachers' identity are not relevant." Red-Br.29. That's not how this works. Litigants can't brush aside decades of precedent simply because that precedent didn't address a specific scenario. Wood's attempt is understandable given the extensive caselaw confirming that a teacher's speech to students is part of that teacher's job. Just because Wood speaks different words doesn't mean Wood isn't still speaking them to students. The difference is irrelevant.

At any rate, courts *have* held that a teacher's use of pronouns with students at school is pursuant to the teacher's official duties and therefore not protected. *See Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 839 (S.D. Ind. 2020); *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1287 (D. Wyo. 2023). It makes no difference that *Willey* and *Kluge* concerned a *student's* pronouns and this case concerns the *teacher's* pronouns. Both scenarios ask the same question: are a teacher's interactions *with* students *at* school part of that teacher's official duties? They are, because "addressing students is necessary to communicate with them and teach them the material." *Kluge*, 432 F. Supp. 3d at 839; *see Willey*, 680 F. Supp. 3d at 1287 (holding

teacher's "interactions with students inside her classroom" and how she "refer[s] to *individual* students" are "pursuant to her official duties"). Students must also address teachers, so the way a teacher directs them to do so is every bit as necessary for teachers to perform their employment duties. Nor can Wood distinguish other cases the State Defendants cited based on the type of speech, *contra* Red-Br.31-32, because they all turn on whether a teacher speaks pursuant to official duties when interacting with students, *see* Blue-Br.21-25. What Wood really asks for is a just-for-teachers'-pronouns-only exception to *Garcetti*.

That the State allows teachers to share "their hometowns, the names of their pets, or their favorite sports teams" says nothing of when teachers speak as employees. *Contra* Red-Br.17. Surely a school could prohibit teachers from espousing racist or antisemitic views when they "introduce themselves to students," even if those views are "a deep-seated part of [the teachers'] identity." Red-Br.17, 23. That's because the teachers share those views as employees pursuant to their official duties.

To be sure, the State Defendants have never suggested that "anything a teacher says at school is automatically government speech." *Contra* Red-Br.18. The State has argued only that providing pronouns and

titles *to students at school* is government speech. The First Amendment is no bar to that.

**2.** Wood frames the test as one of "content" and "context," saying this is a "straightforward application of *Kennedy*." Red-Br.15-17. Yet those considerations were just two of many in the Supreme Court's "practical[]" inquiry of whether Kennedy "engaged in speech 'ordinarily within the scope' of his duties as a coach." *Kennedy*, 597 U.S. at 529. Neither content nor context supports Wood, and *Kennedy*'s other considerations confirm the State Defendants are right.

As to context, Kennedy asserted the right to speak "during a period in which the … coaching staff was free to engage in *all manner of* private speech." *Id.* at 530 (emphasis added). Wood, on the other hand, asserts an unfettered right to speak in every interaction with every student at school. Yet *Kennedy* made clear that teachers may *not* "deliver any message to anyone anytime they wish," including when they "address" students. *Id.* at 527, 530. "[T]eachers and coaches are … government employees paid in part to speak on the government's behalf and convey its intended messages." *Id.* at 527. Caselaw before and after *Kennedy* confirms that. *See* Blue-Br.19-25, 34; *supra* p.1.

As to content, Kennedy "was not seeking to convey a government-created message." *Kennedy*, 597 U.S. at 529. How students should address teachers, however, *is* a government message. Surely schools can require teachers to advise students to address them with honorifics and not their first name. Wood claims Florida "did not 'create' … Wood's message" because "it did not select [Wood's] gender or pick [Wood's] title or pronouns." Red-Br.16. But Florida has created the message teachers convey by selecting the titles and pronouns that are appropriate for them to provide to students—just like a requirement that teachers use honorifics rather than first names. That selection is based on Florida's determination that "sex is an immutable biological trait," consistent with the Supreme Court's longstanding recognition, and that "it is false to ascribe to a person" biologically incongruous pronouns, consistent with longstanding English usage. Fla. Stat. §1000.071(1); *accord* Blue-Br.28, 45-46.

*Kennedy*'s many other considerations—which Wood ignores—likewise support Florida. *See* Blue-Br.31-33. Kennedy "was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach." 597 U.S. at 529-30. Wood seeks unfettered speech with students in all

contexts: instructing students, discussing curriculum, and encouraging better classroom performance—all speech the school pays Wood "to produce as a [teacher]." *Id.* Indeed, the *Kennedy* Court also emphasized that students "were engaged in other activities," which confirmed Kennedy's prayers "were not delivered as an address to the team, but instead in his capacity as a private citizen." *Id.* at 530. Yet Wood's students aren't engaged "in other activities" when Wood addresses them; they are a captive audience. Kennedy also prayed when employees were "free to engage briefly in personal speech and activity"—"call home," "check a text," "socialize," or other "activities." *Id.* at 531. Wood has not shown that teachers are free to do any of those things while speaking with students at school.

**3.** Wood's remaining arguments—all around *Kennedy*—are unavailing. Wood tries to leverage a passing phrase from the opinion into an argument that would eviscerate *Garcetti*. *Kennedy* noted that if "everything teachers and coaches say in the workplace" is "government speech," then "a school could fire a Muslim teacher for wearing a headscarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria." *Id.* It follows, Wood argues, that schools cannot

prohibit teachers from sharing biologically incongruous titles and pronouns with students. Red-Br.15; *see* Red-Br.20-22, 26, 29-31.

This argument misses the passive nature of the speech in *Kennedy* to which the Court analogized. *Kennedy* concerned students simply observing Kennedy's prayers—the "prayers were not delivered as an address" to students. 597 U.S. at 530. Kennedy was not "'actively communicating' with" students. Red-Br.21. Here, a teacher providing titles and pronouns to students is not passively observed by students but directly addressed to them, as Wood recognizes. *See* R.11-1 ¶7. The proper analog to the speech Subsection 3 restricts is not a teacher wearing a hijab but a teacher praying over them at the front of the classroom.

Wood also overlooks that the Court's hypotheticals were grounded in free exercise concerns. The Court explained at the outset of *Kennedy* that "the First Amendment doubly protects religious speech"; "[w]here the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities." 597 U.S. at 523. In the same paragraph as the hypotheticals on which Wood relies, the Court explained that when Kennedy prayed, teachers were free to "engage in any manner of secular

activities." *Id.* at 531. So to prohibit Kennedy from praying "would be to treat religious expression as second-class speech." *Id.*

The same free exercise concerns of neutrality and general applicability arise if a school permits teachers to wear headbands but not hijabs, or jewelry but not cross necklaces, or if a school permits teachers to make phone calls during lunch but not pray over their food. If the Supreme Court's hypotheticals were not grounded in free exercise, then Wood's reading of *Kennedy* would be a keyhole through which teachers could escape *Garcetti* for any type of secular speech observed by students. That cannot be right.

One final point on *Kennedy*. This Court has long recognized that "a teacher's speech can be taken as directly and deliberately representative of the school." *Bishop v. Aronov*, 926 F.2d 1066, 1074 (11th Cir. 1991). Students accordingly could perceive Wood's pronoun usage as government approval of the view that pronouns are not sex based. Blue-Br.27-29. Wood argues that "*Kennedy* rejected using a risk of perception of state endorsement as a reason to censor teachers' speech." Red.Br.24-25. But that came in *Kennedy*'s discussion of the Establishment Clause. 597 U.S. at 538. *Kennedy* issued no such holding in the free speech section of its

decision, much less abrogated circuit precedent that a teacher's speech can be taken as representative of school policy.

## B. Wood's speech is not on a matter of public concern.

Like on the first prong, the State Defendants methodically addressed each factor on whether speech is of public concern—motive, "main thrust," public dissemination, and content, form, and context. Blue-Br.35-40. Wood relies primarily on content to the exclusion of the other factors.

Wood claims biologically incongruous pronouns "communicate" Wood's belief that Wood "is a woman." Red-Br.32. Yet as the district court acknowledged, this is a "self-referential," "personal message[]" about Wood's "personal identit[y]." R.82 at 28-29. And speech that is "personal in nature" is not of public concern. *Renfroe v. Kirkpatrick*, 722 F.2d 714, 715 (11th Cir. 1984) (per curiam). Wood maintains that the speech still is of public concern because usage of titles and pronouns is generally "of public interest." Red-Br.34. This Court's precedents are clear, however, that "the relevant inquiry is not whether the public would be *interested* in the topic of the speech" but "whether the *purpose* of [the employee's] speech was to raise issues of public concern." *Alves*, 804 F.3d at 1167.

Here, "the *point* of [Wood's] speech" is not to raise issues of pronoun usage but "to further [Wood's] purely private interest." *Id.* Wood does not dispute that the desired speech has "purely personal motives" and is "undertaken for personal reasons." Red-Br.37-38. Wood responds instead that focusing on motive "ignore[s] *Kennedy*," since "Kennedy too prayed out of a personal conviction." Red-Br.33, 37; *see* Pub.Just.Br.6-7. But *Kennedy* didn't even address the public-concern prong because the parties "agree[d] that Mr. Kennedy's speech implicates a matter of public concern." 597 U.S. at 528. So *Kennedy* is irrelevant on this prong. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990) (explaining that when the Court "decide[s] particular legal issues while assuming without deciding the validity of antecedent propositions," any "such assumptions … are not binding in future cases that directly raise the questions").

Wood next points to *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). Yet *Meriwether* cannot be divorced from the university context. To start with, the case fell within the Sixth Circuit's "academic freedom" exception to *Garcetti*, under which "professors at public universities" in that circuit—unlike "teachers in primary and secondary schools"—"retain

First Amendment protections at least when engaged in core academic functions, such as teaching." *Id.* at 505 & n.1.

Even still, Wood cites *Meriwether*'s facts section to argue that the professor was motivated by his Christian faith. Red-Br.37-38. But *Meriwether*'s merits discussion did not turn on the issue being personal to the professor. It instead turned on his advocacy in the context of his specific university classroom. "[G]ender identity [was] a hotly contested matter of public concern that 'often' c[ame] up during class discussion in [the professor's] political philosophy courses." 992 F.3d at 506. "Taken in context," the court explained, "the '*point* of his speech' (or his refusal to speak in a particular manner) was to convey a message" that "one's sex cannot be changed." *Id.* at 508. The professor "waded into" and "took a side in" the "political and social debate" over the use of personal titles and pronouns. *Id.* at 508-09. In other words, "the purpose of [his] speech was to raise issues of public concern," whereas Wood admittedly seeks only "to further [Wood's] own private interest." *Alves*, 804 F.3d at 1162; *accord* Blue-Br.35-36.[2]

---

[2] The State does not suggest that a teacher who uses the classroom as a platform for advocacy on social issues would gain First Amendment

Wood's only argument on the "main thrust" factor is that there is "no contradiction" between the idea that Wood's identity is personal yet also of public concern. Red-Br.34. Wood argues that how Wood wants to be addressed is a "matter[] of political or social import." Red-Br.34-35. It is not. Wood conflates a teacher's personal use of pronouns with the broader public debate over pronoun usage. Subsection 3 does not regulate speech on that broader debate. And even if Wood's pronoun usage "alluded to" that debate, the topic alone "does not serve to convert" Wood's pronoun usage into protected speech because it was "not the main thrust of [Wood's] speech." *King v. Bd. of Cnty. Comm'rs*, 916 F.3d 1339, 1347 (11th Cir. 2019); *see Alves*, 804 F.3d at 1167 (holding speech "ostensibly intertwined with" but "only incident to" and "not intended to address a matter of public concern" was unprotected).

Wood claims that courts have "universally concluded" that "transgender government employees' actions in conformance with their gender identities are a matter of public concern," citing two out-of-circuit

---

protection. Here, even if Wood were motivated to advocate on usage of titles and pronouns, that speech would not be protected because the other factors show the speech it not of public concern *and* Wood speaks pursuant to official duties as a teacher.

district court decisions. Red-Br.35-36. But neither decision applied the standards required under this Court's precedent, and neither case concerned personal titles and pronouns. *Monegain v. Department of Motor Vehicles* concerned a transgender employee's "expression of a female identity through feminine dress," 491 F. Supp. 3d 117, 136 (E.D. Va. 2020), and *Kastl v. Maricopa County Community College District*, concerned an employee's "expression of … and change of gender," 2004 WL 2008954, at \*9 (D. Ariz. June 3, 2004). Wood's usage of biologically incongruous pronouns, however, is not an expression of *gender identity* because pronouns reflect *sex*. *See* Blue-Br.28; *infra* pp.20-21.

Wood does not dispute that the desired speech is privately disseminated in a nonpublic context but maintains it still "can be of public concern." Red-Br.39. While "lack of public dissemination is not alone dispositive," it remains "relevant." *King*, 916 F.3d at 1349. And it weighs against Wood here.

Finally, neither Wood nor *amici* cite any support for the argument that Florida's enacting §1000.071 makes a teacher's individual use of biologically incongruous titles and pronouns a matter of public concern. Red-Br.11, 32; Nat'l-Educ.Ass'n-Br.13; Pub.Just.Br.2. Courts regularly

hold that speech concerning regulated subject matters—whether consumer credit reporting or workplace sexual harassment—still is not of public concern. *See, e.g., Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985) (plurality op.); *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993) (per curiam). Accepting Wood's argument would mean speech related to any regulated subject matter automatically meets the public-concern prong.

**C. The State's interests outweigh Wood's.**

At the interest-balancing step (should the Court reach it), Wood tries to impose a higher burden on the State, to discredit the State's interests, and to prove up Wood's interest. Each effort fails.

**1.** Wood's arguments for "higher scrutiny" over regular *Garcetti/Pickering* balancing are misplaced. Subsection 3 does not "compel[]" speech." *Contra* Red-Br.41. It prohibits teachers from using biologically incongruous titles and pronouns. Fla. Stat. §1000.071(3). The law doesn't require Wood to use "Mr." or "he"; Wood can use "Teacher"—as before the district court's injunction—or "Coach" and so on. R.11-1 ¶9.

Even if Subsection 3 could be understood to compel speech, *Garcetti/Pickering* balancing still applies. This Court applied *Pickering* to

compelled speech pre-*Janus*, *see Nicholson v. Gant*, 816 F.2d 591, 599 (11th Cir. 1987) (per curiam), and *Janus* "d[id] not decide" whether "Pickering applies at all to compelled speech," *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 908 (2018). This Court's precedent thus remains controlling. Courts also continue to apply *Pickering* to compelled speech after *Janus*. *See Meriwether*, 992 F.3d at 509; *Willey*, 680 F. Supp. 3d at 1286-87 ("clear majority of courts to address the issue have concluded *Pickering* still applies" (collecting cases)).

Nor does *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995), impose a higher burden. *Contra* Red-Br.42-43. The Court there applied a higher burden "[b]ecause the vast majority of the speech" did "not involve the subject matter of Government employment" and took "place outside the workplace." 513 U.S. at 470. The opposite is true here—the title and pronouns that Wood provides to students concern employment because teaching requires students to address Wood, *see* R.11-1 ¶¶7, 15, and Subsection 3 regulates only speech in the workplace, Fla. Stat. §1000.071(6); *see Willey*, 680 F. Supp. 3d at 1287 n.19 (holding "*NTEU* does not apply" because the speech would not "take place outside the workplace").

Finally, Wood's resort to prior restraint cases is unavailing. Red-Br.43-44. Courts have found "no logical reason to think that the existence of some element of prior restraint should remove a restriction on employee speech from the usual *Pickering* approach." *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1440 (D.C. Cir. 1996); *accord Farhat v. Jopke*, 370 F.3d 580, 598 (6th Cir. 2004).

**2.** Wood does not dispute the importance of the State's asserted interests. Blue-Br.46-47. Wood instead argues only that Subsection 3 "does not advance" them. Red-Br.46-47. But the State's interests need only be "potentially implicated," not "narrowly tailored." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 678 (1996); *see Daunt v. Benson*, 956 F.3d 396, 419 (6th Cir. 2020). And the State's interests are more than potentially implicated here. *See* Blue-Br.45-50.

**a.** The State's first interest is advancing education policy that "sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Fla. Stat. §1000.071(1). In other words, pronouns and personal titles correspond to sex. That has been the correct English usage for centuries and remains so today. *See, e.g.*, *American Heritage Dictionary* 314, 760, 763 (4th ed.

2001) (defining "she" as "female," "female" as "member of the female sex," and "sex" as "property or quality by which organisms are classified on the basis of their reproductive organs"); Noah Webster, *American Dictionary of the English Language* (1828) (defining "he" as "male," "male" as "the sex that procreates young," "female" as the "one of that sex which conceives and brings forth young," and "sex" as "[t]he distinction between male and female"); *see also Collins English Dictionary* 215, 272, 356, 528, 530 (1st ed. 2006); *The Merriam-Webster Dictionary* 264, 330, 433, 658-59, 661 (Int'l ed. 2016); *A Modern Dictionary of the English Language* 435, 655, 759 (2d ed., Macmillan & Co. 1911); *accord* Blue-Br.28. Florida's policy is that such usage remains correct and teachers should use pronouns correctly pursuant to that policy. In addition, Florida (like the Supreme Court) recognizes that "sex, like race and national origin, is an immutable characteristic." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807 (11th Cir. 2022) (en banc) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.)).

Two things happen when a teacher uses titles and pronouns that don't correspond to the teacher's sex. *First*, that usage is incorrect because it goes against centuries of English defining pronouns as aligning

with sex. *Second*, because pronouns align with sex, a teacher who uses pronouns that contradict someone's sex suggests that sex is a mutable trait. Blue.Br.47-48, 52. Florida passed Subsection 3 to ensure the policies in §1000.071(1) are effected. Subsection 3 ensures (1) that teachers use pronouns correctly with students and (2) that teachers do not undermine the State's position that sex is immutable with students.

Wood has several responses for why Wood believes Subsection 3 does not advance the State's interests. *First*, Wood disagrees with Florida's policy choice. Wood thinks that "pronoun use does not make claims about a person's biology." Red-Br.45. Wood is free to think that pronouns aren't used to indicate a person's sex. But Wood is not free to override Florida's educational policy choice just on bare disagreement with it. And to the extent it matters, dictionaries have long credited Florida's view, Blue-Br.28; *supra* pp.20-21, and Wood cites no dictionaries providing otherwise. *See, e.g.*, *United States v. Lopez*, 590 F.3d 1238, 1248 (11th Cir. 2009) (explaining dictionaries evidence "ordinary meaning" and "common usage").[3]

---

[3] Florida's cited dictionaries are not "selective" or "misleading." *Contra* Ling.Soc'y-Br.14-16. Many other dictionaries show pronouns are

*Second*, Wood suggests that "longstanding English usage" is not, in fact, that pronouns align with sex because some court opinions have gone against that usage. Red-Br.45-46. But opinions of this Court and countless others have stuck to biologically congruous pronouns. *See, e.g.*, *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 795 n.1 (11th Cir. 2016) (using "masculine pronouns" despite petitioner's use of "feminine pronouns in referring to himself"); *United States v. Varner*, 948 F.3d 250, 254-58 (5th Cir. 2020); *United States v. Thomason*, 991 F.3d 910, 914-15 (8th Cir. 2021).[4] This Court and others have also done so specifically to avoid "confusion."

---

sex based. *Supra* pp.20-21. It is *amici* who "cherry-pick[]," relying on one subordinate definition from an outlier online dictionary that was added only recently. *See* Ling.Soc'y-Br.16 (citing *Female*, *Merriam Webster Dictionary Online*); Jack Wolfsohn, *Merriam-Webster Changes the Definition of 'Female'*, Nat'l Rev. (July 19, 2022), https://perma.cc/J6EE-PVET.

[4] *See also, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 829, 832, 848, 851 (1994); *id.* at 852 (Blackmun, J., concurring); *Gibson v. Collier*, 920 F.3d 212, 217 & n.2 (5th Cir. 2019); *Praylor v. Tex. Dep't of Crim. Just.*, 430 F.3d 1208, 1208-09 (5th Cir. 2005) (per curiam); *White v. Farrier*, 849 F.2d 322, 323 (8th Cir. 1988); *Supre v. Ricketts*, 792 F.2d 958, 959 n.1 (10th Cir. 1986); *Howard v. Ga. Dep't of Corr.*, 2010 WL 3614159, at *1 (M.D. Ga. July 7, 2010); *Konitzer v. Frank*, 711 F. Supp. 2d 874, 877 n.1 (E.D. Wis. 2010); *Kollins v. S.C. Dep't of Mental Health*, 2007 WL 790010, at *1 n.3 (D.S.C. Mar. 14, 2007).

*Jeune*, 810 F.3d at 796 n.1; *Thomason*, 991 F.3d at 914; *see Varner*, 948 F.3d at 257-58 (describing "quixotic undertaking").[5]

*Third*, Wood tries misdirection. Wood says that "State Defendants have previously argued" that "pronouns are wholly divorced from biological sex." Red-Br.46. That is both a misquote and an out-of-context snippet of Florida's arguments on Wood's Title VII claim below. The State Defendants argued that while "*Bostock* found that 'transgender status [is] inextricably bound up with sex,' … transgender pronoun usage is not." R.60 at 20 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 660-61 (2020)). That's because "transgender persons' concept of pronouns is wholly divorced from biological sex in a way that transgender *status* cannot be"—"transgender persons' pronouns can match their sex, match the opposite sex, go back and forth between the two, or match no sex at all."

---

[5] *See also, e.g.*, *Hood v. Dep't of Child. & Fams.*, 2014 WL 757914, at *1 n.1 (M.D. Fla. Feb. 26, 2014); *Stevens v. Williams*, 2008 WL 916991, at *1 n.3 (D. Or. Mar. 27, 2008); *Barnhill v. Cheery*, 2008 WL 759322, at *1 n.4 (M.D. Fla. Mar. 20, 2008); *Kosilek v. Maloney*, 221 F. Supp. 2d 156, 158 & n.1 (D. Mass. 2002); *Long v. Nix*, 877 F. Supp. 1358, 1360 (S.D. Iowa 1995); *State v. Tabberer*, 626 S.W.3d 274, 277 n.2 (Mo. Ct. App. 2021); *Hobdy v. State*, 2019 WL 3755781, at *1 n.1 (Tex. Ct. App. Aug. 8, 2019); *Tipsword v. Tipsword*, 2013 WL 1320444, ¶1 n.1 (Ariz. Ct. App. Apr. 2, 2013).

*Id.* Florida has never argued that pronouns themselves "are wholly divorced from biological sex."

*Fourth*, Wood argues that Subsection 3 "does little, if anything," to advance Florida's education policy because co-workers can address Wood with feminine titles and pronouns. Red-Br.47. But the First Amendment imposes no "'underinclusiveness' limitation." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992). "A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). The Legislature reasonably concluded that teachers' offering biologically incongruous pronouns to students posed the greatest threat to undermining Florida education policy. That conclusion is entitled to deference. *Umbehr*, 518 U.S. at 676, 678.

*Fifth*, Wood argues that Florida has "no curricular interest" attendant to its educational policy on the immutability of sex because Florida has no "curriculum of teaching that titles and pronouns are inextricably linked with biology." Red-Br.27, 45; *see* Ling.Soc'y-Br.5. But Florida education standards have long emphasized that students "[u]se pronouns correctly" and "[a]ppropriately." Florida's B.E.S.T. Standards: English

Language Arts 39, 64 (2020), https://perma.cc/FS9W-WZCZ; *see also* Florida ELA Appendices 99 (2019), https://perma.cc/3EDZ-Z3SB ("'The girl' is replaced with the pronoun 'She'.").[6] And correct and appropriate use of pronouns turns on one's sex. *See supra* pp.20-21; *accord* Blue-Br.28.

Wood otherwise misconstrues Florida's curriculum laws. Florida law prohibits teaching that "*gender identity* is immutable based on biological traits." R.77-1 at 4 (emphasis added). In other words, Florida prohibits teaching students that a person's gender identity cannot change or differ from that person's sex. That's a wholly different issue than whether, definitionally, pronouns align with sex.[7]

Subsection 3 simply prevents teachers from expressing messages to students that undermine state education policy and curriculum on the

---

[6] The Court may take judicial notice of government-issued, publicly available documents. *See United States v. Howard*, 28 F.4th 180, 186 n.2 (11th Cir. 2022).

[7] In any event, §1000.071(1) is not "the only state policy possibly contradicted by … Wood's title and pronoun use." *Contra* Red-Br.28. That policy dovetails Florida's health education curriculum, which requires that schools classify males and females based on sex during health education. Fla. Stat. §§1003.46(2)(a), 1000.21(7); Blue-Br.46. Teachers using biologically incongruous titles and pronouns undermines that curricular objective too.

immutable nature of sex and correct pronoun usage. To hold that Subsection 3 does not sufficiently implicate the State's interest would leave Florida powerless to protect the integrity of its education system.

**b.** The State's second interest is to prevent confusion among students over the meaning and usage of pronouns that can disrupt classrooms and the teaching of core subjects. Blue-Br.46. Wood claims legislators' confusion concerns arose only from "nonbinary pronouns" and not "pronoun usage of transgender women." Red-Br.47-48. Yet legislators expressed concerns about biologically incongruous pronouns—explaining such usage is inconsistent with "grammar." Blue-Br.10.

By insisting the State provide "evidence" or "concrete example[s]" of confusion or disruption, Red-Br.49-50, Wood tries to flip the evidentiary burden. "The government's legitimate interest in avoiding disruption does not require proof of actual disruption," *Moss v. City of Pembroke Pines*, 782 F.3d 613, 622 (11th Cir. 2015), and "substantial weight" is given "to government employers' *reasonable predictions* of disruption," *Green v. Finkelstein*, 73 F.4th 1258, 1268 (11th Cir. 2023); *accord* Blue-Br.51. In other words, the "particularized showing" that Wood demands "is not required." *Shahar v. Bowers*, 114 F.3d 1097, 1108 (11th Cir. 1997)

(en banc). And the Legislature's predictions of confusion and disruption from teachers' usage of biologically incongruous pronouns were reasonable. Blue-Br.9-11. As noted, countless courts have recognized confusion arising from usage of biologically incongruous pronouns. *Supra* pp.23-24 & n.5. Wood's own counsel demonstrated that confusion in failing to keep straight a co-plaintiff's preferred pronouns. *See* R.80 at 34:18-21.

Wood, moreover, cannot discredit the State's predictions of confusion and disruption in this pre-enforcement posture. *Contra* Red-Br.50-51. The cases Wood cites concerned employees who spoke and were disciplined, so the courts could assess actual and not just potential disruption. *See Berdin v. Duggan*, 701 F.2d 909, 912 (11th Cir. 1983) (noting "onlooking fellow workers continued work as usual"); *Kent v. Martin*, 252 F.3d 1141, 1145-46 (10th Cir. 2001) (noting "reasonable prediction of disruption" is "inapplicable" when employer permits employee "to continue to work after the protected expression"). Because Wood has not been disciplined for noncompliance with Subsection 3, the reasonable-prediction-of-disruption standard applies. And Wood's declaration does not discredit the State's predictions; it confirms student confusion and disruption from

Wood's usage of biologically incongruous pronouns. *See* R.11-1 ¶ 7; *accord* Blue-Br.48-49.

**3.** Wood still cites no authority supporting an interest in using biologically incongruous titles and pronouns. No court has "specifically held" that transgender government employees "have a strong interest in using [them] at work." *Contra* Red-Br.54. The two cases Wood cites don't even mention use of titles and pronouns; they concerned expression of gender identity through physical appearance. *See Monegain*, 491 F. Supp. 3d at 128 (noting plaintiff's "presenting as a woman" through "clothing, makeup, body styling and hair styling"); *Kastl*, 2004 WL 2008954, at *9 n.13 (noting plaintiff's "dressing in a typically female manner"). But personal titles and pronouns are an expression of sex, not gender identity. *See supra* pp.20-21.

Wood's reliance on "feelings of disgust," "pain[]," and "betrayal" from not using a biologically incongruous title, Red-Br.52—purely personal concerns—only undermine Wood's asserted interest. *See Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1324 (11th Cir. 1989) (noting diminished interest because nature of speech had "an element of per-

sonal as opposed to public interest"). And that the context of Wood's desired speech is not "one of bringing the matter to the attention of the public to prompt public discussion" confirms Wood's "interest is not a strong one." *Gresham v. City of Atlanta*, 542 F. App'x 817, 819-20 (11th Cir. 2013) (per curiam).

## II. Wood's delay in seeking preliminary injunctive relief undermines any suggestion of irreparable harm.

Even if Wood showed likely success on the merits, Wood fails to justify the seven-month delay in seeking preliminary relief. Wood first argues that a likely First Amendment violation is always and automatically irreparable harm—full stop. Red-Br.54-55. That view is inconsistent with equitable principles and precedent.

"[T]raditional equitable principles do not permit such broad classifications" or "categorical rule[s]." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393 (2006). Any injunction "is a matter of equitable discretion." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). And "[a]s a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam).

Courts still "must also consider" whether the movant "is likely to suffer irreparable harm." *Id.*

First Amendment claims are no exception. This Court has long recognized that a First Amendment violation "may be *presumed* to cause irreparable injury." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc) (emphasis added). Indeed, "several" circuits hold that "there is no *per se* rule that a violation of freedom of expression *automatically* constitutes irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006). Courts still must "exercise[] [their] discretion in light of the facts of the case" and "not simply apply a categorical rule." *Hoop Culture, Inc. v. GAP Inc.*, 648 F. App'x 981, 985 (11th Cir. 2016) (per curiam).

The presumption of irreparable harm is rebuttable, *e.g.*, *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021)—otherwise it would not be a presumption but a "categorical rule," *eBay*, 547 U.S. at 393. And a plaintiff's delay in seeking preliminary injunctive relief "necessarily undermines a finding of irreparable harm," *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016), which can rebut the presumption, Blue-Br.55-56. Otherwise, a plaintiff could wait *years* to challenge a law and

still obtain a preliminary injunction without having to justify his delay merely because he established a likely First Amendment violation.

Wood next claims that delay should be measured "from the filing of the complaint" because this Court's decisions have used that measure. Red-Br.56. But in those cases, the delay from the filing of the complaint "*by itself*, fatally undermined any showing of irreparable injury"; the court didn't need to consider delay beyond that. *Wreal*, 840 F.3d at 1248 (emphasis added); *see Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, 2023 WL 3704912, at *3 (11th Cir. May 30, 2023) (per curiam); *Citizens Concerned About Our Child. v. Sch. Bd. of Broward Cnty.*, 193 F.3d 1285, 1290 (11th Cir. 1999) (per curiam). Where, as here, the alleged harm flows from a statute, the appropriate measure is the enactment date, as the district court recognized. R.82 at 48-49; *see, e.g.*, *Adventist Health Sys./Sunbelt, Inc. v. HHS*, 17 F.4th 793, 806 (8th Cir. 2021).

Wood has not offered a legitimate "explanation" or "justification" for the seven-month delay. *Wreal*, 840 F.3d at 1248. Wood simply repeats the justifications the district court cited without responding to the State's arguments that they were based on a clearly erroneous factual finding and

incorrect legal standards. *See* Red-Br.59-61. Like the district court, Wood cites no authority that first trying to get officials to ignore the law justifies delay in seeking relief. Blue-Br.57. And even if such efforts could justify delay, Wood's declaration describes further delay of several months after those efforts failed. Blue-Br.57-58. Nor does Wood provide any support for the district court's concerns over the pre-enforcement posture, which were based on incorrect legal standards. Blue-Br.58-59. And while Wood continues to claim no "sophisticated legal knowledge," Red-Br.60, Wood conceded below that no cases recognize that as a legitimate justification, R.80 at 31:19-23.

## CONCLUSION

The district court's order should be reversed and the preliminary injunction vacated.

Dated: August 14, 2024          Respectfully submitted,

/s/ Bryan Weir
Bryan Weir
Daniel Shapiro
Daniel M. Vitagliano*
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
bryan@consovoymccarthy.com
daniel@consovoymccarthy.com
dvitagliano@consovoymccarthy
.com

*Supervised by principals of the firm
admitted to practice in VA*

*Counsel for Defendants-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 32(a)(7) because it contains 6,491 words, excluding the parts that can be excluded. It also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word in 14-point Century Schoolbook font.

Dated: August 14, 2024

*/s/ Bryan Weir*
*Counsel for*
*Defendants-Appellants*

**CERTIFICATE OF SERVICE**

I filed this brief with the Court via ECF, which will email everyone requiring notice.

Dated: August 14, 2024

*/s/ Bryan Weir*
*Counsel for*
*Defendants-Appellants*